FILED

ppm

2015 AUG -5 PM 2: 33

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA *ex rel.*
PAULA C. LORONA,

Case No.: 3:15-CV-959-J-34JRK

Plaintiff,

vs.

**FILED UNDER SEAL**

INFILAW CORPORATION, a Delaware
Corporation, ARIZONA SUMMIT LAW
SCHOOL, LLC, a Delaware limited
liability company, FLORIDA COASTAL
SCHOOL OF LAW, a Florida corporation,
CHARLOTTE SCHOOL OF LAW, a
Delaware limited liability company,

**Pursuant to 31 U.S.C. § 3730(b)(2)**

Defendants.

_____ /

**COMPLAINT OF QUI TAM PLAINTIFF PAULA C. LORONA**
**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. §§ 3729 *et seq.***

Plaintiff Paula C. Lorona by her undersigned attorneys, on behalf of the United

States of America, states the following as her Complaint based upon her non-public,

indirect and independent knowledge:

**I. INTRODUCTION**

1.     This action is brought by Plaintiff/Relator Paula C. Lorona ("Lorona") on

behalf of the United States of America to recover compensatory and punitive damages

and civil penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.      The United States of America shall hereinafter be referred to as the "Government Plaintiff."

## II. PARTIES

3.      Lorona is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was either employed by Arizona Summit Law School ("ASLS" or "the School"), formerly known as Phoenix School of Law, in Phoenix, Arizona or enrolled as a student at ASLS.

4.      Defendant ASLS is a for-profit Delaware limited liability company with its primary place of business in Phoenix, Arizona.

5.      Defendant Charlotte School of Law ("CSL") is a for-profit Delaware limited liability company with its primary place of business in Charlotte, North Carolina.

6.      Defendant Florida Coastal School of Law ("FCSL") is a for-profit Florida corporation with its primary place of business in Jacksonville, Florida.

7.      Defendant Infilaw Corporation ("Infilaw") is a Delaware corporation with a primary place of business in Naples, Florida, and conducts business activities in the Defendant States.

8.      Infilaw is the parent company of ASLS, CSL, and FCSL (collectively, the "Defendant Schools").

9.      At all relevant times Infilaw dominated the business operations of the Defendant Schools.

10.     Infilaw made and directed all significant business decisions of ASLS. For example, when certain members of ASLS's faculty and staff expressed concern about the

2

caliber of students being admitted to ASLS, ASLS President Scott Thompson responded in a meeting attended by Lorona that he had been "instructed to put asses in seats."

11.    Infilaw controlled all the finances of ASLS and, upon information and belief, of CSL and FCSL.

12.    Infilaw controlled and managed the budget and budgeting process of ASLS and, upon information and belief, of CSL and FCSL .

13.    All promotions, raises for performance reviews and any other incentives at ASLS and, upon information and belief, at CSL and FCSL, had to be approved by Infilaw.

14.    Infilaw also had to approve ASLS' and, upon information and belief, CSL's and FCSL's annual budget.

15.    Infilaw processed and maintained control of ASLS' and, upon information and belief of CSL's and FCSL's payroll.

16.    Infilaw controlled and managed 401k and all other benefits of ASLS and, upon information and belief, of CSL and FCSL employees, including tuition waivers for students who were also employees.

17.    Infilaw reviewed, approved (or disapproved) and disbursed reimbursement for corporate credit cards and expenses paid by individual employees while traveling for ASLS and upon information and belief for CSL and FCSL.

18.    Infilaw is accordingly liable not only for its own misconduct, but is liable for the misconduct of the Defendant Schools as alleged herein.

**III. JURISDICTION AND VENUE**

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

20.     This Court also has jurisdiction because pursuant to 31 U.S.C. §3730(e) of the Federal False Claims Act, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

21.     However, if this Court finds that a statutorily relevant public disclosure has occurred, Lorona qualifies as an "original source" of the allegations in all complaints filed by Lorona, as that term is defined by 31 U.S.C. § 3730(e)(4)(A) and (B), even if a statutorily relevant public disclosure has occurred within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

22.     On June 3, 2015, Relator Lorona provided documentation relating to this complaint to the Inspector General's Hotline – Office of Inspector General ("OIG"), United States Department of Education ("DOE").

23.     On July 17, 2015, Relator Lorona met with an Assistant United States Attorney ("AUSA") from the United States Department of Justice ("DOJ") – United States Attorney's Office ("USAO"), Middle District of Florida to discuss her allegations as set forth in this complaint.

24.     On July 17, 2015, Relator Lorona provided to the AUSA of the Middle District of Florida a draft of this Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. §3730(b)(2).

4

25. On August 5, 2015, Relator Lorona concurrently provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of this Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

26. This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside, and transact business in this District.

27. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Infilaw and FCSL transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a).

## IV. BACKGROUND

### A. FALSE CLAIMS ACT, 31 U.S.C. § 3729, ET SEQ.

28. The False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. imposes liability on any person or corporation that:

> A) knowingly presents or causes to be presented a false or fraudulent claim to the United States government for payment or approval[1];
>
> B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States government[2]; and/or

---

[1] 31 U.S.C. § 3729(a)(1)(A)

C) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid[3].

29.     Proof of specific intent is not required[4].

30.     The FCA provides that any person who violates any of its provisions is liable not just for return of all payments falsely made, but also for civil penalties of up to $11,000 per false claim, and for treble damages sustained by the government[5].

31.     The FCA further provides that any person with direct and original knowledge of false claims submitted to the United States by a person or corporation may bring an action on behalf of the United States and may obtain a share of the damages and civil penalties recovered by the United States[6].

**B. TITLE IV / HIGHER EDUCATION ACT – 34 C.F.R. Parts 668,** *et seq.*

32.     The Title IV/Higher Education Act ("HEA") under 34 C.F.R. Parts 668, *et seq.* requires that an institution "will meet the requirements established by... accrediting agencies or associations...." 34 C.F.R. 668.14(b)(23).

33.     Under 34 C.F.R. 668.1, as used in this part, an "institution" includes—

(1) An institution of higher education as defined in 34 C.F.R. § 600.4;

(2) A proprietary institution of higher education as defined in 34 C.F.R. § 600.5; and

---

[2] 31 U.S.C. § 3729(a)(1)(B)
[3] 31 U.S.C. §§ 3729(a)(1)(C - G)
[4] 31 U.S.C. § 3729(b)(1)(B)
[5] 31 U.S.C. § 3729(a)(1)
[6] 31 U.S.C. § 3730

(3) A postsecondary vocational institution as defined in 34 C.F.R. § 600.6.

34.    Title IV / HEA applies to for-profit schools under 34 C.F.R. § 600.5 receiving Title IV funds and to proprietary institutions that become non-profit.

35.    Accordingly, these requirements are a prerequisite for an institution's eligibility to request and receive Title IV/HEA funds.

36.    Under 34 C.F.R. § 668.71(b), Title IV/HEA prohibits an institution from engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."

37.    Title IV/HEA requires that a for-profit "institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds." 34 C.F.R. § 668.14 (16).

38.    The ninety percent (90%) revenue derived from Title IV funds and the ten percent (10%) derived from other sources is commonly known as the "90/10 Rule."

39.    These institutions must calculate income using the cash basis of accounting for purposes of the 90/10 Rule reporting under 34 C.F.R. § 668.28(a)(2).

40.    Their income includes without limitation tuition, fees, other institutional charges, and school activities *necessary* and *required* for students enrolled in those programs. The activities conducted by the institution are considered necessary for education and training students, if they are a) conducted on campus or the faculty is under school control; b) are performed under supervision of a member of the school's faculty;

7

and, c) are **required to be performed by all students in a specific program at the institution**[7].

41.    Revenue generated from institutional aid can be counted as revenue under 34 C.F.R. § 668.28(a)(5):

> (i) For loans made to students and credited in full to the students' accounts at the institution on or after July 1, 2008 and prior to July 1, 2012, include as revenue the net present value of the loans made to students during the fiscal year, as calculated under paragraph (b) of this section, if the loans—
>> (A) Are bona fide as evidenced by standalone repayment agreements between the students and the institution that are enforceable promissory notes;
>> (B) Are issued at intervals related to the institution's enrollment periods;
>> (C) Are subject to regular loan repayments and collections by the institution; and
>> (D) Are separate from the enrollment contracts signed by the students.
> (ii) For loans made to students before July 1, 2008, include as revenue only the amount of payments made on those loans that the institution received during the fiscal year.
> (iii) For loans made to students on or after July 1, 2012, include as revenue only the amount of payments made on those loans that the institution received during the fiscal year.

## C. AMERICAN BAR ASSOCIATION ACCREDITATION

42.    The American Bar Association's ("ABA") is "one of the world's largest voluntary professional organizations, with nearly 400,000 members and more than 3,500 entities."[8]

43.    On its website, the ABA states that "it is committed to doing what only a national association of attorneys can do: serving our members, improving the legal

---

[7] 34 C.F.R. §§ 668.28(a)(3)(ii)(A-C) (emphasis added).

[8] http://www.americanbar.org/about_the_aba.html

profession, eliminating bias and enhancing diversity, and advancing the rule of law throughout the United States and around the world."

44.    The ABA is the accrediting organization for all law schools in the United States.

45.    Under 34 C.F.R. § 602, *et seq.*, the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar are recognized by the United States DOE as the accrediting agency for programs that lead to the Juris Doctor degree[9].

46.    The ABA has promulgated rules governing the application and acceptance of a law school into the accrediting body.

47.    Under ABA Standard 101, BASIC REQUIREMENTS FOR APPROVAL:

     (a) A law school seeking approval by the Council shall demonstrate that it is being operated in compliance with the Standards.

48.    Furthermore, under ABA Standard 301(a), the ABA has defined the objectives of a program of legal education to include:

     (a) A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession[10].

49.    The ABA not only monitors provisional school applicants, but continues to monitor those schools who have been approved for ABA accreditation.

---

[9] See also the ABA's Law School Accreditation Process brochure attached hereto as Exhibit 1 and incorporated herein by this reference.

[10] The 2014-15 ABA Accreditation standards are attached hereto as Exhibit 2 and incorporated herein by this reference.

9

50.    For example, under ABA Standard 316, the ABA monitors schools' bar passage rates, stating:

> (a) A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:
>> (1) That for students who graduated from the law school within the five most recently completed calendar years:
>>> (i) 75 percent or more of these graduates who sat for the bar passed a bar examination; or
>>> (ii) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.
>>> In demonstrating compliance under sections (1)(i) and (ii), the school must report bar passage results from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency.
>> (2) That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.
>> In demonstrating compliance under section (2), the school must report first-time bar passage data from as many jurisdictions as necessary to account for at least 70 percent of its graduates each year, starting with the jurisdiction in which the highest number of graduates took the bar exam and proceeding in descending order of frequency. When more than one jurisdiction is reported, the weighted average of the results in each of the reported jurisdictions shall be used to determine compliance.

51.    The ABA also proscribes requirements for the students admitted to accredited law schools.

52.    Under ABA Standard 501:

> (a) A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education.
> (b) *A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.*
> (c) A law school shall not admit or readmit a student who has been disqualified previously for academic reasons without an affirmative showing that the prior disqualification does not indicate a lack of capacity to complete its program of legal education and be admitted to the bar. For every admission or readmission of a previously disqualified individual, a statement of the considerations that led to the decision shall be placed in the admittee's file.

53.     Additionally, the ABA proscribes methodologies for determining whether a student meets ABA Standard 501.

54.     Under Standard 503[11], the ABA defines the requirements for an admission test:

> A law school shall require each applicant for admission as a first-year J.D. degree student to take a valid and reliable admission test to assist the school and the applicant in assessing the applicant's capability of satisfactorily completing the school's program of legal education. In making admissions decisions, a law school shall use the test results in a manner that is consistent with the current guidelines regarding proper use of the test results provided by the agency that developed the test.

55.     The ABA also delineates standards and requirements for accredited schools to follow regarding student loans and student loan defaults.

---

[11] Additionally, in an Interpretation to 503-1, the ABA states "A law school that uses an admission test other than the Law School Admission Test sponsored by the Law School Admission Council shall demonstrate that such other test is a valid and reliable test to assist the school in assessing an applicant's capability to satisfactorily complete the school's program of legal education."

11

56.     Additionally, the ABA recognizes that Title IV/HEA compliance is of utmost importance.

57.     Under ABA Standard 507 and the ABA's interpretation therein:

A law school shall demonstrate reasonable steps to minimize student loan defaults, including provision of debt counseling at the inception of a student's loan obligations and again before graduation.

Interpretation 507-1
The student loan default rates of a law school's graduates, including any results of financial or compliance audits and reviews, are relevant in assessing the extent to which a law school complies with this Standard.

Interpretation 507-2
For a law school not affiliated with a university, the school's student loan cohort default rate is sufficient if it is not greater than 10% for any of the three most recently published annual cohort default rates.
*Failure to comply with Title IV of the Higher Education Act of 1965, as amended, or having a student loan cohort default rate greater than the rate permitted by Title IV is cause for review of a law school's compliance with the Standards.* A school shall demonstrate that it has resolved all areas of deficiency identified in financial or compliance audits, program reviews, or other information provided by the United States Department of Education.

58.     Additionally, the ABA requires law schools to disclose certain information relating to their student body and the graduation statistics therein.

59.     Under ABA Standard 509, Required Disclosures:

(a) All information that a law school reports, publicizes, or distributes shall be complete, accurate and not misleading to a reasonable law school student or applicant. A law school shall use due diligence in obtaining and verifying such information. Violations of these obligations may result in sanctions under Rule 16 of the Rules of Procedure for Approval of Law Schools.

12

## V.    GENERAL ALLEGATIONS

### A. EMPLOYMENT OF RELATOR LORONA BY ASLS AND INFILAW

60.    Lorona was hired by ASLS in November 2009 as an administrative assistant and received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

61.    Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds through the federal database COD.

62.    Upon Lorona's submission of such a request, the U.S. Department of Education would deposit the requested funds in ASLS's bank account at SunTrust. Each night SunTrust would then sweep those funds to the account of Infilaw.

63.    Lorona also made disbursements to students of the funds received from the Department of Education. She accomplished this by creating and uploading a file to SunTrust's website. SunTrust would then transfer from the account of Infilaw to the account of ASLS funds sufficient to cover the disbursement.

64.    As an employee, Lorona was given a full tuition waiver to attend ASLS' law school, beginning twelve (12) months after full-time employment and continuing throughout employment.

65.    One of the factors Lorona considered when accepting employment with ASLS was the full tuition waiver described above, and in fact, based on her job performance Lorona was permitted a pro rata early tuition waiver starting at nine (9) months into her employment with ASLS.

66.     Before her employment, Lorona reviewed ASLS' evening school plan, ASLS' publically marketed statistics of school completion, and ASLS' bar passage rates, among other factors, and decided that ASLS would be a good place for her to work and attend school.

67.     In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

68.     Throughout her employment, Lorona received excellent employee reviews and was offered the opportunity for advancement commensurate with her skills and experience.

69.     In or about March 2013, ASLS terminated Lorona's employment unexpectedly.

## B. DEFENDANTS SCHEME TO CIRCUMVENT THE 90/10 RULE REQUIREMENTS

70.     In or about early 2010, Defendants became concerned that they might not be able to meet the 90/10 rule requirements under Title IV/HEA because a large proportion of the students attending the Defendant Schools were receiving  very substantial Title IV/HEA loans (the "Infilaw 90/10 Problem").

71.     In or about early 2010 up to and including early 2013, Lorona participated in nearly weekly Friday meetings with other Defendant Schools and Infilaw employees including without limitation Alicia Togno, Debbie Richards, Shirley Mays, Penny Willrich, Scott Thompson, Jim Lemire, Denise Barlow, CSL representatives (via phone), FCSL representatives (via phone), and Infilaw (via phone) wherein the topic of conversation centered solely around how to increase non Title IV/HEA revenue in order

14

to appear as if the law schools owned by Infilaw were meeting the 90/10 rule requirements.

72.    As part of the discussion, the Infilaw leadership team stated that they would like to see schools actually attempt to make it appear they were closer to eighty percent (80%) Title IV/HEA funding and twenty percent (20%) non Title IV/HEA revenue.

73.    In these meetings, the proposition of offering Institutional Loans ("IL") to students was discussed as a solution to the Infilaw 90/10 Problem.

### 1. SUBSTANTIAL REVENUE REALIZED BY THE DEFENDANT SCHOOLS

74.    Publicly available reports[12] regarding proprietary school 90/10 revenue percentage from the DOE report only through the 2012-13 funding year, but the statistics show a staggering amount of revenue realized by the Defendant Schools and provide a backdrop for why it was so important that the Defendant Schools do anything in their power to keep the funding stream alive.

75.    In the 2009-10 funding year, ASLS (formerly Phoenix School of Law) reported an 84.25% / 15.75% split under the 90/10 rule and reported Title IV/HEA revenue of $22,111,393.00.

76.    In the 2009-10 funding year, FCSL reported an 82.94% / 17.06% split under the 90/10 rule and reported Title IV/HEA revenue of $65,758,846.00.

---

[12] Found at: https://studentaid.ed.gov/sa/about/data-center/school/proprietary.

77.    In the 2009-10 funding year, CSL reported Title IV/HEA revenue of $19,224,762.00. Publicly available reporting does not depict CSL's 2009-10 90/10 split.

78.    In the 2010-11 funding year, FCSL reported an 85.88% / 14.12% split under the 90/10 rule and reported Title IV/HEA revenue of $77,452,430.00.

79.    In the 2010-11 funding year, CSL reported an 85.19% / 14.81% split under the 90/10 rule and reported Title IV/HEA revenue of $35,520,138.00.

80.    In the 2010-11 funding year, ASLS (formerly Phoenix School of Law) reported an 87.94% / 12.06% split under the 90/10 rule and reported Title IV/HEA revenue of $36,880,536.00

81.    In the 2011-12 funding year, ASLS (formerly Phoenix School of Law) reported an 87.49% / 12.51% split under the 90/10 rule and reported Title IV/HEA revenue of $50,213,782.00.

82.    In the 2011-12 funding year, FCSL reported an 85.6% / 14.4% split under the 90/10 rule and reported Title IV/HEA revenue of $82,099,054.00.

83.    In the 2011-12 funding year, CSL reported an 86.53% / 13.47% split under the 90/10 rule and reported Title IV/HEA revenue of $52,027,080.00.

84.    In the 2012-13 funding year, ASLS reported an 87.70% / 12.30% split under the 90/10 rule and reported Title IV/HEA revenue of $60,030,378.00.

85.    In the 2012-13 funding year, FCSL reported an 86.63% / 13.37% split under the 90/10 rule and reported Title IV/HEA revenue of $78,751,382.00.

86.    In the 2012-13 funding year, CSL reported an 87.20% / 12.80% split under the 90/10 rule and reported Title IV/HEA revenue of $63,134,358.00.

16

## 2. INSTITUTIONAL LOANS

87.     In those meetings where IL were discussed, Scott Thompson stated that from Infilaw's perspective the sole reason to offer IL was so that the Defendant Schools could appear to meet 90/10 requirements and solve the Infilaw 90/10 Problem.

88.     It was discussed that the ILs would be sold as a solution to students who could not get approved for private loans elsewhere and would be marketed as such, despite not having the same benefits of a Title IV/HEA or GradPlus loan.

89.     ILs are not deferrable by students after graduation.

90.     Students could not apply for financial hardships or forbearances of these ILs.

91.     Knowing that the ILs were not going to be as student-centric nor helpful to students as Thompson attempted to sell them, and further knowing that the ILs were just a way to trump up the ten percent requirement and solve the Infilaw 90/10 Problem, Debbie Barlow commented that "if it looks like a duck and quacks like a duck, it must be a duck."

92.     Regardless of the misguided intentions of Infilaw to provide the ILs, the Defendants Schools began to implement a program to provide the ILs to their students.

93.     Prior to the implementation of the ILs neither Infilaw nor the Defendant schools had been in the lending business.

94.     In a limited rollout of ILs, Infilaw required the Defendant Schools to obtain current credit reports on all their enrolled students and report to the leaders at each school the top credit scores of each of their students.

17

95. Once the reports had been run, the Defendant Schools under Infilaw's direction began emailing students with the top credit scores in an attempt to coerce them to sign up for ILs.

96. Almost immediately, students signed up for ILs and the Defendant Schools began refunding Title IV/HEA funds.

97. This allowed the Defendant Schools to take dollar for dollar out of the ninety percent side and transfer it to the ten percent side of the equation under the 90/10 rules.

98. Once that limited rollout ended, the Defendant Schools began giving ILs to almost any student without regard to creditworthiness or ability to repay.

99. Students with bankruptcies and foreclosures were given ILs (the "Low Credit IL").

100. After a year of funding Low Credit ILs with no hope of repayment to the Defendant Schools, the Defendant Schools counted the Low Credit ILs amounts loaned towards the ten percent (10%) requirement under the 90/10 rule despite never collecting payments from the Low Credit IL students.

101. Additionally, the Defendant Schools began withdrawing future IL support for the Low Credit IL students – thereby destroying their ability to continue to attend school.

102. ASLS made no serious attempt to be consistent with collections on the ILs.

103. For example, certain students after July 2012 could not make payments on their ILs, but Scott Thompson forced Lorona to continue to allow them to attend school

so that he could count the students towards the ten percent (10%) requirement even though ASLS never collected a dollar from these students and could not have ethically nor legally claimed their revenue under Title IV/HEA 90/10 requirements[13].

104.    Under the cash basis of accounting mandated by 34 C.F.R. § 668.28(a)(2), payments can be recorded only when cash is actually received, rather than when it is earned. Thus, counting future payment of ILs as income violated Title IV/HEA and created the false impression that ASLS was complying with the 90/10 Rule.

105.    In substance, the ILs were a mere sham designed solely to make it appear that ASLS was complying with the 90/10 Rule.

106.    As the Defendant Schools had received hundreds of millions of dollars from Title IV/HEA funding over the preceding years, they were able to easily fund the substantial ILs with the same revenues they received from federal student loans.

107.    Upon information and belief, IL default rates exceeded forty percent (40%) as of the 2013 reporting year.

### 3. DEFENDANT SCHOOLS BEGIN OFFERING MYBAR

108.    In or about late 2011, as another solution to solving the Infilaw 90/10 Problem, Infilaw tasked the Defendant Schools – beginning with ASLS as the charter program – with creating and implementing their own bar exam preparation programs to compete directly with established bar prep programs from both BarBri and Kaplan.

---

[13] See 34 C.F.R. § 668.28(a)(5)(iii).

19

109.    In a meeting in Tampa, Florida with Infilaw representatives, it was decided that ASLS would be the "charter" school of the Defendant Schools to offer their own bar prep program.

110.    Historically, graduates of the Defendant Schools – like graduates of many law schools in the United States – have simply taken the well-established bar preparation courses offered by BarBri or Kaplan once they graduate law school in preparation for the rigor of the bar exam in each students' respective jurisdiction choice.

111.    ASLS Dean, Shirley Mays, sent an email on or about September 15, 2011 stating that she had an insightful 90/10 meeting and that the operation of ASLS's own bar prep course "has bubbled to the top as a real solution for 90/10."

112.    As a result of Infilaw's request, ASLS formed the MyBar program and tasked the Director of Critical Legal Skills Program ("DCLSP") to begin implementing the MyBar program for February 2012 bar exam test takers.

113.    Dean Mays and Penny Willrich wanted the DCLSP to create her own brand new program with brand new materials and her own lecturers.

114.    Understandably, the DCLSP was not receptive to the creation and implementation of a brand new bar prep course to rival Barbri and Kaplan in a period of less than three (3) months as she knew that preparing students for the bar exam was no easy task – especially with such a small timeframe.

115.    Additionally, the DCLSP expressed concerns with relying on a February pilot program because it was unknown whether Barbri or Kaplan would even license materials to ASLS; the Supreme Court of Arizona had yet to sign the order to change the bar exam format to the Uniform Bar Exam; and myriad other reasons including without

20

limitation ASLS' impending physical move, new mandatory classes for students, training new hires, and other program changes.

116.    Facing extreme pressures from Infilaw's and ASLS' leadership put the DCSLP in an untenable situation – she would have to sacrifice education quality and risk not preparing the students for bar, or she would have to face being forced out of her employment.

117.    Undeterred by the valid reasons for waiting, Dean Shirley Mays stated that regardless of the DCLSP's frustration, the MyBar program was an important initiative for ASLS' 90/10 problem and that she needed the DCLSP to show leadership with the program and do all they can to make it happen.

118.    As students were becoming increasingly nervous regarding bar preparation, and as ASLS could not definitively state its plan regarding bar preparation, students began inquiring as to bar preparation scholarships for BarBri courses that they had already been enrolled, which had been offered in the previous years to students.

119.    The DCLSP requested information from Dean Shirley Mays regarding the availability of bar prep scholarships – the DCLSP been told there was fifty thousand dollars ($50,000) available to the Defendant Schools for students in dire need.

120.    Dean Mays responded that ASLS did not have those funds anymore.

121.    Instead of providing students with a quality bar preparation program, ASLS' leadership group decided to "game" the bar passage requirements under the ABA and began requesting that students defer taking the bar exam.

122.     The Title IV/HEA under 34 C.F.R. Parts 668, *et seq.* requires that an institution "will meet the requirements established by... accrediting agencies or associations...." 34 C.F.R. § 668.14(b)(23).

123.     For the students that ASLS's leadership could not convince to defer taking the bar, ASLS's leadership group began requesting the DCLSP tell students not to take BarBri, but instead take ASLS's bar prep program, which later became known as MyBar.

124.     This program does not meet the guidelines under 34 C.F.R. § 668.28 as it did not nor does it presently prepare ASLS' students to take the bar.

125.     ASLS all but admitted that fact in an email to the student body on or about December 23, 2014 (the "December 2014 Email") indicating *the anticipated bar passage rate for ASLS students on the February 2015 bar exam was forty-seven percent (47%) compared with a state average of 70%* despite ASLS continuing to market the false efficacy of their bar prep program.

126.     In a meeting with Penny Willrich, Willrich told the DCLSP that ASLS needs to find a way to force the students to take ASLS' bar prep course and not BarBri.

127.     Willrich even suggested that ASLS inform BarBri to provide no materials to the students unless the students had signed up for ASLS' bar prep program.

128.     Additionally, Willrich wanted to charge students parking fees for ASLS' bar prep program and count that towards the ten percent (10%) requirement of the Title IV/HEA 90/10 requirement.

129.     On December 12, 2013, ASLS sent an email advising students not to sign up for Kaplan bar review, and touting higher bar passage rates for students taking MyBar as opposed to Barbri or Kaplan.

22

130.    Advertisements for MyBar were posted on the ASLS website, including one that read:

> Why is myBAR the best?
>
> The myBAR Program has been specially designed to offer you the best of everything—including live lectures and practice tests by the two nationally-known bar prep companies (BarBri and Kaplan) and personalized assistance from the myBAR team of experts and fellow bar-takers.
>
> With myBAR you are able to get a jump start on your bar review. You can request materials before the lectures start and get access to BarBri AMP.
> BarBri AMP combines brain science techniques with cutting-edge game studies research to fully engage and teach you in the most effective way possible. Its unique functionality – a multiple-choice testing format like no other – and proven memory-recall devices help you grasp the law faster and retain it longer. Exactly what you need to reinforce all the material you'll cover during the myBAR program.

131.    According to LSAC, ASLS reports an average bar pass rate, LSAT scores, and average admissions grade point average, intentionally disregarding students not admitted through traditional enrollment.

132.    Upon information and belief, the Defendant Schools have applied MyBar program fees to the ten percent (10%) portion of the 90/10 rules to trump up their actual student paid numbers.

133.    For the February 2015 bar exam, ASLS tracked one hundred ninety-seven students who were ready to take the bar exam for the first time.

134.    Of those students, ASLS targeted thirty-seven students as students they absolutely believed could not pass the bar.

135.    Additionally, of those one hundred ninety-seven students, thirty-nine of them had been *previously* paid to defer the July 2014 bar exam already.

136.    As of January 14, 2015, ASLS predicted only a 50.9 percent anticipated passage rate for first-time bar test takers and had some students marked as a less than ten percent chance of passing – including multiple students with a less than *six percent* (6%) chance of passing.

137.    Additionally, ASLS all but ignored any students who were preparing to take the bar exam for a second time or more as discussed herein.

138.    When approached by an ASLS' employed bar coach about a bar sitting student who had failed previously and was now struggling to prepare for the bar exam, Dean Mays said that ASLS' does not care about students who have already failed. Instead ASLS was only concerned about first-time bar exam sitters.

139.    Additionally, ASLS paid students who participated in MyBar thousands of dollars for completing modules, effectively refunding the students' MyBar fees via a bonus program – allowing ASLS to claim the tuition received from MyBar fees as revenue towards the ten percent side of the 90/10 rule, and then hide the fact that they then refunded the money in a cleverly and fraudulently packaged bonus and incentive program.

140.    Because the Defendant School's bar preparation programs incomes are not income from school activities *necessary* and *required* for students enrolled in their programs, nor do the programs actually *prepare* their students properly as evidenced herein to take an examination for an industry-recognized credential or certification issued

by an independent third party, they cannot be considered revenue to apply towards the 90/10 rule[14].

### C. DECEPTION BY DEFENDANT SCHOOLS OF ABA ACCREDITATION REQUIREMENTS

#### 1. ASLS' ALTERNATIVE ADMISSIONS MODEL FOR LEGAL EDUCATION PROGRAM

141.   In early 2011, Lorona had expressed concern in meetings with Dean Shirley Mays, Thompson, the admissions staff, and financial aid staff that the school was being deceptive in marketing to incoming students, in violation of 34 C.F.R. § 668.6[15].

142.   Lorona also expressed concern that ASLS was also providing misleading data to investors and incoming students regarding how successful those students were likely to be, as well as which students were actually paying students, as opposed to "trying law school" or being funded by ASLS.

143.   For example, Dean Mays stated during a meeting including Admissions, Finance, Financial Aid staff, Dean Mays, and Scott Thompson that students coming in through the Alternative Admissions Model for Legal Education ("AAMPLE") program, rather than traditional means of admission, were just as successful in the classroom.

144.   ASLS advertises their AAMPLE program as being "synonymous with opportunity. The Alternative Admissions Model Program for Legal Education offers

---

[14] 34 C.F.R. §§ 668.28(a)(3)(ii)(A-C) and (iii)(C) (emphasis added).

[15] 34 C.F.R. § 668.6 defines the reporting requirements and required disclosures for institutions receiving Title IV/HEA funding.

motivated and determined individuals with lower traditional indicators (i.e. LSAT and/or GPA) the opportunity to earn a seat into the competitive Juris Doctorate program at Arizona Summit Law School."

145. Additionally, ASLS' website states that they go "beyond looking at your LSAT score or undergraduate GPA. An individual's success is determined by perseverance, a willingness to learn beyond the classroom and a true passion for the law. AAMPLE® may be the right path for students who possess these traits but do not meet the admissions standards of Arizona Summit Law School."[16]

146. Lorona told Dean Mays and others in the meeting that her statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment.

147. Students entering law school through AAMPLE may appear to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

148. Lorona's concerns were based on the School's cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding placement of AAMPLE students in internship/externship programs as well as final placements.

---

[16] http://www.azsummitlaw.edu/www.azsummitlaw.edu/admissions/aample

26

149.    In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions.

150.    Such reports were intended to mislead prospective students in violation of Arizona's Consumer Fraud laws[17] and in violation of ABA Standards[18].

151.    AAMPLE students were initially required to pay three thousand five hundred dollars ($3,500) to attend the AAMPLE program.

152.    As time passed, Thompson stated in regards to the AAMPLE program in a meeting that he had been "instructed to put asses in seats."

153.    Accordingly, ASLS reduced the cost to enroll in AAMPLE to three hundred dollars ($300).

154.    Additionally, ASLS began offering admission to the law school to *all* AAMPLE students.

155.    However, admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions.

156.    Reporting enrollment and success statistics based on 20% or less of the student population is grossly misleading to incoming students, and existing students.

---

[17] A.R.S. § 44-1521 *et seq.*
[18] See ABA Standard 509.

157.   ASLS reports on the school website an increase in enrollment through non-traditional enrollment (AAMPLE) from 11% in 2005 to 80% of AAMPLE program students in spring 2011.

## 2. BAR DEFERMENTS AND DEFENDANT SCHOOLS' PAYMENTS TO TEST TAKERS

158.   Infilaw has studied bar passage rates for its students and based on its findings, Infilaw and ASLS have developed a bar exam failure predictor formula.

159.   The failure predictor formula includes LSAT scores, undergraduate gpa, and law school gpa, among the factors.

160.   The Law School Admission Council ("LSAC") has also commissioned a study into correlations between undergraduate gpa, law school gpa, and LSAT scores and bar passage rates.

161.   In 1998, LSAC found that LSAT scores correlate to bar passage at a .30 correlation, and law school gpa held a .38 correlation[19].

162.   ASLS' median LSAT score was 150 in 2010, but that had fallen precipitously to 144 by Fall 2014 with a 75th percentile LSAT score of 149.

163.   Additionally, CSL's median LSAT score was 149 in 2010, but that had fallen precipitously to 142 by Fall 2014 with a 75th percentile LSAT score of 146.

164.   Furthermore, FCSL's median LSAT score was 149 in 2010, but that had fallen precipitously to 143 by Fall 2014 with a 75th percentile LSAT score of 147.

---

[19] LSAC Longitudinal Bar Passage Study, 1998, Wightman.

165.    Knowing that LSAT correlation is a strong indicator of bar passage success, the Defendant Schools should have and must have known that a large percentage of their newly admitted students were not likely to pass the bar.

166.    Again, ASLS all but admitted that fact in the December 2014 Email with their anticipated bar passage rate of forty-seven percent (47%).

167.    This tacit admission is in direct violation of rules promulgated by the ABA – the accrediting organization recognized under Title IV/HEA for law schools in the United States.

168.    Knowing they were facing a mounting problem, and in an attempt to cover up for their admission of students who do not meet ABA admission standards and beginning in May 2014, the Defendant Schools began paying students not to take the bar exam upon graduation based on these calculated failure predictors through their Unlock Potential ("UP") program.

169.    The UP program is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to increase bar passage percentages.

170.    In fact, as discussed herein, *at least* thirty-nine (39) otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam.

171.    ASLS' and Infilaw's representatives held meetings on January 16 and 17, 2015 to discuss first time bar exam takers who they had predicted would not pass the bar and determine a strategy to pay them to defer the February 2015 bar.

29

172.   ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered five thousand dollars ($5,000) and other benefits such as bi-weekly payments, to defer taking the bar exam.

173.   In determining the likelihood that a student would pass the bar examination, ASLS used three separate predictor formulas including: 1) LSAT scores only; 2) LSAT scores plus Law School GPA ("LGPA"); and, 3) LSAT scores plus LGPA plus a modifier for AAMPLE students plus a modifier based on ethnicity (the "ASLS Minority Predictor").

174.   In connection with the February 2015 bar examination, the ASLS Minority Predictor shows that ASLS credited Caucasian/white students an increased potential passage percentage across the board, while ASLS automatically reduced by approximately four percent (4%) across the board the potential passage rate for minority students based on race and ethnicity alone.

175.   In addition, ASLS students who were unable to afford bar prep courses that requested financial assistance, but did not fall within Infilaw's Failure Predictor Formula criteria, were denied financial assistance to prepare for the February 2015 bar exam.

176.   The effect of Infilaw's and Defendant Schools' actions was to prevent students who Defendants predicted would fail the bar exam from taking the bar exam and thereby manipulating, misrepresenting, and gaming the bar test passage rates in order to retain accreditation and receive other benefits, such as retain Title IV/HEA eligibility from the Department of Education.

30

177.    This position is in direct contradiction to the public marketing intended to induce students, including those who enroll via non-traditional methods, to enroll at ASLS and take institutional and federally-backed student loans in order to pay tuition.

178.    Further, this is evidence of Defendants' attempts to deceive and misrepresent actual data concerning bar passage rates, a vital measurement of success of law schools.

179.    In an email dated October 16, 2014, Dean Mays reported that the bar passage rate of ASLS graduates for the July 2014 bar examination was 54.4% for "1st time sitters" and 49.5% for "Total: First time and repeaters."

180.    Moreover, an email dated December 23, 2014 from Ann Woodley, ASLS's Associate Dean for Bar Pass and Student Success, to certain ASLS students and graduates stated that "The ASLS grads planning to take the bar exam in February have a predicted pass rate of 47%, compared to an expected state average of greater than 70%. This is based on our statistical analysis of how our students have performed on the last few bar exams (and is primarily focused on law school grade point averages and LSAT scores)."

181.    This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

182.    These bar passage rates and predicted bar passage rates were substantially and materially lower than those ASLS touted in its previous advertising and marketing materials, including bar pass rates well in excess of 80%.

183.    Under 34 C.F.R. § 668.71(b), Title IV/HEA prohibits an institution from engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates."

184.    In or about June 2015, in regards to the UP program, Dean Mays of ASLS stated that "since February 2014, 95 Arizona Summit graduates have participated in the program."

185.     That constitutes more than 14 percent of the school's graduates during that time.

186.    Unsurprisingly, the initial cohort of UP graduates scored a fifty-six percent (56%) first-time pass rate, while the second had a fifty percent (50%) pass rate.

187.    Dean Mays admitted that the pass rates are not stellar.

188.    As if courting students to defer the bar exam in an email or a meeting months before the bar exam was not enough, Dean Mays actually called certain students the evening of July 27, 2015, literally the *night before* the Arizona Bar Examination and tried to convince them to defer taking of the examination the next day.

189.    In an email dated May 15, 2012, regarding the February 2012 Arizona bar examination, Dean Mays reported a bar passage rate of 71.7% for ASLS graduates taking the bar examination for the first time and an "overall" pass rate of 63.8%, which purportedly compared favorably with the average of all individuals taking the Arizona Bar.

190.    By email dated October 15, 2012, regarding the July, 2012 Arizona bar examination, Dean Mays reported a bar passage rate of 76.6% for ASLS graduates taking

the bar examination for the first time and a total passage rate of 73.1% for all ASLS graduates.

191.    By email dated May 13, 2013, regarding the February 2013 Arizona bar examination, Dean Mays reported a passage rate of 73.5 % for ASLS graduates taking the bar examination for the first time and 72.9% for all ASLS graduates.

192.    In addition, ASLS's "Viewbook" marketing brochure which was used to market to and attract student to ASLS in at least the years 2013 and 2014 prominently touts an "Ultimate Bar Pass Rate" of 86% for ASLS graduates, purportedly based on all "[g]raduates who passed the Arizona Bar Exam on the first or subsequent attempts."

193.    Indeed, even in her October 16, 2014 email quoted above, Dean Mays reported an "Ultimate pass rate" of 80.8%.

194.    The Bar Examination statistics and pass rates maintained by the Arizona Supreme Court indicate that the passage rate for individuals taking the Arizona Bar Examination for a second time or subsequent times is substantially lower than the passage rate for individuals taking the Arizona Bar Examination for the first time.

195.    On or about February 11, 2015, Lorona received a phone call from a representative of ASLS/Infilaw stating she was on a list of students not likely to pass the February bar exam based on lack of participation in on-campus optional simulated bar exams other predictors.

196.    Lorona's school assigned bar coach told Lorona that ASLS is concerned that it may lose accreditation and access to Title IV/HEA Federal funding due to drastically low performance numbers.

197.    ASLS, through its representative, then offered to pay Lorona two thousand six hundred thirty-five dollars ($2,635) to defer the bar exam until July 2015 with an additional monthly stipend, as explained above, in an attempt to inflate the passage numbers.

198.    The ASLS representative informed Lorona that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential new students.

199.    Lorona declined to participate in the program and did not take the $5,000 to defer taking the bar exam.

200.    Additionally, ASLS' bar passage rates are advertised as 68.85% for first time takers.

201.    Bar exam results sent in misleading emails to faculty, staff, and student purport bar exam passage rates at 87%, when actual rates are approximately 47%.

202.    Recent graduates, after spending hundreds of thousands of dollars in tax payer backed loans were informed via email that their anticipated bar passage rate for the February 2015 Arizona Bar exam were 47%, in stark comparison to the rosy projections presented before and at the time of enrollment.

203.    ASLS deceptively represented that its Legal Education Program provided "We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating well-rounded lawyers who add immediate value to their firms and employers."

204.     ASLS misrepresented the existence of success of past, present, and future graduate's ability to meet job qualification requirements, including but not limited to: graduation; bar passage; character and fitness; and other job requirements.

205.     ASLS misleads students by enrolling students ineligible for federal financial aid based on credit by "giving students time to fix their credit to receive loans" knowing with certainty that Department of Education does not lend to students for specified time periods with specific credit blemishes include foreclosures, and bankruptcies.

206.     The school provided institutional loans causing students to incur debt, without the means to repay such debt in an effort to deceive the students and investors that students would somehow be able to continue at ASLS without funding.

207.     As alleged above, Defendants published misleading representations about school success and bar passage rates of its students.

208.     But for Defendant's misrepresentations, Plaintiff would not have enrolled in ASLS and continued to enroll and to remain a student at ASLS and to incur substantial debt in connection therewith.

### 3. DEFENDANTS MISLEAD AND FRAUDULENTLY INDUCE STUDENTS TO ENROLL IN ASLS

209.     Defendants misrepresented what incoming students should expect to pay for their education. For example, ASLS's website represented that:

> As of the 2010-11 academic year, tuition and fees for the 3 year JD program total $101,310.00. Books and supplies for the program total $2,184.00.

35

The median cumulative program debt for PhoenixLaw graduates between July 1, 2009 and June 30, 2010 is $93, 142.51 for federal student loan debt and $5,000.00 for private student loan debt.

210.    However, ASLS' most recent Gainful Employment Disclosure lists the median loan debt as one hundred eighty-seven thousand seven hundred ninety-two dollars ($187,792) for Federal loans *alone.*

211.    As alleged above, Lorona informed ASLS through Dean Mays, President Scott Thompson, and Assistant Dean of Admissions Glen Fogerty that students who were admitted through non-traditional means, such as AAMPLE, had lower success rates on the bar exam.

212.    However, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same.

213.    ASLS' bar passage rate in July 2014 was approximately forty-eight percent (48%).

214.    This number represents a significant decline in passage rate from previous years before AAMPLE students began graduating.

215.    This is due in part to reporting of the students who enrolled at ASLS via nontraditional methods, including AAMPLE, who had graduated and began taking the bar exam.

216.    Dean Mays attempted to mislead current students, faculty, staff, and alumni by sending out an email documenting the bar passage percentage in a combined calculation representing a bar passage rate of over eighty percent (80%).

36

217.    ASLS possesses cumulative data demonstrating that its students do not pass the bar exam at the rate that it publicly states on its websites, in brochures, and in its face-to-face marketing and enrollment counseling.

218.    The omission of data is a material misrepresentation designed to mislead prospective students, including Lorona, to enroll and pay tuition and other expenses to the School.

### 4. SATISFACTORY PERFORMANCE FAILURES

219.    ASLS', FCSL's, and CSOL's students were not and could not have been satisfactorily performing as required under Title IV/HEA and ABA guidelines.

220.    Regardless of the Defendant Schools' students' grade point averages, the most important thing to a law school in terms of their graduate's careers post graduation and continued ABA accreditation is that school's first-time bar passage rate.

221.    Without a satisfactory bar passage rate, the ABA can and will remove accreditation from a law school.

222.    The Defendant Schools know this and have continued to game these statistics as discussed herein.

223.    Furthermore, the Defendant Schools have shown repeated and consistent reductions in their already dismal performance when first-time bar takers passage rates are reviewed for each of the Defendant Schools.

224.    Because the Defendant Schools are using Title IV/HEA funds to pay their worst performing students to defer taking the bar indefinitely, they are covering up their true bar passage rates and continuing to defraud not only their students, but also the ABA and the Department of Education.

37

## VI. DEMAND FOR JURY TRIAL

225.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Lorona hereby demands a trial by jury.

## VII. CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A)**
**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS**
**ASLS, CSL & FCSL**

226.    Lorona and the United States re-allege and incorporate by reference each and every allegation of the foregoing paragraphs as if fully set forth herein.

227.    This is a *qui tam* action brought by Lorona and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 *et seq.*

228.    The Federal False Claims Act, 31 U.S.C. §3729(a)(1) provides: Liability for certain acts. Any person who-- (A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval *Id.*

229.    By virtue of the above-described acts, among others, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and possibly continues to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. §3729(a)(1).

230.    For example, those false claims include claims for Title IV/HEA funding

38

for students who would not normally be admitted to any law school under ABA accreditation rules, and thereafter paid by the United States, but for the illegal practices of Defendants described in this Complaint.

231.  .Those claims were false, as a large percentage of students admitted to the Defendant Schools had very little chance of success and passage of a bar exam as required by ABA accreditation guidelines.

232.  As they were ineligible for funding, by submitting or causing these false claims to be submitted, Defendants further violated 31 U.S.C. §3729(a)(1)(A) from at least 2011 to the present.

233.  Additionally, Defendants falsified and deliberately obscured data relating to Institutional Aid and bar preparation programs in violation of 34 C.F.R. § 668 *et seq.* in an effort to illegally claim to meet the standards proscribed under the 90/10 rule.

234.  Plaintiff United States, unaware of the falsity of the claims that the Defendants made to the United States, and in reliance on the accuracy thereof, paid Title IV/HEA funding for claims that would otherwise not have been allowed. These claims were false as that term is defined by the Federal False Claims Act in that they were ineligible for funding as described herein.

235.  For those claims that Defendants submitted or caused to be submitted, it was foreseeable and in fact the intended result that those claims would be submitted. Further, at all times relevant to the Complaint Defendants acted with the requisite scienter.

236.  By reason of Defendants' unlawful practices, hundreds of millions of dollars in Title IV/HEA funds have been provided to Defendants thus providing

substantial profits to Defendants.

237. The amounts of the false or fraudulent claims to the United States were material. Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendants' unlawfully incurred Title IV/HEA funding.

238. It is believed that as a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

239. Lorona is a private person with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to the Federal False Claims Act on behalf of herself and the United States.

**COUNT TWO**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(B)**
**CREATION OR USE OF FALSE STATEMENTS OR RECORDS MATERIAL TO**
**A FALSE CLAIM**
**ASLS, CSL & FCSL**

240. Lorona and the United States re-allege and incorporate by reference each and every allegation of the foregoing paragraphs as if fully set forth herein.

241. This is a qui tam action brought by Lorona and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 *et seq.*

242.    The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B) provides: Liability for certain acts. Any person who—(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. *Id.*

243.    By virtue of the above-described acts, among others, Defendants knowingly made used or caused to be made or used false records or statements to get false claims paid by the United States, and possibly continues to do so, in violation of 31 U.S.C. §3729(a)(1)(B).

244.    For example, claims for funding under Title IV/HEA based on Defendants' representation of records purporting to show compliance with the 90/10 Rule would not have been submitted, and thereafter paid by the United States, but for the illegal practices of Defendants described in this Complaint including their false records and statements.

245.    By engaging in the fraudulent and illegal practices described herein, Defendants violated provisions of the ABA Accreditation guidelines and 34 C.F.R. § 668 *et seq.* Defendants' material violations of ABA Accreditation guidelines and 34 C.F.R. § 668 *et seq.* led to the submission of claims for Defendants' Title IV/HEA funds to the United States. Those claims were false, as they were ineligible for reimbursement, and by making or causing to be made false records or statements to get those false claims paid, Defendants further violated 31 U.S.C. §3729(a)(1)(B).

246.    Plaintiff United States, unaware of the falsity of the records and/or statements which the Defendants made to get false claims paid, and in reliance on the accuracy thereof, paid Defendants for claims that would otherwise not have been

allowed. These claims were false as that term is defined by the Federal False Claims Act in that they were ineligible for reimbursement as described herein.

247.   For those records and/or statements that Defendants made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false claims. Further, at all times relevant hereto, Defendants acted with the requisite scienter.

248.   By reason of Defendants' unlawful practices, hundreds of millions of dollars in Title IV/HEA funds have been provided to Defendants thus providing substantial profits to Defendants.

249.   The amounts of the false or fraudulent claims to the United States were material. Plaintiff United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendants, and in reliance on the accuracy thereof paid and continues to pay for Defendants' unlawfully incurred Title IV/HEA funding.

250.   It is believed that as a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

251.   Lorona is a private person with direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to the Federal False Claims Act on behalf of herself and the United States.

**COUNT THREE**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(A)(1)(C)**
**CONSPIRACY**

42

**ALL DEFENDANTS**

252.   Lorona and the United States re-allege and incorporate by reference each and every allegation of the foregoing paragraphs as if fully set forth herein.

253.   This is a qui tam action brought by Lorona and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 et seq.

254.   The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C) provides:

Liability for certain acts. Any person who—

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); ...is liable to the United States Government for a civil penalty of not less than $ 5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, ... *Id.*

255.   In violation of 31 U.S.C. §3729(a)(1)(C), by the foregoing acts and omissions,   Defendants conspired among themselves and with others to defraud the United States by getting false and fraudulent claims paid and approved in violation of the False Claims Act, 31 U.S.C.§3729(a)(1)(C).

256.   By the foregoing acts and omissions, Defendants took actions in furtherance of their conspiracies, including but not limited to the payment of substantial sums of monies. Indeed, Defendants conspired to defraud the Department of Education by accepting students who otherwise could not attend law school in violation of ABA standards and further conspired to submit falsified Institutional Loan data and improper revenues from bar preparation courses to circumvent the 90/10 rules. Said actions constitute violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C). Defendants committed other overt acts set forth above in furtherance of that conspiracy, all in violation of the laws of and causing damage to the United States.

43

257.    As a consequence of Defendants' violations of 31 U.S.C. §3729(a)(1)(C). the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim Defendants conspired to get paid or allowed.

258.    Lorona is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Federal False Claims Act on behalf of themselves and the United States.

**COUNT FOUR**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(A)(1)(B)**
**FALSE CERTIFICATION OF COMPLIANCE WITH TITLE IV/HEA**
**GUIDELINES VIA PROGRAM PARTICIPATION AGREEMENTS**
**ASLS, CSL & FCSL**

259.    Lorona and the United States re-allege and incorporate by reference each and every allegation of the foregoing paragraphs as if fully set forth herein.

260.    This is a qui tam action brought by Lorona and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. §3729 et seq.

261.    To be eligible for Title IV/HEA funds, proprietary Institutions must comply with HEA and DOE requirements through a Program Participation Agreement ("PPA") under 34 C.F.R. §§ 668.14(a)(1) and (b)(22).

262.    The PPA is a prerequisite for a proprietary institution to request and receive Title IV funding.

263.    The PPA conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of 34 §

44

C.F.R. § 668.14, the individual program regulations, and any additional conditions specified in the PPA.

264.    Under the PPA, and according to 34 C.F.R § 668.14(b)(1), proprietary institutions certify that they will further "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program."

265.    By the acts and omissions alleged herein, Defendants violated their individual PPAs by falsely certifying compliance with applicable regulations, statutes, and accreditation guidelines.

266.    As a consequence of Defendants' violations of 31 U.S.C. §3729(a)(1)(B), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim Defendants conspired to get paid or allowed.

267.    Lorona is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Federal False Claims Act on behalf of themselves and the United States.

## VIII. PRAYER FOR RELIEF

1.      WHEREFORE, Plaintiff prays for judgment that Defendants cease and desist from violating 31 U.S.C. §3729 et seq., and the equivalent provisions of the state statutes set forth above;

2.      that this Court enter judgment in Plaintiffs' favor and against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.      that Plaintiffs be awarded the maximum amount allowed pursuant to §3730(d) of the federal False Claims Act;

4.      that Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and,

5.      that Plaintiffs recover such other relief as the Court deems just and proper, or that is necessary to make Plaintiffs whole.

RESPECTFULLY SUBMITTED this 5th day of August, 2015.

/s/ Mark M. Wall
Mark M. Wall (FBN: 58483)
Mark.wall@hwhlaw.com
J. Logan Murphy (FBN: 0072241)
Logan.murphy@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 33602
Telephone (813) 221-3900
Facsimile (813) 221-2900

-and-

46

Sean A. Woods*
Arizona Bar No. 028930
docket@millsandwoods.com
Robert T. Mills*
Arizona Bar No. 018853
docket@millsandwoods.com
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone (480) 999-4556
Facsimile (480) 999-4750
*Motion for Admission Pro Hac Vice Pending

Attorneys for Relator Paula C. Lorona

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2015, a copy of the foregoing was hand-delivered to the Clerk, U.S. District Court.

/s/ Mark M. Wall
Mark M. Wall

47

6990214v1