FILED

2015 AUG 31   AM 11: 47

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
*ex rel.* PAULA C. LORONA,

      Plaintiff,

      v.

INFILAW CORPORATION,
ARIZONA SUMMIT LAW SCHOOL, LLC,
FLORIDA COASTAL SCHOOL OF LAW,
and CHARLOTTE SCHOOL OF LAW,

      Defendants.

_____/

Case No. 3:15-cv-959-J-34JRK

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**
**and Court Order (Doc. S-7)**

## FIRST AMENDED COMPLAINT
## OF QUI TAM PLAINTIFF PAULA C. LORONA

      Plaintiff Paula C. Lorona, by her undersigned attorneys and on behalf of the United States of America, states the following as her First Amended Complaint based upon her non-public and independent knowledge:

### I.   INTRODUCTION

      1.    This action is brought by Plaintiff/Relator Paula C. Lorona ("Lorona") on behalf of the United States of America to recover compensatory and punitive damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*

### II.   PARTIES

      2.    Lorona is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was either employed by or enrolled as a student at Arizona Summit Law School (ASLS), formerly known as Phoenix School of Law, in Phoenix, Arizona.



3.      Defendant ASLS is a for-profit Delaware limited liability company with its primary place of business in Phoenix, Arizona.

4.      Defendant Charlotte School of Law (CSL) is a for-profit Delaware limited liability company with its primary place of business in Charlotte, North Carolina.

5.      Defendant Florida Coastal School of Law (FCSL) is a for-profit Florida corporation with its primary place of business in Jacksonville, Florida.

6.      Defendant Infilaw Corporation ("Infilaw") is a Delaware corporation with its primary place of business in Naples, Florida. Infilaw is the parent company of ASLS, CSL, and FCSL (collectively, the "Defendant Schools"), and controls and dominates the business activities of ASLS, CSL, and FCSL. Infilaw therefore conducts business activities in the states in which those schools are located: Arizona, North Carolina, and Florida.

7.      Infilaw made and directed all significant business decisions of ASLS. For example, when certain members of the ASLS faculty and staff expressed concern about the caliber of students being admitted to ASLS, ASLS President Scott Thompson responded in a meeting attended by Lorona that he had been "instructed to put asses in seats," presumably by Infilaw. Upon information and belief, Infilaw made and directed all significant business decisions of CSL and FCSL, as well.

8.      Infilaw controlled the finances of ASLS by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at ASLS; (c) processing and maintaining control over the ASLS payroll; (d) managing the 401(k) plan and other financial benefits of ASLS employees, including tuition waivers for employees who

2

were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for ASLS employees traveling on ASLS business.

9.     On information and belief, Infilaw also controlled the finances of CSL and FCSL by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at CSL and FCSL; (c) processing and maintaining control over the CSL and FCSL payroll; (d) managing the 401(k) plan and other financial benefits of CSL and FCSL employees, including tuition waivers for employees who were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for CSL and FCSL employees traveling on business.

10.     Accordingly, Infilaw is liable not only for its own misconduct, but also for the misconduct of the Defendant Schools as alleged herein.

## III.     JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

12.     This Court also may exercise subject-matter jurisdiction over this action because, pursuant to 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the allegations or transactions alleged in this First Amended Complaint. Even if a statutorily relevant disclosure has occurred, Lorona qualifies as an "original source" of the allegations in the First Amended Complaint, as that term is defined by 31 U.S.C. §§ 3730(e)(4)(A) and 3730(e)(4)(B) because she has voluntarily disclosed to the Government

3

information on which the allegations in this action are based, and because she has independent knowledge that materially adds to the publicly disclosed transactions.

13.     On June 3, 2015, Lorona provided documentation relating to this First Amended Complaint to the Inspector General's Hotline – Office of Inspector General ("OIG"), United States Department of Education ("DOE").

14.     On July 17, 2015, Lorona met with an Assistant United States Attorney from the United States Attorney's Office, Middle District of Florida, to discuss the allegations herein. At the same time, Lorona provided to the AUSA a draft of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

15.     On August 5, 2015, Lorona provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

16.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found, resides, transacts business, and committed violations of the False Claims Act within this District. Venue is likewise proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) for the same reasons.

IV.   EMPLOYMENT OF LORONA BY ASLS AND INFILAW

17.     Lorona was hired by ASLS in November 2009 as an administrative assistant to the General Counsel of ASLS, and later received promotions to financial aid representative

4

in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

18.     In those capacities, Lorona observed and participated in ASLS' application for accreditation from the American Bar Association and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements. More specifically, Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds through the Common Origination and Disbursement System (COD), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans.

19.     When Lorona would submit a COD request on behalf of ASLS and Infilaw, the DOE would deposit the requested funds in the ASLS bank account at SunTrust Bank. Each night, SunTrust would then 'sweep' those funds into bank accounts maintained by Infilaw. Once funds were swept into accounts maintained by Infilaw, Lorona would make disbursements to individual students by creating and uploading a file to SunTrust's website, which would cause SunTrust to transfer the Title IV funds from Infilaw's account to an ASLS account. ASLS would then directly distribute the funds to the student who applied for Title IV funds.

20.     Before her employment with ASLS, Lorona reviewed published ASLS materials, statistics, and bar passage rates and decided to work at ASLS because it would help her attend law school. Indeed, as an employee, Lorona was given a full tuition waiver and a pro rata early tuition waiver to attend ASLS.

## V.   DEFENDANTS' SCHEME TO CIRCUMVENT THE 90/10 RULE

21.     In order to participate in any Title IV, Higher Education Act (HEA) program, for-profit institutions must enter into a written program participation agreement with DOE, which conditions participation in Title IV on compliance with Title IV and DOE rules and regulations.

22.     Under one of those regulations, Title IV and the HEA require that a for-profit institution "derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds." 34 C.F.R. § 668.14(b)(16). This is commonly known as the "90/10 Rule." To calculate revenue under the 90/10 Rule, institutions must use the cash basis of accounting, counting only revenue actually received. 34 C.F.R. § 668.28(a)(2).

23.     In or about early 2010, Defendants became concerned that they would not satisfy the 90/10 Rule because a large proportion of the students attending ASLS, FCSL, and CSL were receiving substantial Title IV/HEA funding through loans.

24.     Publicly available reports found on the DOE website demonstrate why it was crucially important for Defendants to keep the Title IV/HEA funding stream alive. For example, in the 2009-2010 funding year, ASLS reported an 84.25%/15.75% split between Title IV/HEA revenue and non-Title IV revenue and reported Title IV/HEA revenue of $22,111,393.00; FCSL reported 82.94% Title IV/HEA revenue of $65,758,846.00; and CSL reported revenue of $19,224,762.00, without reporting a 90/10 Rule split.

25.     In the most recently available public data for the 2012-2013 funding year, ASLS reported an 87.70%/12.30% split with Title IV/HEA revenue of $60,030,378.00;

FCSL reported an 86.63%/13.37% split with Title IV/HEA revenue of $78,751,382.00; and CSL reported an 87.20%/12.80% split with Title IV/HEA revenue of $63,134,358.00.

26.     From 2010 through and including 2013, Lorona participated in weekly meetings with other Defendants Schools and Infilaw employees, including Alicia Togno, Debbie Richards, Shirley Mays, Penny Willrich, Scott Thompson, Jim Lemire, Denise Barlow, CSL representatives (via phone), FCSL representatives (via phone), and Infilaw employees and representatives (via phone). Those weekly meetings centered around how to create the appearance that Defendants were meeting the 90/10 Rule. Infilaw leadership and representatives consistently represented at those meetings that it would be beneficial for the statistics to appear as though the revenue was split 80/20, so that the government would not become suspicious and begin an investigation.

27.     It was in the Friday meetings that the concept of offering Institutional Loans ("ILs") to students was proposed and discussed as a solution to the 90/10 Rule. When discussed, Scott Thompson, the President of ASLS and former Chief Financial Officer for Infilaw, stated that from Infilaw's perspective the sole reason to offer ILs was to give the appearance that the Defendant Schools were meeting the 90/10 Rule. The ILs would be offered to students who could not get approved for private loans elsewhere, and would be marketed in the same manner as Title IV/HEA or GradPlus loans, even though they did not have the same benefits. ILs are not deferrable by students after graduation, nor may students apply for financial hardships or forbearances of the ILs.

28.     Knowing that the ILs were not going to be as helpful to students as Thompson attempted to sell them, and further knowing that the ILs were just a way to create the

7

impression that the Defendant Schools were meeting the 90/10 Rule, Debbie Barlow commented that "if it looks like a duck and quacks like a duck, it must be a duck."

29.     ILs were conceived as a potential solution because revenue generated from institutional aid may be counted as non-Title IV/HEA revenue under 34 C.F.R. § 668.28(a)(5), as long as the institutions offering the loans meet certain guidelines and requirements. Many of these guidelines were not met, including the requirement that the ILs be subject to regular loan repayment and collection. Defendants knew, and ignored, the fact that most of the students receiving ILs could not and would not repay the loans. In fact, Defendants would purposefully shun collection efforts to avoid the appearance of violating the guidelines and the 90/10 Rule.

30.     Despite never having been in the lending business, Defendants began to roll out ILs. In this process, Infilaw required the Defendant Schools to obtain credit reports on all students and report to the leaders at each school the top credit scores. Once the reports had been run, the Defendant Schools, under Infilaw's direction, began contacting students with the top credit scores in an attempt to coerce them to sign up for ILs. This effort was immediately successful, and students began signing up.

31.     Once that limited rollout ended, the Defendant Schools began soliciting and providing ILs to almost any student without regard to creditworthiness or ability to repay, including students with bankruptcies and foreclosures ("Low Credit ILs").

32.     After a year of funding Low Credit ILs with no prospect of repayment, the Defendant Schools counted the amounts loaned through the Low Credit ILs toward the 10% non-Title IV/HEA revenue requirement of the 90/10 Rule despite never collecting—and

never seriously intending or attempting to collect—from the Low Credit IL students. Even more nefariously, the Defendant Schools began withdrawing future IL support for the Low Credit ILs students, thereby destroying their ability to continue to attend school.

33.     For example, certain students could not make payments on their ILs, but Scott Thompson forced Lorona to continue to allow them to attend school so that he could count the students towards the 10% requirement even though ASLS never collected a dollar from these students and could not have ethically nor legally claimed their revenue toward the 90/10 Rule. Upon information and belief, IL default rates exceeded 40% in the 2013 fiscal reporting year.

34.     Under the cash basis of accounting, revenue can be recorded only when cash is received, rather than when it is earned. Thus, counting future payment of ILs (which Defendants knew they would not collect) as revenue under the 90/10 Rule violated Title IV/HEA and created the false impression that Defendants were complying with the 90/10 Rule. In substance, the ILs were a sham designed solely to make it appear that Defendants were complying with the 90/10 Rule.

35.     Lorona was privy to this scheme and its mechanics during her time at ASLS due to her position and employment, and was instructed to complete the financial transactions necessary to fund ILs. Once a student was convinced to sign up for an IL, the Defendant Schools would "refund" the Title IV/HEA funds previously received from DOE and replace those loan funds with IL funds from the institution, some of which was previously received Title IV/HEA funds. This allowed the Defendants schools to transfer funds from the 90% side to the 10% side in a dollar-for-dollar manner, making it appear they

were complying with the 90/10 Rule. Checks were kept to a certain maximum value, as to prevent undue attention from governmental and regulatory bodies.

36.     Lorona was aware of and viewed internal calculations of revenue under the 90/10 Rule (as opposed to the publicly reported data), most of which demonstrated that ASLS was consistently in violation of the 90/10 Rule. In fact, Lorona was provided documents demonstrating a violation of the 90/10 Rule and instructed to convert some Title IV/HEA loans into ILs for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule. Upon information and belief, the same documents existed at the other Defendants Schools.

## VI.    MyBar and Inadequate Bar Preparation

37.     In or about late 2011, as another solution to satisfying the 90/10 Rule, Infilaw tasked the Defendant Schools – beginning with ASLS – with creating and implementing their own bar exam preparation programs to compete with established programs from BarBri and Kaplan. The Dean of ASLS, Shirley Mays, sent an email on or about September 15, 2011, stating that she had an insightful 90/10 meeting and that ASLS's own bar prep course "has bubbled to the top as a real solution for 90/10."

38.     So, ASLS formed the MyBar program and tasked the Director of Critical Legal Skills Program ("DCLSP") to implement it. Understandably, the DCLSP was not receptive to the implementation of a new bar course in less than 3 months. Additionally, the DCLSP expressed concerns with relying on a February 2012 pilot program for myriad other reasons, including an impending switch to the Uniform Bar Exam in Arizona.

39.     Undeterred, Dean Mays stated that regardless of the DCLSP's legitimate concerns, the MyBar program was an important initiative for satisfying the 90/10 Rule. The DCLSP faced extreme pressure from Infilaw and ASLS leadership, putting her in an untenable situation – sacrifice education quality and quality bar preparation, or be forced out.

40.     As pressure and time mounted, and ASLS could not definitively state its plan regarding bar preparation, students began enrolling in other bar preparation courses and inquiring as to scholarships for established bar courses. Unlike prior years, however, Dean Mays informed the DCLSP that the $50,000 usually available for students in dire need was no longer available, closing avenues to bar preparation programs other than MyBar.

41.     In other attempts to derive non-Title IV/HEA funding to satisfy the 90/10 Rule, Penny Willrich suggested that ASLS **force** its students to take MyBar, provide no bar preparation materials to the students unless they sign up for MayBar, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds.

42.     Recognizing that the bar preparation for its students was dismal and students were unlikely to pass the bar, ASLS and Infilaw leadership decided to "game" the bar passage requirements imposed by the American Bar Association (ABA) by requesting that students defer taking the bar exam in exchange for a monetary payment or stipend. For students the ASLS leadership could not convince to defer taking the bar exam, ASLS leadership began telling students to enroll in MyBar, rather than BarBri or Kaplan.

43.     For the February 2015 bar exam, ASLS tracked 197 students who were ready to take the bar exam for the first time. Of those students, ASLS targeted 37 students who they

11

believed could not pass the bar. Additionally, of those 197 students, 39 of them had been previously paid to defer taking the July 2014 bar exam. In fact, Dean Mays said that ASLS does not care about students who have already failed. Instead ASLS was only concerned about first-time bar exam sitters, who look better in ASLS statistics.

44.     As of January 14, 2015, ASLS predicted only a 50.9 percent anticipated passage rate for first-time bar test takers and had some students marked as a less than ten percent chance of passing – including students with a less than 6% chance of passing.

45.     Additionally, ASLS all but ignored any students who were preparing to take the bar exam for a second time or more as discussed herein

46.     Due to the restrictions and restraints imposed by Infilaw and ASLS leadership, MyBar was woefully inadequate as a bar preparation course. As such, the program does not meet the requirements of 34 C.F.R. § 668.28, as it does not prepare ASLS students to take the bar. ASLS admitted this in an email on December 23, 2014, indicating that the anticipated bar passage rate for an ASLS student on the February 2015 bar exam was **47%**, compared to a state average of 70%. Nevertheless, ASLS continues to falsely market the 'efficacy' of its bar preparation programs, including sending emails to students touting higher bar passage rates for MyBar, as opposed to established bar preparation courses.

47.     Additionally, ASLS **paid** students who participated in MyBar thousands of dollars for completing modules, effectively refunding the students' MyBar fees through a bonus program. This cleverly-packaged arrangement allowed ASLS to claim tuition received from MyBar fees as non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds.

48.     The Defendant Schools' bar preparation programs incomes are not income from school activities necessary and required for students enrolled in their programs, nor do the programs actually prepare their students properly to take an examination for an industry-recognized credential or certification issued by an independent third party. The funds received from the bar preparation programs of the Defendant Schools therefore cannot be considered non-Title IV/HEA revenue to apply towards the 90/10 Rule.

49.     Upon information and belief, all Defendant Schools have counted MyBar program fees as non-Title IV/HEA revenue toward satisfying the 90/10 Rule.

50.     MyBar and other bar preparation courses for the Defendant Schools do not meet the guidelines under 34 C.F.R. § 668.28 because they do not prepare ASLS students to take the bar examination.

## VII.   ALTERNATIVE ADMISSIONS MODEL FOR LEGAL EDUCATION (AAMPLE)

51.     Title IV/HEA prohibits an institution from engaging in substantial misrepresentation of the nature of its educational programs, its financial charges, or the employability of its graduates.

52.     In early 2011, Lorona expressed concern in meetings with Dean Mays, Thompson, the admissions staff, and financial aid staff that the school was deceptively marketing to incoming students, in violation of 34 C.F.R. § 668.6. Lorona also expressed concern that ASLS was also providing misleading data to investors and incoming students regarding potential career success and student financial obligations.

53.     One of the prime examples of this misleading information is the ASLS Alternative Admissions Model for Legal Education (AAMPLE). ASLS advertises their

AAMPLE program as offering "motivated and determined individuals with lower traditional indicators (i.e. LSAT and/or GPA) the opportunity to earn a seat into the competitive Juris Doctorate program at Arizona Summit Law School." Dean Mays claimed that students matriculating through AAMPLE are just as successful as traditional students, a claim that is belied by all available data. Students entering law school through AAMPLE may *appear* to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

54.    Indeed, Lorona told Dean Mays and others that the statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment. Lorona's concerns were based on ASLS cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding AAMPLE student employment.

55.    In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions. Such reports were intended to mislead prospective students.

56.    When AAMPLE was created, Thompson stated that the program would go forward because he had been "instructed to put asses in seats." AAMPLE students were initially required to pay $3,500.00 to attend the AAMPLE program, but that number has been reduced to $300.00 to encourage more and more students to enroll and eventually matriculate into ASLS, regardless of their academic standing or prospects.

14

57.     Additionally, in the beginning, ASLS would offer admission to only the top few students emerging from the AAMPLE program. After realizing the program was a source of enrollment and revenue, ASLS began offering admission to **all** AAMPLE students, even though AAMPLE does not require GPAs or LSAT scores within traditional ranges.

58.     ASLS typically does not include AAMPLE students in their statistics and data that are publicly reported regarding career placement, bar passage, and financial obligations.

**VIII.   BAR DEFERMENTS AND PAYMENTS TO POTENTIAL TEST TAKERS.**

59.     Infilaw and ASLS studied bar passage rates for its students and developed a formula to predict bar exam failure. The failure predictor formula includes LSAT scores, undergraduate GPA, and law school GPA, among the factors.

60.     The Law School Admission Council (LSAC) has also commissioned a study into correlation between bar passage rates, on the one hand, and LSAT scores, undergraduate GPA, and law school GPA, on the other hand. LSAC found that LSAT scores correlate to bar passage at a .30 correlation, and law school GPA held a .38 correlation.

61.     The Defendant Schools' median LSAT scores have fallen precipitously over the last 5 years. For example, the ASLS median LSAT score was 150 in 2010, but fell to 144 by Fall 2014. CSL's median LSAT score was 149 in 2010, but fell to 142 by Fall 2014. And FCSL's median LSAT score was 149 in 2010, but fell to 143 by Fall 2014.

62.     Knowing that LSAT correlation is a strong indicator of bar passage success, the Defendant Schools should have and must have known that a large percentage of their newly admitted students were not likely to pass the bar. Indeed, ASLS admitted this fact in a December 2014 email from Dean Mays, anticipating a bar passage rate of 47%.

63.     Knowing they were facing a mounting problem, and in an attempt to compensate for the admission of students who do not meet ABA admission standards, the Defendant Schools began paying students not to take the bar exam upon graduation based on these calculated failure predictors. The misnomer selected for this scheme was the Unlock Potential ("UP") program. The UP program is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to fallaciously increase bar passage percentages.

64.     *At least* 39 otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam.

65.     ASLS and Infilaw representatives held meetings on January 16 and 17, 2015, to discuss first-time bar exam takers who were predicted to fail the February 2015 bar exam. Those students were offered $5,000.00 and other benefits, such as bi-weekly payments, to defer taking the bar exam. Moreover, ASLS students who were unable to afford bar preparation courses, but did not fall within Infilaw's failure predictor formula, were denied financial assistance to prepare for the February 2015 bar exam.

66.     Lorona has personally felt the brunt of Defendants' tactics. On or about February 11, 2015, Lorona received a phone call from a representative of ASLS or Infilaw stating she was on a list of students not likely to pass the February bar exam. Lorona's school assigned bar coach also told Lorona that ASLS is concerned that it may lose accreditation and access to Title IV/HEA funding due to drastically low performance numbers.

67.     ASLS, through its representative, then offered to pay Lorona $2,635 to defer the bar exam until July 2015 with an additional monthly stipend in an attempt to inflate the

passage numbers. The ASLS representative informed Lorona that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential students. Lorona declined to participate in the program or defer.

68.     The effect of Defendants' actions was to prevent students who Defendants predicted would fail the bar exam from taking the bar exam and thereby manipulating, misrepresenting, and gaming the bar exam passage rates in order to retain accreditation and receive other benefits, such as retain Title IV/HEA eligibility.

69.     These actions are directly contradictory to Defendants' public marketing strategies, which are intended to induce students to enroll at Defendant Schools and apply for and receive institutional and federally-backed student loans in order to pay tuition.

70.     The dichotomy between public and private expectations is represented by communications by Infilaw and ASLS leadership. In an email dated October 16, 2014, Dean Mays reported that the bar passage rate of ASLS graduates for the July 2014 bar examination was 54.4% for "1st time sitters" and 49.5% for "Total: First time and repeaters." In another email dated December 23, 2014, Ann Woodley, ASLS Associate Dean for Bar Pass and Student Success, stated to certain ASLS students and graduates that "The ASLS grads planning to take the bar exam in February have a predicted pass rate of 47%, compared to an expected state average of greater than 70%." This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

71.     According to communications from Dean Mays, 95 ASLS graduates have participated in the UP program since February 2014. That represents more than 14% of the

school's graduates during that time period. Unsurprisingly, the initial cohort of UP graduates had a 56% first-time pass rate, while the second had a 50% pass rate. Even Dean Mays admitted that the pass rates are not stellar.

72.     These bar passage rates and predicted bar passage rates were materially lower than those ASLS touted in its advertising and marketing materials, including bar passage rates well in excess of 80%. Specifically, ASLS has publicly stated a much higher bar passage rate in the following public communications:

a.     In a May 15, 2012 email, regarding the February 2012 Arizona bar examination, Dean Mays reported a first-time bar passage rate of 71.7% and an "overall" bar passage rate of 63.8%.

b.     In an October 15, 2012 email, regarding the July 2012 Arizona bar examination, Dean Mays reported a first-time bar passage rate of 76.6% and an "overall" passage rate of 73.1%.

c.     In a May 13, 2013 email, regarding the February 2013 Arizona bar examination, Dean Mays reported a first-time bar passage rate of 73.5% and an "overall" passage rate of 72.9%.

d.     ASLS's "Viewbook" marketing brochure which was used to attract student to ASLS in 2013 and 2014 prominently touts an "Ultimate Bar Pass Rate" of 86% for ASLS graduates, purportedly based on all "[g]raduates who passed the Arizona Bar Exam on the first or subsequent attempts."

e.     In an October 16, 2014 email, Dean Mays reported an "Ultimate pass rate" of 80.8%.

73.     ASLS bar passage rates are advertised as 68.85% for first-time exam takers. And bar exam results sent in misleading emails to faculty, staff, and students profess bar exam passage rates at 86%, when actual rates are approximately 47%.

74.     ASLS and Infilaw misrepresented the career prospects and preparation available to its students.

75.     ASLS also misleads students by enrolling and then giving "credit" to those ineligible for federal financial aid, purportedly to "giv[e] students time to fix their credit to receive loans," despite knowing that the DOE does not lend to students with credit blemishes for specified time periods.

76.     Under 34 C.F.R. § 668.71(b), Title IV/HEA prohibits an institution from engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." The foregoing allegations demonstrate a violation of this regulation. Defendants published misleading representations about bar passage, academic, and career prospects, and pushed unsuspecting students into loans that could not be repaid.

IX.    DEFENDANTS MISLEAD PROSPECTIVE STUDENTS REGARDING FINANCIAL OBLIGATIONS

77.     Defendants misrepresented what incoming students should expect to pay for their education. For example, ASLS's website represented that tuition and fees for the J.D. program during the 2010-11 academic year was $101,310.00, with books and supplies an additional $2,184.00. ASLS also represented that the median cumulative program debt for graduates between July 1, 2009 and June 30, 2010 was $93,142.51 for federal student loan debt and $5,000.00 for private student loan debt.

78.     However, ASLS' most recent Gainful Employment Disclosure lists the median loan debt as **$187,792** for Federal loans *alone*.

79.     Despite notice provided by Lorona, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same.

## X.     CIRCUMVENTING ABA ACCREDITATION REQUIREMENTS

80.     Title IV/HEA requires that an institution meet the requirements established by accrediting agencies or association. 34 C.F.R. § 668.14(b)(23). Under 34 C.F.R. § 602.1 *et seq.*, the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar is the accrediting agency for law schools in the United States.

81.     Under ABA Standard 501(b), "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

82.     Nevertheless, Defendant Schools continue to admit applicants who do not appear capable of completing their legal education and being admitted to the bar, as evidence by median LSAT and GPA of matriculating students, the growing proportion of AAMPLE students, and the poor bar passage rates of the Defendant Schools.

83.     Without a satisfactory bar passage rate, the ABA can and will remove accreditation from a law school. The Defendant Schools know this and have continued to game these statistics as discussed herein.

84.     ASLS created reports showing the grade point average of students admitted through alternative admissions programs versus traditional admissions. Such reports were

20

intended to mislead prospective students in violation of ABA Standards. Upon information and belief, similar reports were generated by the other Defendant Schools.

85.     Through all of the facts alleged, Defendants have deceived the ABA and circumvented its accreditation requirements, thereby failing to comply with Title IV/HEA regulations requiring compliance with accrediting agency requirements.

86.     ABA accreditation documents were prepared by the General Counsel of ASLS. Due to her initial position as executive assistant to the General Counsel, Lorona witnessed the accreditation process, giving her unparalleled access to the preparation and submission of such documents. In that manner, she possesses inherent indicia of reliability that such accreditation documents, with the errors and misrepresentations alleged above, were submitted to the ABA, in violation of federal regulations.

87.     Upon information and belief, similar accreditation documents were prepared by the other Defendant Schools, as overseen by Infilaw, under similarly misrepresentative schemes.

**XI.   SUBMISSION OF PROGRAM PARTICIPATION AGREEMENTS**

88.     To be eligible for Title IV/HEA funds, institutions such as the Defendant Schools must comply with HEA and DOE requirements by executing a Program Participation Agreement ("PPA") under 34 C.F.R. § 668.14(a)(1).

89.     By submitting a PPA, institutions certify that they will "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV

of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program."

90.     At ASLS, PPAs were completed and executed in the financial aid department and the President's Office, giving Lorona unparalleled access to the documents and the process under which they were certified. The PPAs were executed by Thompson, but they were prepared by other employees within the President's Office and financial aid department.

91.     The ASLS PPAs certified compliance with all regulations and requirements, despite full knowledge of ASLS and Infilaw leadership and staff that the regulations and requirements were regularly being violated. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to ASLS, in violation of the False Claims Act.

92.     Upon information and belief, the other Defendant Schools prepared, executed, and submitted similar PPAs, in conjunction with Infilaw, to certify compliance with all Title IV/HEA regulations and requirements, despite full knowledge of Defendant Schools and Infilaw leadership and staff that the regulations and requirements were regularly being violated. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to Defendant Schools and Infilaw, in violation of the False Claims Act.

## XII.   CLAIMS FOR RELIEF

**Count I**
**Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**
**Presenting or Causing to Be Presented False Claims**
**ASLS, CSL & FCSL**

93.     Lorona and the United States incorporate by reference Paragraphs 17 through 92, as if fully set forth herein, all allegations in which are relevant to and necessary for this claim.

94.     The False Claims Act prohibits any person from knowingly presenting, or causing to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

95.     By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly presented or caused to be presented, and continues to present or cause to be presented, false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

96.     For example and without limitation, ASLS, CSL, and FCSL presented to DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. Absent such false certification, DOE would not have distributed Title IV/HEA funds to the Defendant Schools.

97.     These PPAs were falsely certified because, among other reasons and without limitation, Defendant Schools sought funding for students who would not normally be admitted to any law school under ABA accreditation policies; Defendant Schools failed to comply with ABA accreditation policies; Defendant Schools failed to comply with and fraudulently circumvented the 90/10 Rule.

98.     Accordingly, during such periods that falsely certified PPAs were submitted to the federal government, all claims for federal Title IV/HEA funds were false or fraudulent.

99.     ASLS, CSL, and FCSL also made false statements or misrepresentations to the ABA, as the accrediting agency for law schools in the United States. The statements made were essential to the Defendant Schools maintaining and receiving their accreditation, including statements as to the actual and potential bar passages rates, the caliber of students admitted, and the financial obligations of those students.

100.    Accordingly, during such periods as ASLS, CSL, and FCSL made false statements or misrepresentations to the ABA, all claims for federal Title IV/HEA funds were false or fraudulent.

101.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants and the submission of false claims. Lorona has direct and independent knowledge of the allegations in this First Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of the submission of false claims and the receipt of improperly solicited federal funds, which were then distributed to students, who then used those funds to pay the exorbitant tuition required by ASLS, FCSL, and CSL. Lorona therefore possesses unique indicia of reliability as to the submission of false claims.

102.    For those false or fraudulent claims submitted by Defendant Schools, it was foreseeable and in fact the intended result that those claims would be submitted to the federal Government. In that vein, Defendants acted with the requisite scienter to violate the False Claims Act.

103.    The amounts of the false or fraudulent claims made to the United States were material. The United States, unaware of the falsity of the claims and statements made by

24

Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

104.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count II**
**Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
**Creation or Use of False Statements or Records Material to a False Claim**
**ASLS, CSL & FCSL**

105.    Lorona and the United States incorporate by reference Paragraphs 17 through 92, as if fully set forth herein, all allegations in which are relevant to and necessary for this claim.

106.    The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

107.    By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to the false or fraudulent claims described in this First Amended Complaint, in violation of 31 U.S.C. § 3729(a)(1)(A).

108.    For example and without limitation, ASLS, CSL, and FCSL presented to DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. These PPAs contained false records and statements, as described above. Among the false

25

statements and records submitted, but without limitation, were statements to the ABA material to accreditation; statements regarding revenue received, in relation to the 90/10 Rule; statements as to bar passage and career success rates; and statements as to financial obligations of students. Absent such false certification, DOE would not have distributed Title IV/HEA funds to the Defendant Schools. Defendants Schools created and used other false statements and records, as described above, material to the submission of false claims and to induce the federal government to distribute Title IV/HEA funds.

109.    By making the false records and statements and engaging in the fraudulent practices described, Defendants violated the ABA Accreditation guidelines, in violation of 34 C.F.R. § 668.1 *et seq.* Material violations of the guidelines led to the submission of claims for Title IV/HEA funds, which were false, as Defendants were ineligible for reimbursement, yet receiving it only due to false records and statements made, which were material to the false claims described above.

110.    For those records and/or statements made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false claims. For the reasons alleged above, Defendants acted with the requisite scienter to cause violations of the False Claims Act.

111.    Accordingly, during such periods that falsely certified PPAs were submitted to the federal government, all claims for federal Title IV/HEA funds were false or fraudulent.

112.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, and the submission of false claims. Lorona has direct and independent knowledge of the

allegations in this First Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of Defendants' making and use of false records or statements to cause false claims to be submitted to, and approved by, the federal Government.

113.    The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

114.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count III**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy**
**All Defendants**

115.    Lorona and the United States incorporate by reference Paragraphs 7 through 10 and 17 through 92, as if fully set forth herein, all allegations in which are relevant to and necessary for this claim.

116.    The False Claims Act provides that any person who conspires to commit a violation of sections 3729(a)(1)(A) and 3729(a)(1)(B) is liable to the United States Government for a penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains. 31 U.S.C. § 3729(a)(1)(C).

117. By virtue of the allegations presented above, Defendants conspired among themselves and with others to defraud the United States by submitting false and fraudulent claims and making, using, or causing to be made or used, false records or statements material to fraudulent claims.

118. By the acts and omissions alleged above, Defendants took actions in furtherance of their conspiracies, including but not limited to the payment of substantial sums of monies and weekly meetings to encourage the submission of false claims and the creation of false records and statements material to the submission of false claims. Indeed, Defendants conspired to defraud DOE by accepting students who otherwise could not attend law school; by submitting falsified revenue data to feign compliance with the 90/10 Rule; and by fabricating bar passage and career prospect statistics. This is without limitation, and defendants committed other overt acts in furtherance of the conspiracy, as set forth above, all of which were in violation of the False Claims Act and which caused damage to the United States.

119. Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims, and the conspiracy in furtherance thereof. Lorona has direct and independent knowledge of the allegations in this First Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of Defendants' overt acts in furtherance of the conspiracy.

120. The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity

of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

121.   As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count IV**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
**False Certification of Compliance with Title IV/HEA Guidelines via PPAs**
**ASLS, CSL & FCSL**

122.   Lorona and the United States incorporate by reference Paragraphs 17 through 92, as if fully set forth herein.

123.   The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

124.   The PPA is a prerequisite for an institution to request and receive Title IV/HEA funding. By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims by falsely certifying compliance with the applicable regulations, statutes, and accreditation guidelines.

125.   ASLS, CSL, and FCSL knew such certification to be false, and knew that such certifications would induce the federal Government to pay Title IV/HEA funds to the Defendants Schools when they were not entitled to make such claims.

126. Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims, and false certification of the PPAs. Lorona has direct and independent knowledge of the allegations in this First Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of Defendants' falsely certifying PPAs and making or using false records or statements to cause false claims to be submitted to, and approved by, the federal Government.

127. The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

128. As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

## XIII. JURY DEMAND

129. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Lorona hereby demands a trial by jury.

## XIV. PRAYER FOR RELIEF

WHEREFORE Plaintiffs/Relator Paula C. Lorona and the United States of America pray for judgment in their favor, and:

      a.      That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*;

      b.      That this Court enter judgment in Plaintiff/Relator's favor and against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

      c.      That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

      d.      That Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

      e.      That Plaintiffs recover such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED **this 31st day of August, 2015.**

*/s/ Sean A. Woods*

Sean A. Woods*
Arizona Bar No. 028930
docket@millsandwoods.com
Robert T. Mills*
Arizona Bar No. 018853
docket@millsandwoods.com
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone (480) 999-4556
Facsimile (480) 999-4750
*\*Admitted Pro Hac Vice*

-and-

Mark M. Wall (FBN: 58483)
Mark.wall@hwhlaw.com
J. Logan Murphy (FBN: 0072241)
Logan.murphy@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 33602
Telephone (813) 221-3900
Facsimile (813) 221-2900

*Attorneys for Relator Paula C. Lorona*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2015, a copy of the foregoing was hand-delivered to the Clerk, U.S. District Court.

*/s/ Sean A. Woods*
Sean A. Woods

32

7067067v1