

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

March 10, 2016

**FILED** BD

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA
*ex rel.* PAULA C. LORONA, and
REID POTTER,

      Plaintiff,

v.

INFILAW CORPORATION,
ARIZONA SUMMIT LAW SCHOOL, LLC,
FLORIDA COASTAL SCHOOL OF LAW,
CHARLOTTE SCHOOL OF LAW, and
BARBRI, INC.,

      Defendants.

_____/

Case No. 3:15-cv-959-J-34JRK

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**
**and Court Order (Doc. S-7)**

**SECOND AMENDED COMPLAINT**
**OF QUI TAM PLAINTIFFS PAULA C. LORONA AND REID POTTER**

Plaintiffs/Relators Paula C. Lorona, and Reid Potter by their undersigned attorneys and on behalf of the United States of America, state the following as their Second Amended Complaint based upon their non-public, indirect, and independent knowledge:

**I.**    **INTRODUCTION**

1.    This action is brought by Plaintiff/Relator Paula C. Lorona ("Lorona") and Plaintiff/Relator Reid Potter ("Potter") on behalf of the United States of America to recover compensatory and punitive damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*

S-14

## II.   PARTIES

2.      Lorona is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was either employed by or enrolled as a student at Arizona Summit Law School ("ASLS"), formerly known as Phoenix School of Law, in Phoenix, Arizona.

3.      Potter is a resident of Pima County, Arizona, and at all times pertinent to this Complaint, Potter was either employed by or enrolled as a student at ASLS in Phoenix, Arizona.

4.      Defendant ASLS is a for-profit Delaware limited liability company with its primary place of business in Phoenix, Arizona.

5.      Defendant Charlotte School of Law ("CSL") is a for-profit Delaware limited liability company with its primary place of business in Charlotte, North Carolina.

6.      Defendant Florida Coastal School of Law ("FCSL") is a for-profit Florida corporation with its primary place of business in Jacksonville, Florida.

7.      Defendant Infilaw Corporation ("Infilaw") is a Delaware corporation with its primary place of business in Naples, Florida. Infilaw is the parent company of ASLS, CSL, and FCSL (collectively, the "Defendant Schools"), and controls and dominates the business activities of ASLS, CSL, and FCSL. Infilaw therefore conducts business activities in the states in which those schools are located: Arizona, North Carolina, and Florida.

8.      Infilaw made and directed all significant business decisions of ASLS. For example, when certain members of the ASLS faculty and staff expressed concern about the caliber of students being admitted to ASLS, ASLS President Scott Thompson responded in a meeting attended by Lorona that he had been "instructed to put asses in seats," presumably

2

by Infilaw. Upon information and belief, Infilaw made and directed all significant business decisions of CSL and FCSL, as well.

9.      Infilaw controlled the finances of ASLS by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at ASLS; (c) processing and maintaining control over the ASLS payroll; (d) managing the 401(k) plan and other financial benefits of ASLS employees, including tuition waivers for employees who were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for ASLS employees traveling on ASLS business.

10.     On information and belief, Infilaw also controlled the finances of CSL and FCSL by (a) controlling and managing the budget and budgeting process; (b) requiring Infilaw approval of all promotions, raises, performance review, and any other financial incentives for faculty and staff at CSL and FCSL; (c) processing and maintaining control over the CSL and FCSL payroll; (d) managing the 401(k) plan and other financial benefits of CSL and FCSL employees, including tuition waivers for employees who were also students; and (e) approving and disapproving reimbursement for credit cards and expenses for CSL and FCSL employees traveling on business.

11.     Accordingly, Infilaw is liable not only for its own misconduct, but also for the misconduct of the Defendant Schools as alleged herein.

12.     Defendant Barbri, Inc. ("Barbri") is a Delaware corporation with its primary place of business in Dallas, Texas. Barbri provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates.

3

### III.   JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

14.     This Court also may exercise subject-matter jurisdiction over this action because, pursuant to 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the allegations or transactions alleged in this Second Amended Complaint. Even if a statutorily relevant disclosure has occurred, both Potter and Lorona qualify as an "original source" of the allegations in the Second Amended Complaint, as that term is defined by 31 U.S.C. §§ 3730(e)(4)(A) and 3730(e)(4)(B) because they have voluntarily disclosed to the Government information on which the allegations in this action are based, and because they have independent knowledge that materially adds to the publicly disclosed transactions.

15.     On or about July 31, 2012, Potter provided information regarding this Second Amended Complaint to the United States Department of Justice ("DOJ") through the DOJ's whistleblower hotline.

16.     On December 12, 2012, Potter provided documentation relating to this Second Amended Complaint to the United States Department of Education ("DOE").

17.     On June 3, 2015, Lorona provided documentation relating to this Second Amended Complaint to the Inspector General's Hotline – Office of Inspector General ("OIG"), United States Department of Education ("DOE").

4

18.     On July 17, 2015, Lorona met with an Assistant United States Attorney from the United States Attorney's Office, Middle District of Florida, to discuss the allegations herein. At the same time, Lorona provided to the AUSA a draft of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

19.     On August 5, 2015, Lorona provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of the initial Complaint and a disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

20.     On March 3, 2016, Potter and Lorona provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a copy of the Second Amended Complaint and a supplemental disclosure statement summarizing and supported by all known material evidence in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

21.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found, resides, transacts business, and committed violations of the False Claims Act within this District. Venue is likewise proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) for the same reasons.

IV.     EMPLOYMENT OF LORONA BY ASLS AND INFILAW

22.     Lorona was hired by ASLS in November 2009 as an administrative assistant to the General Counsel of ASLS, and later received promotions to financial aid representative

5

in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

23.     In those capacities, Lorona observed and participated in ASLS' application for accreditation from the American Bar Association and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements. More specifically, Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds through the Common Origination and Disbursement System (COD), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans.

24.     Upon Lorona's submission of COD requests on behalf of ASLS and Infilaw, the DOE deposited the requested funds in the ASLS bank account at SunTrust Bank. Each night, SunTrust would then 'sweep' those funds into bank accounts maintained by Infilaw. Once funds were swept into accounts maintained by Infilaw, Lorona would make disbursements to individual students by creating and uploading a file to SunTrust's website, which would cause SunTrust to transfer the Title IV funds from Infilaw's account to an ASLS account. ASLS would then directly distribute the funds to the student who applied for Title IV funds.

25.     Before her employment with ASLS, Lorona reviewed materials, statistics, and bar passage rates published by ASLS and decided to work at ASLS because it would help her attend law school. Indeed, as an employee, Lorona was given a full tuition waiver and a pro rata early tuition waiver to attend ASLS.

## V.   EMPLOYMENT OF POTTER BY ASLS AND INFILAW

26.   Potter is a former student of ASLS. After graduating from law school, Potter was hired by ASLS in 2011 and continued to work for ASLS until September 2014 in ASLS' Academic Services department.

27.   In his role, Potter was directly involved with guiding students through their bar exam preparation.

28.   Potter was also involved in meetings with ASLS and Infilaw officials regarding academic success programs including without limitation ASLS' bar exam preparation programs, and ASLS' use of those programs to secure and maintain federal funds as discussed herein.

29.   Additionally, Potter, in all cases directed by his superiors, collected funds from students for bar exam preparation fees in exchange for refunds given to the students by Barbri. Potter was involved in discussions with representatives of Infilaw, ASLS and Barbri who devised this exchange, and knew that its purpose was to disguise funds ASLS received from federal student loan programs so that ASLS could continue to receive such funds.

## VI.   ELIGIBILITY FOR TITLE IV FUNDS -- SUBMISSION OF PROGRAM PARTICIPATION AGREEMENTS

30.   To be eligible for Title IV/HEA funds, institutions such as the Defendant Schools must comply with HEA and DOE requirements by executing a Program Participation Agreement ("PPA") under 34 C.F.R. § 668.14(a)(1).

31.   By submitting a PPA, institutions certify that they will "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements,

7

agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program."

32.     At ASLS, PPAs were completed and executed in the financial aid department and the President's Office, giving Relator Lorona unparalleled access to the documents and the process under which they were certified. The PPAs were executed by Thompson, but they were prepared by other employees within the President's Office and financial aid department.

33.     The ASLS' PPAs certified compliance with all regulations and requirements, despite full knowledge of ASLS and Infilaw leadership and staff that the regulations and requirements were regularly being violated as alleged herein. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to ASLS, in violation of the False Claims Act.

34.     Upon information and belief, the other Defendant Schools prepared, executed, and submitted similar PPAs, in conjunction with Infilaw, to certify compliance with all Title IV/HEA regulations and requirements, despite full knowledge of Defendant Schools and Infilaw leadership and staff that the regulations and requirements were regularly being violated. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to Defendant Schools and Infilaw, in violation of the False Claims Act.

35.     Virtually all of Defendant Schools' income is derived from Title IV, HEA program funds. The Defendant Schools' survival is dependent on their ability to maintain the appearance that they are in compliance with Title IV, HEA program rules and regulations.

8

**VII.  DEFENDANTS' SCHEMES TO CIRCUMVENT THE 90/10 RULE**

36.     In order to participate in any Title IV, Higher Education Act (HEA) program,

for-profit institutions must enter into a written program participation agreement with DOE,

which conditions participation in Title IV on compliance with Title IV and DOE rules and

regulations.

37.     Under one of those regulations, Title IV and the HEA require that a for-profit

institution "derive at least 10 percent of its revenues for each fiscal year from sources other

than Title IV, HEA program funds." 34 C.F.R. § 668.14(b)(16). This is commonly known as

the "90/10 Rule." To calculate revenue under the 90/10 Rule, institutions must use the cash

basis of accounting, counting only revenue actually received. 34 C.F.R. § 668.28(a)(2).

38.     DOE rules / regulations under 34 C.F.R. § 668.1 *et seq.* require that for-profit

institutions participating in any Title IV, HEA program, report to the DOE annually the

amount and percentage of its income derived from Title IV, HEA program funds, and the

amount and percentage of its income derived from other sources.

39.     In or about early 2010, Defendants became concerned that they would not

satisfy the 90/10 Rule because a large proportion of the students attending ASLS, FCSL, and

CSL were receiving substantial Title IV/HEA funding through loans. Because tuition and

fees charged by the Defendant Schools is among the highest in the nation, students attending

those schools typically borrowed well over $100,000 to fund their educations.

40.     Publicly available reports found on the DOE website demonstrate why it was

crucially important for Defendants to keep the Title IV/HEA funding stream alive. For

example, in the 2009-2010 funding year, ASLS reported an 84.25%/15.75% split between

Title IV/HEA revenue and non-Title IV revenue and reported Title IV/HEA revenue of $22,111,393.00; FCSL reported 82.94% Title IV/HEA revenue of $65,758,846.00; and CSL reported revenue of $19,224,762.00, without reporting a 90/10 Rule split.

41.     In the public data available for the 2012-2013 funding year, ASLS reported an 87.70%/12.30% split with Title IV/HEA revenue of $60,030,378.00; FCSL reported an 86.63%/13.37% split with Title IV/HEA revenue of $78,751,382.00; and CSL reported an 87.20%/12.80% split with Title IV/HEA revenue of $63,134,358.00.

42.     In the most recent public data available covering the 2013-2014 funding year, ASLS reported an 88.04%/11.96% split with Title IV/HEA revenue of $53,281,915.00; FCSL reported an 84.95%/15.05% split with Title IV/HEA revenue of $67,556,056.00; and CSL reported an 87.87%/12.13% split with Title IV/HEA revenue of $74,954,327.00.

43.     In fact, the numbers for ASLS were so precarious that Potter was told by a CSL representative, Odessa Alm, in or about July 2012 that ASLS had a "90/10 Problem."

A.    INSTITUTIONAL LOANS

44.     From 2010 through and including 2013, Lorona participated in weekly meetings with other Defendants Schools and Infilaw employees, including Alicia Togno, Debbie Richards, Shirley Mays, Penny Willrich, Scott Thompson, Jim Lemire, Denise Barlow, CSL representatives (via phone), FCSL representatives (via phone), and Infilaw employees and representatives (via phone). The central topic of discussion at each of those weekly meetings was how to create the appearance that Defendants were complying with the 90/10 Rule. Infilaw leadership and representatives consistently represented at those meetings that it would be beneficial for the statistics to appear as though the revenue was split 80/20,

10

so that the government would not become suspicious and begin an investigation into actual compliance.

45.    During one of the Friday meetings in 2011 Scott Thompson, the President of ASLS and former Chief Financial Officer for Infilaw, introduced and proposed to Lorona and the other participants the concept of offering Institutional Loans ("ILs") to students as a solution to the 90/10 Rule. Thompson stated that from Infilaw's perspective the sole reason to offer ILs was to give the appearance that the Defendant Schools were in compliance with the 90/10 Rule.

46.    Infilaw viewed the ILs as a potential solution to the 90/10 Rule because revenue generated from institutional aid may be counted as non-Title IV/HEA revenue under 34 C.F.R. § 668.28(a)(5), as long as the institutions offering the loans meet certain guidelines and requirements. Among these requirements is that the ILs be subject to regular loan repayment and collection.

47.    Infilaw and the Defendant Schools marketed the ILs in the same manner as Title IV/HEA or GradPlus loans, even though they did not have the same benefits. Unlike Title IV/HEA and GradPlus loans, ILs are not deferrable by students after graduation, nor may students apply for financial hardships or forbearances of the ILs.

48.    Despite never having been in the lending business, Infilaw and the Defendant Schools began to roll out ILs in 2012 for the Fall 2011 – Spring 2012 financial aid year. As part of this process, Infilaw required the Defendant Schools to obtain credit reports on all students and report the top credit scores. Once the reports had been run, the Defendant Schools, under Infilaw's direction, began contacting students with the top credit scores in an

attempt to convince them to sign up for ILs. This effort was immediately successful, and students began signing up.

49.     Once that limited rollout ended, Infilaw and the Defendant Schools decided to then offer the ILs to students who could not get approved for private loans elsewhere.

50.     The Defendant Schools began soliciting and providing ILs to almost any student without regard to creditworthiness or ability to repay, including students with bankruptcies and foreclosures ("Low Credit ILs").

51.     After a year of funding Low Credit ILs with no prospect of repayment, the Defendant Schools counted and reported to the DOE the amount of the corresponding receivables from these loans as income "from sources other that Title IV, HEA program funds." This created the illusion that the Defendant Schools derived a much higher percentage of their income from non-Title IV sources so that the Defendant Schools appeared to be well in compliance with the 90/10 Rule.

52.     In reality, neither Infilaw nor the Defendant Schools ever made any serious attempts to collect from the Low Credit IL students. From the perspective of Infilaw and the Defendant Schools, all that mattered was the ability to count and report the loan as income. Even more nefariously, the Defendant Schools began withdrawing future IL support for the Low Credit ILs students who had accrued tremendous amounts of debt and had been determined by Defendants Schools to have a low chance to pass the bar exam, thereby destroying their ability to continue to attend school.

53.     Defendants knew, and ignored, the fact that most of the students receiving ILs could not and would not repay the loans. In fact, because Defendants had so much Title

IV money, they were able to purposefully shun collection efforts in order to avoid calling attention to the fact that the loans were not in fact collectible and because they had discovered they could, in effect, use the uncollectible ILs as a way to create fake income and trump up their "10" money to avoid the appearance of violating the guidelines and the 90/10 Rule and continue to receive the large amount of "90" money they were receiving.

54.     For example, certain students could not make payments on their ILs and ASLS upon information and belief never collected a dollar from them. But Scott Thompson forced Lorona to continue to allow them to attend school so that he could count the students' receivables towards the "10" money of the 90/10 Rule. Obviously ASLS could not legally or ethically count such non-existent revenue in determining compliance with the 90/10 Rule. Upon information and belief, IL default rates exceeded 40% in the 2013 fiscal reporting year.

55.     Under the cash basis of accounting, revenue can be recorded only when cash is received, rather than when it is earned. Thus, counting future payment of ILs (which Defendants knew they would not collect) as revenue under the 90/10 Rule violated Title IV/HEA and created the false impression that Defendants were complying with the 90/10 Rule. In substance, the ILs were mostly a sham designed solely to make it appear that Defendants were complying with the 90/10 Rule.

56.     There is no principle of accounting that permits an individual or entity to credit as income a debt or receivable that cannot or will not be collected.

57.     Lorona was privy to this scheme and its mechanics during her time at ASLS due to her position and employment, and was instructed to complete the financial transactions necessary to fund ILs. Once a student was convinced to sign up for an IL, the

Defendant Schools would "refund" the Title IV/HEA funds previously received from DOE and replace those loan funds with IL funds from the institution, most of which was previously received Title IV/HEA funds from other students' financial aid submissions. This allowed the Defendants schools to transfer funds from the 90% side to the 10% side in a dollar-for-dollar manner, making it appear they were complying with the 90/10 Rule. Checks were kept to a certain maximum value, as to prevent undue attention from governmental and regulatory bodies.

58.     Lorona was aware of and viewed internal calculations of revenue under the 90/10 Rule (as opposed to the publicly reported data), most of which demonstrated that ASLS was consistently in violation of the 90/10 Rule. In fact, Lorona was provided documents demonstrating a violation of the 90/10 Rule and instructed to convert some Title IV/HEA loans into ILs for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule. Upon information and belief, the same documents existed at the other Defendants Schools.

59.     Knowing that the ILs were not going to be as helpful to students as Thompson attempted to market them, and further knowing that the ILs were just a way to create the false impression that the Defendant Schools were complying with the 90/10 Rule, Debbie Barlow, an Infilaw employee or contractor, commented that "if it looks like a duck and quacks like a duck, it must be a duck."

60.     At some point after the first year of the ILs, Infilaw and the Defendant Schools realized that the ILs alone were insufficient to maintain the continuing illusion of

90/10 Rule compliance. Infilaw and the Defendant Schools searched for other, additional ways to boost their reported income "from sources other than Title IV, HEA program funds."

**B.    MYBAR AND INADEQUATE BAR PREPARATION**

61.    In or about late 2011, as another solution to satisfying the 90/10 Rule, Infilaw tasked the Defendant Schools – beginning with ASLS – with creating and implementing their own bar exam preparation programs to compete with established programs from Barbri and other providers. The Dean of ASLS, Shirley Mays, sent an email on or about September 15, 2011, stating that she had an insightful 90/10 meeting and that ASLS's own bar prep course "has bubbled to the top as a real solution for 90/10."

62.    ASLS undertook to form a bar preparation program, and tasked the Director of Critical Legal Skills Program ("DCLSP") to implement it. The DCLSP was not receptive to the implementation of a new bar course in less than 3 months in order to prepare December 2011 graduates to take the February 2012 bar examination. Additionally, the DCLSP expressed concerns with relying on a February 2012 pilot program for myriad other reasons, including an impending switch to the Uniform Bar Exam in Arizona.

63.    Undeterred, in October 2011 Dean Mays stated that regardless of the DCLSP's legitimate concerns, the bar preparation program was an important initiative for satisfying the 90/10 Rule. The DCLSP faced extreme pressure from Infilaw and ASLS leadership, putting her in an untenable situation – sacrifice education quality and quality bar preparation, or be forced out.

64.    As pressure and time mounted, and ASLS could not definitively state its plan regarding bar preparation, students began enrolling in other bar preparation courses and

15

inquiring as to scholarships for established bar courses like Barbri. In prior years, ASLS maintained a fund of $50,000 to assist students in dire financial need to enroll in established bar preparation courses. In late 2011, however, Dean Mays informed the DCLSP that the $50,000 usually available for students in dire need was no longer available, thus attempting to close avenues to bar preparation programs other than their new program.

65.     In other attempts to derive non-Title IV/HEA funding to satisfy the 90/10 Rule, Penny Willrich suggested that ASLS **force** its students to take its bar preparation program, provide no bar preparation materials to the students unless they sign up for ASLS bar preparation program, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds.

66.     As ASLS formalized its new program, it named the program "myBAR" which stood for Multi-Year Bar Advanced Review.

67.     ASLS began **paying** students who participated in myBAR thousands of dollars as "bonuses" for completing mini-courses called modules, thus effectively refunding the students' myBAR fees. This cleverly-packaged arrangement allowed ASLS to claim tuition received from myBAR fees as non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds.

68.     Upon information and belief, all Defendant Schools have counted myBAR program fees as non-Title IV/HEA revenue toward satisfying the 90/10 Rule.

69.     Due to the restrictions and restraints imposed by Infilaw and ASLS leadership, myBAR was woefully inadequate as a bar preparation course. As such, the program does not meet the requirements of 34 C.F.R. § 668.28, as it does not prepare ASLS students to take the

bar. ASLS admitted this in an email on December 23, 2014, indicating that the anticipated bar passage rate for an ASLS student on the February 2015 bar exam was <u>47%</u>, compared to a state average of 70%. Nevertheless, ASLS continues to falsely market the 'efficacy' of its bar preparation programs, including sending emails to students touting higher bar passage rates for myBAR, as opposed to established bar preparation courses.

70.     The Defendant Schools' bar preparation programs incomes are not income from school activities necessary and required for students enrolled in their programs, nor do the programs actually prepare their students properly to take an examination for an industry-recognized credential or certification issued by an independent third party. The funds received from the bar preparation programs of the Defendant Schools therefore cannot be considered non-Title IV/HEA revenue to apply towards the 90/10 Rule.

71.     Recognizing that the bar preparation for its students was dismal and students were unlikely to pass the bar, ASLS and Infilaw leadership decided to "game" the bar passage requirements imposed by the American Bar Association (ABA) by requesting that students defer taking the bar exam in exchange for a monetary payment or stipend. For students the ASLS leadership could not convince to defer taking the bar exam, ASLS leadership began telling students to enroll in myBAR, rather than Barbri or other established providers.

72.     For the February 2015 bar exam, ASLS tracked 197 students who were ready to take the bar exam for the first time. Of those students, ASLS targeted 37 students who they believed could not pass the bar. Additionally, of those 197 students, 39 of them had been previously paid to defer taking the July 2014 bar exam. In fact, Dean Mays said that ASLS

does not care about students who have already failed. Instead ASLS was only concerned about first-time bar exam sitters, who look better in ASLS statistics.

73.     As of January 14, 2015, ASLS predicted only a 50.9 percent anticipated passage rate for first-time bar test takers and had some students marked as a less than ten percent chance of passing – including students with a less than 6% chance of passing.

74.     Additionally, ASLS all but ignored any students who were preparing to take the bar exam for a second time or more as discussed herein.

75.     The actual pass rate for ASLS graduates taking the July 2015 Arizona bar examination was a woeful 26.4% - despite ASLS continuing to market the efficacy of their myBAR program.

### C.     THE CHECK EXCHANGE WITH BARBRI AND DEFENDANT SCHOOLS

76.     Barbri begins soliciting law students to sign up for their bar exam preparation courses during the first year of law school. Students that enroll in Barbri's courses are required to pay a deposit in exchange for ensuring that the student is given the best possible bar exam preparation course price as the cost increases for each year a student waits to pay the deposit. Additionally, Barbri typically hires student representatives to recruit other students for their bar preparation courses. These representatives are often current law students and receive a free or discounted bar exam preparation course in exchange for recruiting and soliciting students.

77.     Barbri's bar preparation courses include a series of live or recorded lectures, study materials, and practice exams. A significant portion of the courses' cost is attributable to Barbri's copyrighted bar preparation books, outlines, and practice exams, which are

18

tailored to each state's bar exam. These live or pre-recorded lectures are offered in a physical classroom staffed by Barbri employees. Barbri offers their bar exam preparation courses at every non-Infilaw law school in Arizona, Florida, and North Carolina.

78.     In 2011 or 2012, Infilaw and the Defendant Schools approached Barbri about creating an internal bar exam preparation program that would be offered at the Defendant Schools.

79.     The program implemented at all three Defendant Schools, utilized the written materials and lectures developed by Barbri for their bar exam preparation courses.

80.     The ASLS internal bar preparation course is called the myBAR program (formerly "IBPP"); FCSL's internal bar preparation course is called the Coastal Enhanced Bar Pass Program; and CSL's internal bar preparation course is called the Bar Exam Advanced Review or "BEAR" program.

81.     In or around 2012, Infilaw and the Defendant Schools entered into agreements with Barbri that provide that Barbri would stop offering their own courses at the Defendant Schools in exchange for the Defendant Schools' purchase of Barbri materials for their internal programs.

82.     The contract between Infilaw and Barbri prohibits Barbri from soliciting the Defendant Schools' students, setting up recruiting tables at the Defendant Schools, or offering discounts to Infilaw students.

83.     The student representatives at the Defendant Schools, with whom Barbri had entered into agreements to recruit other students in exchange for free bar preparations

courses, were upon information and belief converted into Infilaw internal bar review student representatives.

84.     Barbri and Infilaw entered into an agreement (the "Barbri Agreement"), dated July 2, 2012, that provides that Barbri will provide all the materials for the Defendant Schools' internal bar review programs. The contract was stated to cover a term from July 2, 2012 until July 31, 2015 (the "Barbri Initial Term"). Stephen Fredette, the chairman and CEO of Barbri, signed the contract on behalf of Barbri. Chidi Ogene, general counsel for Infilaw, signed the contract on behalf of Infilaw. Infilaw was required under the agreement to report various student data to Barbri, including the results of diagnostic testing administered in connection with the bar preparation courses. Infilaw agreed to pay Barbri a fixed fee for Barbri's materials and instruction services. The total sum payable to Barbri over the Barbri Initial Term amounted to more than twelve million dollars ($12,000,000).

85.     Scott Thompson told Potter in or about July 2012 that ASLS needed to create "10" revenue with the check exchange program and that a paper trail needed to be created for it in order to mask the fact that the majority of students were using their Title IV distributions to pay for bar preparation.

86.     Tellingly, at the time of the Barbri Agreement's execution, the Defendant Schools' students taking the Summer 2012 bar review course had already paid or contracted directly with Barbri to take Barbri's bar review course and the Barbri course was already half over.

87.     A substantial and material amount of the funds the Defendant Schools' students paid to Barbri for Barbri's Summer 2012 bar review came from Title IV funds which had been previously distributed to students who then paid Barbri from those funds.

88.     After the Barbri Agreement was signed, students who navigated to the Barbri bar preparation course through Barbri's website were then told by Barbri employees that due to an agreement with Infilaw they must register in the Defendant Schools' internal bar preparation courses. Infilaw's agreements with Barbri fixed the price of the "live" bar preparation courses offered to Defendant Schools' students, eliminated any competition by Barbri, and resulted in large payments from Infilaw to Barbri to ensure that the Defendant Schools' in-house bar review courses were the only option available to the Infilaw students.

89.     Although the Defendant Schools' bar preparation courses were touted as an honest attempt to increase the Defendant Schools' bar passage rates and as an "individualized bar preparation program designed specifically for [ASLS students]" that "comprises the best features of Barbri and Kaplan," the real reason that Infilaw created the program was to inflate the portion of revenue at the Defendant Schools that could be counted as non-Title IV or "10" revenue. Prior to the creation of the myBAR program, the Defendant Schools, and in particular ASLS, were in danger of violating the 90/10 Rule because the vast majority of their revenue was paid from Title IV sources.

90.     In order for Defendant Schools to immediately begin recognizing the money already paid by the Defendant Schools' students to Barbri as non-Title IV "10" money revenue, Infilaw and the Defendant Schools (with assistance from Barbri) concocted a plan to make the students who had already paid deposits and contracted with Barbri switch their

enrollment to the Infilaw bar preparation programs for the July 2012 through July 2013 bar exams.

91.     As part of this plan, Barbri, Infilaw and the Defendant Schools came up with an elaborate scheme to falsely count the full amount of the internal bar review course cost as non-Title IV revenue, the Defendant Schools required students that had already made payments to Barbri for the summer 2012 course, or as deposits for future courses, to engage in a "check exchange" program with the law schools. Barbri agreed to refund each student's past payments by sending the checks *directly* to the Defendant Schools. The Defendant Schools would then distribute the checks to the students in exchange for the student writing a personal check payable to the school for the same amount.

92.     Even though the July 2012 bar preparation course students had already paid Barbri; had already attended Barbri-led classes; and were nearly complete with the Barbri program, Barbri nevertheless – in the initial check exchange with ASLS – sent refund checks to ASLS to perform a check exchange for these students so that ASLS could count the revenue as "10" money – and never provide any services for the money.

93.     During this time, Relator Potter had multiple conversations with representatives of CSL and FCSL to discuss the check exchange for their respective schools and was consistently told that ASLS had a 90/10 problem and the check exchange was a solution to ASLS' 90/10 problem.

94.     Scott Thompson told Reid Potter and Glenys Spence in an email dated July 29, 2012 that "It is important we get the $ deposited as 90/10 is a cash basis calculation, so the $ need to be in our account by 7/31."

95.    In an email sent by ASLS' employee Glenys Spence on August 21, 2012 she wrote that she had a lot of questions regarding marketing the internal bar review program as she believed that Barbri was still marketing their program to ASLS students "which does not bode well for 90/10."

96.    Another primary reason for the development of its internal bar review programs is so that Infilaw could gather data on and identify students that were unlikely to pass the bar exam. The Barbri Agreement provided for assessment tests to be administered to the Infilaw students and for this data to be reported to Infilaw. The goal of identifying students who were at high risk of failing the bar exam was to persuade the students to delay or forgo the bar exam and, thereby, falsely inflate the Defendant Schools' bar passage and employment rates as set forth in greater detail in the next section. Barbri entered into its agreement with Infilaw in connection with the Defendant Schools' internal bar exam programs knowing full well that the purpose of the program was to inflate and falsify the Schools' non-Title IV revenue to avoid having the schools become automatically ineligible for Title IV funding.

97.    Relator Reid Potter was present during discussions with Barbri employees where this purpose (and its potential illegality) was discussed.

98.    For example, on or around September 6, 2012, Relator Potter and another employee of ASLS, Glenys Spence, held a telephone call with Barbri employee Mary Goza. During the call, the participants discussed rebranding Barbri's bar preparation materials as being affiliated with ASLS's bar exam preparation course. The ASLS and Barbri employees also discussed how to transition Barbri's law student representatives, who recruited law

23

students to sign up for Barbri's course in exchange for a free bar preparation course, to recruit students for ASLS's internal program. Mary Goza was aware that inflating ASLS's non-Title IV revenue was the main purpose of the MyBar Program.

99.     ASLS' Dean, Shirley Mays sent an email to Glenys Spence on September 19, 2012 stating that ASLS cannot accept deposits for the internal review program "due to 90/10 presumptions" and instead requested that students sign a contract or letter of intent.

100.     This was because ASLS had decided that to better hide the sham nature of the "10" revenue from students paid for the myBAR program, they would not collect fees for myBAR until after students had graduated and received a change of status from "enrolled" to "graduated" in ASLS' student management database.

101.     This was confirmed in another email – this one sent on May 9, 2013 by Nina Segovia to Scott Thompson, Glenys Spence, Shirley Mays, and Reid Potter stating in reference to a myBAR Frequently Asked Questions (the "myBAR FAQ") document attached to the email: "SCOTT – The question about 'deposits' for myBAR is listed in question #4. If we opt to ask for a deposit, this will mean that we can't use the money as '10' money (on average $250 per 100 sign-ups = $25,000). Please let us know if you'd like to go with option 'a' or option–'b' This is a critical question."

102.     Question 4 of the myBAR FAQ stated:

**When do I have to pay for myBAR?**
a) Recommended:  You will pay for your **myBAR** program after you graduate and before the course starts.  Unlike with BARBRI, you do not need to pay a deposit to obtain your books.
b) You will need to provide a $100 deposit as a 1L and $150 as a 2L at the time of registration.

103.    In fact, students attempted to pre-pay their myBAR fees prior to graduation, but were rebuffed and told that ASLS could not collect money for myBAR until after they had graduated.

104.    Students at Defendant Schools were repeatedly told that they would only be invoiced for the bar preparation programs once they graduate and not prior.

105.    In an email dated August 18, 2013 with a subject of "myBAR Policies," the procedure was documented as: "Students will pay $250 ($100 as a 1L and $150 as a 2L). That money is refunded after graduation. Once the student graduates, he or she will pay the full $2,550 and get the $250 back."

106.    Barbri's incentive to help implement the scheme was to realize an increase in revenue that they normally would not have seen. As detailed herein, Barbri would realize more revenue from the Barbri Agreement with Infilaw during the Barbri Initial Term than they would actually realize if they had signed up individual students – as they do with all other law schools.

107.    Scott Thompson stated in an email dated January 8, 2013 that ASLS had paid Barbri based upon the Barbri Agreement and that he was expecting student refunds within a week so that the check exchange process could start with students who were now listed as "graduated" in the student database.

108.    An email sent from Mary Goza to ASLS' employees on or about January 18, 2013 details that Barbri not only knew about the scheme to move money to the "10" side of the 90/10 equation, but that they were instrumental in designing and deploying the scheme. In that email, Ms. Goza lays out the "CHECK EXCHANGE PROCESS" as:

CHECK EXCHANGE PROCESS:

1) A spreadsheet was sent to each school showing the amount each student paid to BARBRI. When we get confirmation on those lists we will process checks (FCSL is still outstanding).

2) A check made payable to each student will be issued and sent to each school. We cannot do a lump sum check because the students are enrolled in the BARBRI system and therefore the account is in the student's name.

3) Each school will be responsible for notifying the impacted students and comple.ng the check exchange.

4) Each school will distribute the checks to each student, and in return the student will provide a personal check payable to the school for the same amount. *To ensure compliance with 90/10, the student should not merely sign over the check to the school, but instead provide direct funds*. The process will include out of state students, thus the school must notify and complete the exchange with the out of state students. (emphasis added)

109.   A memo distributed by Infilaw to the Defendant Schools even detailed and copied the check exchange program narrative nearly verbatim from Mary Goza's email, stating:

MyBar CHECK EXCHANGE PROCESS:
A spreadsheet was sent to each school showing the amount each student paid to BARBRI. When we get confirmation on those lists we will process checks (FCSL is still outstanding).

A check made payable to each student will be issued and sent to each school. We cannot do a lump sum check because the students are enrolled in the BARBRI system and therefore the account is in the student's name.
Each school will be responsible for notifying the impacted students and completing the check exchange.

Each school will distribute the checks to each student, and in return the student will provide a personal check payable to the school for the same amount. To ensure compliance with 90/10, the student should not merely sign over the check to the school, but instead provide direct funds. The process will include out of state students, thus the school must notify and complete the exchange with the out of state students.

26

110.   For the summer 2012 bar review course, ASLS received checks for approximately 70 graduates representing approximately $184,000. This was income that was owed and had already been paid to Barbri based on the students' agreements with Barbri. Through the check exchange program ASLS illegally counted a large and material amount of this money as non-Title IV income in its 2012 annual audit submitted to the DOE.

111.   In an email dated January 30 2013, Mary Goza stated that both CSL and ASLS will receive student refund checks from Barbri on February 4, 2013.

112.   ASLS obtained from Barbri lists of students that had made payments to Barbri for summer 2013 bar review courses. These students had already taken a Barbri bar preparation course and already taken the summer 2013 bar exam. But in its efforts to falsify its 90/10 Revenue calculation, ASLS contacted these students, attempted to make them cash a "refund" check from Barbri, and then immediately write a check in the same amount to ASLS for its myBAR program. Students that would not comply with this obvious charade were threatened that ASLS would withhold their character and fitness certification for those students who had passed their bar exams and were applying for bar admission. Barbri sent refund checks for approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process. The checks from these students were falsely reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE.

113.   In order to force students to enter into the check exchange process, i.e., to enter into a sham transaction with Barbri and the Defendant Schools, the schools resorted to making threats to students and recent graduates, including that the school would withhold

27

transcripts required for the students' bar admission (assuming they passed the bar) or would report any unpaid debt to character and fitness.

114.  In fact, the Defendant Schools' were so concerned with ensuring the funds were collected to knowingly inflate and misstate the 90/10 revenue calculations, that they even resorted to sending threatening emails to students the night *prior* to bar exams to inform them that the payment must be made to Defendant Schools as the Defendant Schools "would like to avoid any questions during Character and Fitness review."

115.  The purpose of the internal bar exchange programs and check exchange process was to knowingly misstate the Defendant Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of ASLS (then called the Phoenix School of Law) informed the Director of Academic Services at ASLS that Defendant Infilaw had "tasked" ASLS with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the ASLS' Director of Academic Services raised ethical objections to forcing students to use an internal bar preparation course, ASLS terminated the Director's employment.

116.  The sham nature of the revenue recognized by the Defendant Schools in 2011 through 2013 for the Schools' internal bar preparation course is evidenced by the conversations that occurred between Barbri, Infilaw and the Defendant Schools regarding rebranding or reprinting Barbri's materials with Infilaw or the Defendant Schools' branding. When Barbri informed employees of ASLS that the bar exam course materials had already

been printed for 2012 with the Barbri logo and branding, it was suggested that ASLS print stickers and manually attach them to the Barbri books to make them look as if ASLS and Infilaw had a role in developing the materials. In reality, the $2500 each student paid to ASLS for the myBAR course was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona.

117.   In addition to the anti-competitive and sham nature of the internal bar preparation course revenue, the entire amount of the internal bar preparation course fees paid to the Defendant Schools was really for "books and materials" provided by Barbri. As a result, the Defendant Schools were prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges. 34 C.F.R. § 668.28(a)(7)(v).

118.   Infilaw and the Defendant Schools' arrangements with Barbri contained unwritten agreements that prohibited Barbri from hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri's bar preparation programs, offering tuition assistance and discounts to students or otherwise competing with Infilaw in pricing or advertising to Infilaw Students for bar preparation courses. ASLS prevented any other bar review programs from marketing to students on campus.

119.   The Defendant Schools' were so committed to the scheme, that even when students who got wind of the scheme requested to not be a part of it, Scott Thompson tasked Relator Reid Potter to "reach out to the student and explain the situation and correct the inaccuracies."

120.   Scott Thompson further requested Relator Potter go "door-to-door" to students' households to perform the check exchange with students who had not done already exchanged checks.

121.   Scott Thompson demanded that Relator Potter setup a table in front of bar study classrooms and not allow individual students to attend who had not participated in the check exchange – until after they had successfully exchanged checks with the student.

122.   The urgency to collect the checks reached a fever pitch when Scott Thompson sent an email on March 5, 2013 stating that he was "very concerned about the status of our collections" on the internal bar review program, as "this is a very important piece of '10 money'."

123.   Thompson sent another email on March 16, 2013 again stating that collecting the money is "important to '10' money" and that the collections should be completed by end of March 2013.

124.   Thompson was alarmed that ASLS' initial projections for myBAR revenue was higher than what was occurring in practice and sent an email on May 10, 2013 stating " Once we get the reconciliation solved, we can work on a process to optimize '10 money' as I believe we are missing opportunities."

125.   Thompson became increasingly concerned with collections efforts and sent an email on May 21, 2013 stating that he may work with Barbri to get students who were still directly enrolled in Barbri's courses into ASLS' myBAR program so that "we can get the '10' money."

126.    Infilaw, the Defendant Schools, and Barbri conspired to manipulate and falsify the Defendant Schools' 90/10 Rule data by entering into an illegal price fixing and anti-competitive arrangement that limited students' ability choose between multiple competing live bar preparation programs, as well as eliminating discounts and other incentives that would typically be offered to students by Barbri and other established programs.

## VIII.   SUBSTANTIAL MISREPRESENTATIONS REGARDING THE NATURE OF DEFENDANT SCHOOLS' EDUCATIONAL PROGRAMS, FINANCIAL CHARGES, AND EMPLOYABILITY OF GRADUATES.

127.    Title IV/HEA prohibits an institution from engaging in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b). That prohibition extends to misrepresentations "in all forms, including those made in advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution." *Id.* Violation of this prohibition may subject an institution to loss of its eligibility and access to Title IV, HEA funds. As alleged herein, the Defendant Schools repeatedly violated this regulation by publishing materially false and misleading representations about bar passage, academic, and career prospects, and pushing unsuspecting students into loans that could not be repaid.

### A.    ALTERNATIVE ADMISSIONS MODEL FOR LEGAL EDUCATION (AAMPLE)

#### 1.    ASLS PUBLISHED ADMISSION STATISTICS AND BAR PASSAGE RATES ON ITS WEBSITE AND OTHER MARKETING MATERIALS.

128.    Before her employment and before enrolling at ASLS, Lorona reviewed statistics set forth in marketing materials physically placed throughout the admissions area of

the ASLS facility. This marketing material included the annual "Viewbook" which contained favorable statements from previous students about the caliber of the students attending ASLS and the quality of the education they received from ASLS. The "Viewbook" was also available online on ASLS' website.

129.    ASLS posted on its website and in its "Viewbook" enrollment statistics, including LSAT scores and undergraduate GPAs, of its students. ASLS updated this information at least annually on its website and in the "Viewbook." ASLS also provided this information to the Law School Admission Council ("LSAC"), which similarly posted it on its website for review by students and potential students of ASLS. Lorona reviewed these statistics both online and in the paper copy marketing materials and "Viewbooks" available in the admissions area of ASLS facilities.

130.    Lorona also reviewed additional information on ASLS' graduates provided by ASLS in its student application packet. From this information, Lorona was impressed to learn that only two out of 70 students that were actively seeking employment were unemployed. She also learned from the application packet that the median salary for ASLS graduates was $60,000, with a median student loan debt of $101,310.

131.    ASLS' law school application instructions that ASLS provided to Lorona online contained in its Section 10 explicit assurance that: "Phoenix School of Law's [ASLS's] admissions process is governed by the American Bar Association Standards for Approval of Law Schools and Interpretations. In particular, Standard 501 provides that: (a) A law school's admission policies shall be consistent with the objectives of its educational program and the resources available for implementing those objectives. (b) A law school

32

shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar."

132.    Relator Lorona read and relied upon these assurances in deciding to enroll at ASLS as a law student. ASLS repeated these assurances in its online application page through at least 2012.

133.    Lorona also read on ASLS' website prior to enrolling at ASLS as a student that ASLS' graduates had bar passage rates exceeding 80%.

134.    Based upon all the foregoing information, which ASLS provided to Lorona prior to her enrollment, Lorona decided that ASLS would be a good place for her to work and attend law school.

135.    Specifically, Lorona reasonably believed based upon this information that if she completed ASLS' law school program she had a very good chance of passing the bar examination and would easily be able to find employment at a law firm or even in the public sector making approximately $60,000 per year.

136.    In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

137.    Throughout the time she was a law student of ASLS, ASLS continued to post on its website and in its "Viewbook" statistics including LSAT scores and grade point averages of ASLS students. ASLS updated the reported statistics at least annually. ASLS also continued to provide those statistics to LSAC, which with ASLS' knowledge and permission, continued to post them on LSAC's website for review by students and potential students of ASLS.

138.   LSAT scores and undergraduate GPAs are commonly accepted indicators of the likelihood of a student's success in law school and ability to pass the bar examination.

139.   Throughout the time Lorona was a student at ASLS she continued to read and rely upon the admission statistics, including LSAT scores and undergraduate GPAs of ASLS students as reported on ASLS' website and marketing materials, including the "Viewbook" and on LSAC's website.

140.   Lorona took comfort in the fact that the reported statistics regarding LSAT scores and undergraduate GPAs of ASLS students remained stable throughout this time, and compared favorably to comparable statistics regarding students enrolled at other law schools.

141.   For example, median LSAT scores and undergraduate GPAs for ASLS students as reported on ASLS website in the "Viewbook" as of Spring 2008 were 153 and 3.18 respectively.

2.   **ADMISSION OF LARGE NUMBERS OF STUDENTS THROUGH THE AAMPLE PROGRAM MATERIALLY DECREASED THE MEDIAN AND AVERAGE LSAT SCORES AND UNDERGRADUATE GPAS OF ASLS' STUDENT BODY.**

142.   By 2005, ASLS was admitting students to its law school through a program known as Alternative Admissions Model for Legal Education ("AAMPLE").

143.   Admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions. AAMPLE students are admitted through alternative means. As such, and unbeknownst to Lorona, LSAT and undergraduate GPA statistics were not included in the admissions statistics ASLS posted on its website, published in its marketing materials, including the "Viewbook" and provided to the LSAC for review by potential and existing ASLS students.

144.    In early 2011, Lorona expressed concern in meetings with Dean Mays, Thompson, the admissions staff, and financial aid staff that the school was deceptively marketing to incoming students, in violation of 34 C.F.R. § 668.6. Lorona also expressed concern that ASLS was also providing misleading data to investors and incoming students regarding potential career success and student financial obligations.

145.    ASLS advertises its AAMPLE program as offering "motivated and determined individuals with lower traditional indicators (i.e. LSAT and/or GPA) the opportunity to earn a seat into the competitive Juris Doctorate program at Arizona Summit Law School." Dean Mays claimed that students matriculating through AAMPLE are just as successful as traditional students, a claim that is belied by all available data. Students entering law school through AAMPLE may *appear* to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

146.    Indeed, Lorona told Dean Mays and others that the statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment. Lorona's concerns were based on ASLS cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding AAMPLE student employment.

147.    In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions. Such reports were intended to

mislead prospective students and current students as to the caliber of students attending ASLS. Due to the grading curve and percentage of AAMPLE students in relation to traditionally admitted students, these reports gave the illusion that the AAMPLE students were performing at the same level as traditional students.

148.   When AAMPLE was created, Thompson stated that the program would go forward because he had been "instructed to put asses in seats." AAMPLE students were initially required to pay $3,500.00 to attend the AAMPLE program, but ASLS eventually reduced that amount to $300.00 to encourage more and more students to enroll and eventually matriculate into ASLS, regardless of their academic standing or prospects.

149.   Additionally, in the beginning, ASLS would offer admission to only the top few students emerging from the AAMPLE program. After realizing the program was a source of enrollment and revenue, ASLS began offering admission to **all** AAMPLE students, even though AAMPLE does not require GPAs or LSAT scores within traditional ranges.

150.   As evidence of Infilaw's commitment to bring any warm body it could find to fill seats, Infilaw developed at least one lead generation website to bring students in to the Defendant Schools. Infilaw paid for the creation of this separate website, located at www.lawcareernow.com, as a means of recruiting students into the AAMPLE Program.

151.   The AAMPLE program is advertised on the site as "a 6 - 7 week online program offering two actual law school courses, Fourth Amendment and Negotiable Instruments, that allow prospective law school students to experience the structure and rigor of law school, gain a true understanding of what to expect in the classroom and how to succeed." The site further advertises "Success in the AAMPLE program, will provide you

with acceptance at one of the participating law schools." The participating law schools are ASLS, FCSL, and CSL.

152.   ASLS typically does not include AAMPLE students in their statistics and data that are publicly reported regarding career placement, bar passage, and financial obligations.

153.   The percentage of AAMPLE applicants who were admitted to ASLS increased from 11% in 2005 to 80% in Spring 2011. The number and percentage of AAMPLE students included in ASLS' student body likewise increased substantially and materially during that time period.

154.   However, ASLS did not disclose on its website or in marketing materials or the "Viewbook," or in the information it provided to LSAC for posting on its website that the reported admissions statistics, including LSAT scores and undergraduate GPAs, did not include the LSAT scores or undergraduate GPAs of AAMPLE students. As such, the statistics ASLS reported were materially false and misleading.

155.   Lorona did not know that the reported LSAT scores and undergraduate grade point averages of ASLS students that she reviewed on ASLS website and marketing materials, including the "Viewbook," excluded AAMPLE students. This omission was material, and rendered the reported statistics materially false and misleading.

156.   Defendants thus misrepresented their admission requirements and the caliber of students being admitted to ASLS.

157.   Reporting enrollment and success statistics based only on the non-AAMPLE portion of the student population is grossly misleading to incoming and existing students.

158.    The actual impact of the admission of ever-increasing numbers of AAMPLE students was not known to Lorona until ASLS' recent disclosure of abysmal and progressively lower bar examination passage rates, culminating in the July 2015 bar passage rate of 26.4% for first-time and repeat takers.

159.    Actual bar pass rates (combined first time and repeat takers) of ASLS graduates during Lorona's tenure as a student of ASLS were as follows: February 2012 63.8%; July 2012  73.1%; February 2013 72.9%; July 2013  63.3%; February 2014 48.8%; July 2014  49.5%; and, February 2015  52.6%.

160.    Lorona took the February 2015 bar examination.

161.    The actual bar pass rate of ASLS graduates taking the July 2015 bar examination was 26.4%. The bar pass rate for Arizona State University Sandra Day O'Connor College of law and University of Arizona James E. Rogers College of Law graduates taking the July 2015 bar examination were 81.8% and 77%, respectively.

162.    However, prior to and continuing through the time that Lorona was a student of ASLS, ASLS continued to tout "Ultimate Bar Pass Rate[s]" exceeding 80%. For example, ASLS' "Viewbook" marketing brochure which was used to market to and attract students to ASLS in at least the years 2013 and 2014 prominently touts an "Ultimate Bar Pass Rate" of 86% for ASLS graduates, and in fine-print purportedly bases this on "[g]raduates who passed the Arizona Bar Exam on the first or subsequent attempts."

163.    In an October 16, 2014 email to ASLS students, including Lorona, Dean Mays reported an "Ultimate pass rate" of 80.8%.

164.    Throughout her tenure as a law student of ASLS Lorona read and relied upon and continued to read and rely upon ASLS's representations of an "Ultimate Bar Pass Rate" exceeding 80%.

165.    Moreover, as the bar pass rate of ASLS graduates continued to decline, enrollment at ASLS appeared to increase substantially during Lorona's tenure. Thus, the "Ultimate" bar pass rates touted by ASLS were extremely misleading at best.

166.    The Bar Examination statistics and pass rates maintained by the Arizona Supreme Court indicate that the passage rate for individuals taking the Arizona Bar Examination for a second time or subsequent times is substantially lower than the passage rate for individuals taking the Arizona Bar Examination for the first time.

167.    Throughout the time Lorona was a law student of ASLS, Lorona continued to rely on ASLS' representations regarding the success of its graduates in finding employment in in average salary of its graduates. This information could be found in ASLS' marketing materials and website.

168.    ASLS stated on its website from at least 2010 through 2013 that: PSL's [ASLS's] Bar Exam passage rates are high, and the school places 97% of its graduates into jobs within nine months of graduation.

169.    Lorona read and took continuing comfort in this representation, and it gave her assurance and confidence that she would be able to obtain employment with her ASLS degree.

**3.   DEFENDANTS KNEW BUT FAILED TO DISCLOSE THAT THE PERCENTAGE OF ITS STUDENTS LIKELY TO PASS THE BAR EXAM WAS DECLINING RAPIDLY AND MATERIALLY**

170.    Infilaw and ASLS studied bar passage rates for its students and developed a formula to predict bar exam failure. The failure predictor formula includes LSAT scores, undergraduate GPA, and law school GPA, among the factors. This data is used by Infilaw's statisticians to generate Excel spreadsheets that depict the failure chance of each student including using students' sex and race as quantitative factors to identify students at risk of failing the bar in the statistical "models" employed by the Defendant Schools.

171.    The test used by virtually every ABA-accredited law school is the Law School Admission Test ("LSAT"). Prospective law students that take the LSAT are given a score that ranges from 120 to 180 and scores from each test administration are curved to account for test-to-test variation in difficulty. The median LSAT score is between a 151 and 152, meaning that 50% of students scored 152 and above while approximately 50% score 151 or below. An LSAT score of 140 corresponds to the 13.4 percentile, meaning that only 13.4% of test takers scored 140 or below. An LSAT score of 135 corresponds to approximately the bottom 5th percentile.

172.    The Law School Admission Council (LSAC) has also commissioned a study into correlation between bar passage rates, on the one hand, and LSAT scores, undergraduate GPA, and law school GPA, on the other hand. LSAC found that LSAT scores correlate to bar passage at a .30 correlation, and law school GPA held a .38 correlation.

173.    The Defendant Schools' median LSAT scores have fallen precipitously over the last 5 years. For example, the ASLS median LSAT score was 150 in 2010, but fell to 144

by Fall 2014. CSL's median LSAT score was 149 in 2010, but fell to 142 by Fall 2014. And

FCSL's median LSAT score was 149 in 2010, but fell to 143 by Fall 2014. This means 25%

of FCSL's starting class, 106 students, was in the bottom 13.7% of all LSAT takers. The

median undergraduate GPA for FCSL's 2014 starting class was 2.93.

174.    In 2014, ASLS and FCSL had twenty-five percent (25%) of its entering class

score a 140 or below on the LSAT. CSL had twenty-five percent (25%) of its entering class

score 138 or below on the LSAT for the same year. The number of students in the 2014

starting classes for the Defendant Schools was two hundred sixty-two (262) at ASLS, four

hundred twenty-four (424) at FCSL, and four hundred forty-six (446) at CSL. Based on their

admission of students with lower LSAT scores, this means that the Defendant Schools

enrolled more than two hundred eighty-three (283) students that did not score better than the

bottom 13.7% of all LSAT takers. At least twenty-five percent (25%) of CSL's entering class

were in the bottom ten percent (10%) of LSAT scores. Additionally, more than fifty percent

(50%) of the one thousand one hundred thirty-two (1,132) students that Infilaw enrolled in

2014 had an undergraduate GPA of less than 2.94.

175.    Knowing that LSAT correlation is a strong indicator of bar passage success,

the Defendant Schools should have and must have known that a large percentage of their

newly admitted students were not likely to pass the bar.

176.    Both ASLS and Infilaw thus knew, but failed to disclose, that the percentage

of its students who were likely to ever pass the bar examination was declining substantially

and rapidly throughout the time of Lorona's legal education at ASLS. This omission was

material. For example, in an email dated December 23, 2014 from Ann Woodley, ASLS's

Associate Dean for Bar Pass and Student Success to certain ASLS students and graduates stated that, "[t]he ASLS grads planning to take the bar exam in February have a predicted pass rate of 47%, compared to an expected state average of greater than 70%. This is based on our statistical analysis of how our students have performed on the last few bar exams (and is primarily focused on law school grade point averages and LSAT scores)." This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

177.    Defendants also knew, but failed to disclose, that the substantial decline in likely bar pass rates was due to the admission of ever-increasing numbers of students through the AAMPLE program. This omission was likewise material.

178.    To make matters worse, Infilaw attempts to keep all students enrolled in the Defendant Schools even after it becomes apparent that the students are unlikely to pass the bar or be able benefit from a legal education. For example, students that have less than a 2.5 law school GPA, or even students with less than a 2.0 GPA, are allowed to continue taking courses—even though the Defendant schools own internal grading systems indicate the students are poor-performing and likely to fail the bar. This insures that Infilaw can continue collecting Title IV money for these students. At the same time, the Defendant Schools have implemented policies designed to undermine high performing students' attempts to transfer to better law schools.

179.    The ASLS bar examination preparation coach to whom Lorona was assigned told Lorona frankly that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

180.    Rather than disclosing this substantial and material decline in their students' abilities to pass the bar exam and in expected bar passage rates, Defendants have attempted to manipulate reported bar pass rates.

**B.    BAR DEFERMENTS AND PAYMENTS TO POTENTIAL TEST TAKERS.**

181.    Knowing they were facing a mounting problem, and in an attempt to compensate for the admission of students who do not meet ABA admission standards, the Defendant Schools began paying students not to take the bar exam upon graduation based on these calculated failure predictors. The misnomer selected for this scheme was the Unlock Potential ("UP") program. The UP program is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to fallaciously increase bar passage percentages.

182.    Beginning in May 2014, ASLS along with its Infilaw sister schools Florida Coastal School of Law and Charlotte School of Law actually began to pay substantial and material numbers of their graduates to defer or forego taking the bar exam upon graduation based on these calculated failure predictors.

183.    This is an attempt to deceive the ABA accrediting board, and Department of Education, potential and existing students, and the general public by artificially increasing bar passage percentages.

184.    At least 39 otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam.

185.    ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

186.    ASLS and Infilaw representatives held meetings on January 16 and 17, 2015, to discuss first-time bar exam takers who were predicted to fail the February 2015 bar exam. Those students were offered $5,000.00 and other benefits, such as bi-weekly payments, to defer taking the bar exam. Moreover, ASLS students who were unable to afford bar preparation courses, but did not fall within Infilaw's failure predictor formula, were denied financial assistance to prepare for the February 2015 bar exam.

187.    Additionally, upon information and belief, ASLS counted students they paid under the UP program as full-time employees for purposes of reporting to the ABA and DOE. To create a paper trail, ASLS provided 1099s to the students in the UP program.

188.    Lorona has personally felt the brunt of Defendants' tactics. On or about February 11, 2015, Lorona received a phone call from a representative of ASLS or Infilaw stating she was on a list of students not likely to pass the February bar exam. Lorona's school assigned bar coach also told Lorona that ASLS is concerned that it may lose accreditation and access to Title IV/HEA funding due to drastically low performance numbers.

189.    ASLS, through its representative, then offered to pay Lorona $5,000 to defer the bar exam until July 2015 with an additional monthly stipend in an attempt to inflate the passage numbers. The ASLS representative informed Lorona that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential students. Lorona declined to participate in the program or defer taking

the bar examination. Other students sitting for subsequent bar exams were offered an increased amount of $10,000 in personal phone calls made by Dean Mays. Mays told media outlets that she was not asking people to not take the exam, but merely advising them they could enroll in the UP program.

190.    The effect of Defendants' actions was to prevent students who Defendants predicted would fail the bar exam from taking the bar exam and thereby manipulating, misrepresenting, and gaming the bar exam passage rates in order to retain accreditation and receive other benefits, such as retaining Title IV/HEA eligibility.

191.    These actions are directly contradictory to Defendants' public marketing strategies, which are intended to induce students to enroll at Defendant Schools and apply for and receive institutional and federally-backed student loans in order to pay tuition.

192.    ASLS and Infilaw misrepresented the career prospects and preparation available to its students. A large percentage of students admitted to Defendant Schools with low LSAT scores and low undergraduate GPAs either fail to graduate or fail the bar exam. Even fewer become licensed attorneys with jobs that require a law license. Infilaw knows these students are more likely than not to fail at completing their legal education and passing a bar exam. Yet, instead of not admitting these students, which would decrease Infilaw's revenue, the Defendant Schools, at the direction of Infilaw, have instead opted to continue admitting unqualified students and engage in a widespread campaign to manipulate and conceal the negative data that would otherwise be generated by these unqualified students. Without this manipulation, the Defendant Schools would not be able to maintain ABA accreditation and Title IV eligibility.

193.   ASLS also misleads students by enrolling and then giving "credit" to those ineligible for federal financial aid, purportedly to "giv[e] students time to fix their credit to receive loans," despite knowing that the DOE does not lend to students with credit blemishes for specified time periods.

### C. DEFENDANTS MISLEAD PROSPECTIVE STUDENTS REGARDING FINANCIAL OBLIGATIONS

194.   Defendants misrepresented what incoming students should expect to pay for their education. For example, ASLS's website represented that tuition and fees for the J.D. program during the 2010-11 academic year was $101,310.00, with books and supplies an additional $2,184.00. ASLS also represented that the median cumulative program debt for graduates between July 1, 2009 and June 30, 2010 was $93,142.51 for federal student loan debt and $5,000.00 for private student loan debt.

195.   However, ASLS' most recent Gainful Employment Disclosure lists the median loan debt as **$187,792** for Federal loans *alone*. Additionally, FCSL's median loan debt is $174,844 and CSL's is $159,208. The amounts do not include private or undergraduate student loans.

196.   To add insult to injury, overall, only thirty-five percent (35%) of Infilaw's 2013 graduates found permanent full-time jobs that required a law license.

197.   Despite notice provided by Lorona, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same.

## IX.   CIRCUMVENTING ABA ACCREDITATION REQUIREMENTS

198.   Title IV/HEA requires that an institution meet the requirements established by accrediting agencies or association. 34 C.F.R. § 668.14(b)(23). Under 34 C.F.R. § 602.1 *et seq.*, the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar is the accrediting agency for law schools in the United States. Failure to meet these requirements may subject an institution to loss of eligibility to receive Title IV, HEA program funds.

199.   Under ABA Standard 501(b), "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

200.   Nevertheless, Defendant Schools continue to admit applicants who do not appear capable of completing their legal education and being admitted to the bar, as evidence by median LSAT and GPA of matriculating students, the growing proportion of AAMPLE students, and the poor bar passage rates of the Defendant Schools.

201.   Without a satisfactory bar passage rate, the ABA can and will remove accreditation from a law school. The Defendant Schools know this and have continued to game these statistics as discussed herein.

202.   ASLS created reports showing the grade point average of students admitted through alternative admissions programs versus traditional admissions. Such reports were intended to mislead prospective students in violation of ABA Standards. Upon information and belief, similar reports were generated by the other Defendant Schools.

203.   Through all of the facts alleged, Defendants have deceived the ABA and circumvented its accreditation requirements, thereby failing to comply with Title IV/HEA regulations requiring compliance with accrediting agency requirements.

204.   ABA accreditation documents were prepared by the General Counsel of ASLS. Due to her initial position as executive assistant to the General Counsel, Lorona witnessed the accreditation process, giving her unparalleled access to the preparation and submission of such documents. In that manner, she possesses inherent indicia of reliability that such accreditation documents, with the errors and misrepresentations alleged above, were submitted to the ABA, in violation of federal regulations.

205.   Upon information and belief, similar accreditation documents were prepared by the other Defendant Schools, as overseen by Infilaw, under similarly misrepresentative schemes.

X.   CLAIMS FOR RELIEF

### Count I
### Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)
### Presenting or Causing to Be Presented False Claims
### ASLS, CSL & FCSL

206.   The False Claims Act prohibits any person from knowingly presenting, or causing to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

207.   By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly presented or caused to be presented, and continues to present or cause to be presented, false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

208.    For example, and without limitation, ASLS, CSL, and FCSL presented to DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. Absent such false certification, DOE would not have distributed Title IV/HEA funds to the Defendant Schools.

209.    These PPAs were falsely certified because, among other reasons and without limitation, Defendant Schools sought funding for students who would not normally be admitted to any law school under ABA accreditation policies; Defendant Schools failed to comply with ABA accreditation policies; Defendant Schools failed to comply with and fraudulently circumvented the 90/10 Rule.

210.    Accordingly, during such periods that falsely certified PPAs were submitted to the federal government, all claims for federal Title IV/HEA funds were false or fraudulent.

211.    ASLS, CSL, and FCSL also made false statements or misrepresentations to the ABA, as the accrediting agency for law schools in the United States. The statements made were essential to the Defendant Schools maintaining and receiving their accreditation, including statements as to the actual and potential bar passages rates, the caliber of students admitted, and the financial obligations of those students.

212.    Accordingly, during such periods as ASLS, CSL, and FCSL made false statements or misrepresentations to the ABA, all claims for federal Title IV/HEA funds were false or fraudulent.

213.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants and the submission of false claims. Lorona has direct and independent knowledge of the allegations in this Second Amended Complaint. Due to her

positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of the submission of false claims and the receipt of improperly solicited federal funds, which were then distributed to students, who then used those funds to pay the exorbitant tuition required by ASLS, FCSL, and CSL. Lorona therefore possesses unique indicia of reliability as to the submission of false claims.

214.   For those false or fraudulent claims submitted by Defendant Schools, it was foreseeable and in fact the intended result that those claims would be submitted to the federal Government. In that vein, Defendants acted with the requisite scienter to violate the False Claims Act.

215.   The amounts of the false or fraudulent claims made to the United States were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

216.   As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count II**
**Violations of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
**Creation or Use of False Statements or Records Material to a False Claim**
**ASLS, CSL & FCSL**

217.   The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

218.   By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to the false or fraudulent claims described in this Second Amended Complaint, in violation of 31 U.S.C. § 3729(a)(1)(A).

219.   For example, and without limitation, ASLS, CSL, and FCSL presented to the DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. These PPAs contained false records and statements, as described above. Among the false statements and records submitted, but without limitation, were statements to the ABA material to accreditation; statements regarding revenue received, in relation to the 90/10 Rule; statements as to bar passage and career success rates; and statements as to financial obligations of students. Absent such false certification, the DOE would not have distributed Title IV/HEA funds to the Defendant Schools. Defendants Schools created and used other false statements and records, as described above, material to the submission of false claims and to induce the federal government to distribute Title IV/HEA funds.

220.   By making the false records and statements and engaging in the fraudulent practices described, Defendants violated the ABA Accreditation guidelines, in violation of 34 C.F.R. § 668.1 *et seq.* Material violations of the guidelines led to the submission of claims

51

for Title IV/HEA funds, which were false, as Defendants were ineligible for reimbursement, yet receiving it only due to false records and statements made, which were material to the false claims described above.

221.   For those records and/or statements made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false claims. For the reasons alleged above, Defendants acted with the requisite scienter to cause violations of the False Claims Act.

222.   Accordingly, during such periods that falsely certified PPAs were submitted to the federal government, all claims for federal Title IV/HEA funds were false or fraudulent.

223.   Lorona and Potter possessed a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims. Lorona and Potter together have direct and independent knowledge of the allegations in this Second Amended Complaint. Due to their positions within the General Counsel's office, academic success office, bar preparation programs, and the office of financial aid, they witnessed and were aware of Defendants' making and use of false records or statements to cause false claims to be submitted to, and approved by, the federal Government.

224.   The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

225.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count III**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy**
**All Defendants**

226.    The False Claims Act provides that any person who conspires to commit a violation of sections 3729(a)(1)(A) and 3729(a)(1)(B) is liable to the United States Government for a penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains. 31 U.S.C. § 3729(a)(1)(C).

227.    By virtue of the allegations presented above, Defendants conspired among themselves and with others to defraud the United States by submitting false and fraudulent claims and making, using, or causing to be made or used, false records or statements material to fraudulent claims.

228.    By the acts and omissions alleged above, Defendants took actions in furtherance of their conspiracies, including but not limited to the payment of substantial sums of monies and weekly meetings to encourage the submission of false claims and the creation of false records and statements material to the submission of false claims. Indeed, Defendants conspired to defraud the DOE by accepting students who otherwise could not attend law school; by submitting falsified revenue data to feign compliance with the 90/10 Rule; and by fabricating bar passage and career prospect statistics. This is without limitation, and

53

defendants committed other overt acts in furtherance of the conspiracy, as set forth above, all of which were in violation of the False Claims Act and which caused damage to the United States.

229.    Specifically, Infilaw and the Defendant Schools entered into agreements with Barbri to manipulate and misstate the Defendant Schools' 90/10 Revenue and bar passage rates. Barbri entered into these agreements knowing that the purpose and effect of the agreements would violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

230.    Defendants knowingly, recklessly, or with deliberate indifference agreed to perpetuate a fraudulent scheme to obtain and retain ineligible Title IV funding in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

231.    Lorona and Potter possess a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims, and the conspiracy in furtherance thereof. Lorona and Potter together have direct and independent knowledge of the allegations in this Second Amended Complaint. Due to their positions within the General Counsel's office, academic success office, bar preparation programs, and the office of financial aid, they witnessed and were aware of Defendants' overt acts in furtherance of the conspiracy.

232.    The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

233.    Defendants are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement of each Defendant and knowledge of, or reckless indifference toward, the scheme's illegality.

234.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count IV**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
**False Certification of Compliance with Title IV/HEA Guidelines via PPAs**
**ASLS, CSL & FCSL**

235.    The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

236.    The PPA is a prerequisite for an institution to request and receive Title IV/HEA funding. By virtue of the allegations presented above, ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims by falsely certifying compliance with the applicable regulations, statutes, and accreditation guidelines.

237.    ASLS, CSL, and FCSL knew such certification to be false, and knew that such certifications would induce the federal Government to pay Title IV/HEA funds to the Defendants Schools when they were not entitled to make such claims.

238.    Lorona possesses a unique and unparalleled position to acquire knowledge regarding the actions of Defendants, the making and use of false records and statements, the submission of false claims, and false certification of the PPAs. Lorona has direct and independent knowledge of the allegations in this Second Amended Complaint. Due to her positions within the General Counsel's office and the office of financial aid, she witnessed and was aware of Defendants' falsely certifying PPAs and making or using false records or statements to cause false claims to be submitted to, and approved by, the federal Government.

239.    The amounts of the false or fraudulent claims made to the United States as a result of false records or statements were material. The United States, unaware of the falsity of the claims and statements made by Defendants and in reliance on the accuracy thereof, paid and continues to pay unlawfully claimed Title IV/HEA Funding.

240.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

**Count V**
**Violations of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
**Retention of Overpayments**
**(Infilaw, ASLS, FCSL, CSL)**

241.    By virtue of the acts described herein, Defendants Infilaw, ASLS, FCSL, and CSL have knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. Specifically, Defendants knew or should have

known that they received millions of dollars in payments for claims they were not entitled to. The False Claims Act prohibits any person from knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

242.    Once known, even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report such funds to the government within sixty (60) days. Defendants have not reported or returned the improper payments described herein.

243.    By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

244.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

245.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered substantial losses in an amount that exceeds hundreds of millions of dollars. The United States is entitled to treble damages, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

## XI.   JURY DEMAND

246.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators Paula C. Lorona, Reid Potter, and the United States of America hereby demand a trial by jury.

## XII.   PRAYER FOR RELIEF

WHEREFORE Plaintiffs/Relators Paula C. Lorona, Reid Potter, and the United States of America pray for judgment in their favor, and:

a.   That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*;

b.   That this Court enter judgment in Plaintiff/Relator's favor and against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.   That Plaintiffs be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.   That Plaintiffs be awarded all costs of this action, including attorneys' fees and expenses; and

e.   That Plaintiffs recover such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 9th day of March, 2016.

/s/ Sean A. Woods
Sean A. Woods*
Arizona Bar No. 028930
docket@millsandwoods.com
Robert T. Mills*
Arizona Bar No. 018853
docket@millsandwoods.com
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101

Phoenix, Arizona  85014
Telephone (480) 999-4556
Facsimile (480) 999-4750
*Admitted Pro Hac Vice / Attorneys for Relator
Paula C. Lorona and Reid Potter*

-and-

Mark M. Wall (FBN: 58483)
Mark.wall@hwhlaw.com
J. Logan Murphy (FBN: 0072241)
Logan.murphy@hwhlaw.com
HILL WARD & HENDERSON, P.A.
101 E. Kennedy Blvd., Suite 3700
Tampa, FL 33602
Telephone (813) 221-3900
Facsimile (813) 221-2900

*Attorneys for Relator Paula C. Lorona only.*


### CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2016, a copy of the foregoing was hand-delivered to the Clerk, U.S. District Court.

/s/ Sean A. Woods
Sean A. Woods