**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA
*ex rel.* PAULA C. LORONA and REID
POTTER,

       Relators-Relators,

                               Case No. 3:15-cv-00959-MMH-PDB

v.

INFILAW CORPORATION, a Delaware
Corporation, *et al.*,

       Defendants.

_____/

## RELATORS' RESPONSE TO DEFENDANTS INFILAW CORPORATION, ARIZONA SUMMIT LAW SCHOOL, LLC, FLORIDA COASTAL SCHOOL OF LAW, AND CHARLOTTE SCHOOL OF LAW, LLC'S OMNIBUS MOTION TO DISMISS

       Plaintiffs / Relators Paula Lorona and Reid Potter (collectively "Relators"), by and through undersigned counsel, hereby submit their response to Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion To Dismiss. Plaintiffs / Relators' response is supported by the following memorandum of law and points of authorities.

## I.    PROCEDURAL BACKGROUND

       On August 5, 2015, Relator Paula Lorona ("Lorona") brought an action as a qui tam relator under the False Claims Act, 31 U.S.C. § 3729, *et seq*. against Infilaw Corporation ("Infilaw"), Arizona Summit Law School, LLC. ("ASLS"), Florida Coastal School of Law ("FCSL"), and Charlotte School of Law ("CSL") (collectively, "Infilaw Defendants"). Lorona filed her First Amended Complaint on August 31, 2015. On March 9, 2016, Relators filed their Second Amended Complaint ("SAC"), adding Reid Potter ("Potter") as

1

a relator and adding Barbri, Inc. ("Barbri") as a Defendant. Subsequently, this Court struck Relators' Second Amended Complaint on the grounds of shotgun pleading. (Doc. 35). Relators filed their Third Amended Complaint ("TAC") on May 18, 2018. (Doc. 36) Infilaw Defendants filed their Motion to Dismiss ("MTD") on October 22, 2018.

## II.    **INTRODUCTION**

In Infilaw Defendants' MTD, Infilaw Defendants take the position that Relators do not have "requisite personal knowledge of any facts to support their claims." (Doc. 56 at 11). However, Relators are both former employees of ASLS and have direct, personal knowledge of the claims brought against Infilaw Defendants. Infilaw Defendants also accuse Relators of bringing claims "recycled from news reports," but the articles included by Infilaw Defendants as exhibits to their MTD do not match the FCA claims brought by Relators. (*Id.*).

The Eleventh Circuit has held that the insider status of an employee or former employee provides indicia of reliability that satisfy Rule 9(b). The Eleventh Circuit has recognized that a "relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims" *United Stated ex rel. Mastej v. Health Mgmt. Associates, Inc.*, 591 Fed. Appx. 693, 704 (11th Cir. 2014) (distinguishing between a relator with first-hand knowledge and a stranger to the alleged transactions) (citing *United Stated ex rel. Walker v. R & F Properties of Lake County, Inc.,* 433 F.3d 1349, 1360 (11th Cir. 2005).

Lorona was hired by ASLS in November 2009 as an administrative assistant to the General Counsel of ASLS, and later received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011. (Doc. ¶ 22). In those capacities, Lorona observed and participated in ASLS' application for accreditation from the American Bar Association ("ABA") and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application

for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements. (*Id.* ¶ 23). More specifically, Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds through the Common Origination and Disbursement System ("COD"), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans. (*Id.* ¶ 24).

Potter is a former student of ASLS. After graduating from law school, Potter was hired by ASLS in 2011 and continued to work for ASLS until September 2014 in ASLS Academic Services department. (*Id.* ¶ 26). In his role, Potter was directly involved with guiding students through their bar exam preparation. (*Id.* ¶ 27). Potter was also involved in meetings with ASLS and Infilaw officials regarding academic success programs including without limitation ASLS' bar exam preparation programs, and ASLS' use of those programs to secure and maintain federal funds as discussed herein. (*Id.* ¶ 28) Additionally, Potter, in all cases directed by his superiors, collected funds from students for bar exam preparation fees in exchange for refunds given to the students by Barbri. Potter was involved in discussions with representatives of Infilaw, ASLS, and Barbri who devised this exchange, and discovered that its purpose was to disguise funds that ASLS received from federal student loan programs so that ASLS could continue to receive such funds. (*Id.* ¶ 29).

Undoubtedly, both Lorona and Potter were not strangers to the alleged false claims as stated in the TAC. In fact, as employees of the Infilaw Defendants, their job duties and participation in meetings have provided them with the requisite personal knowledge of the facts alleged in the TAC.

Fed. R. Civ. P. 9(b) is designed to put a Defendant on notice so that it is alerted to the misconduct alleged against it. Infilaw Defendants' MTD shows they understand the precise allegations against them. Infilaw Defendants cite the TAC multiple times and describe the allegations against them. As such, Infilaw Defendants are sufficiently on

3

notice regarding the allegations against them and Relators have pled their allegations with more than sufficient particularity. Infilaw Defendants' MTD should be denied.

## III.   LEGAL DISCUSSION

The purpose of the False Claims Act is to encourage private individuals, like Lorona and Potter, who are aware of fraud being perpetrated against the government to bring such information forward. *United Stated ex rel Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The False Claims Act is a necessary part of the government's arsenal in combating "widespread fraud by contractors" such as the Defendants, which capitalize on an "opportunity for windfall profit." *See United Stated ex rel Newsham v. Lockheed Missiles and Space Co., Inc.*, 722 F. Supp 607, 609 (N.D. Cal. 1989).

### A.   Rule 12(b)(6) Does Not Require the Relators to Prove their Case in the Complaint

The Supreme Court in *Iqbal* held that "… a proper review of a motion to dismiss requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In *qui tam* cases, just as with other cases, the relator is not obligated to prove his entire case in the complaint. The Southern District of Georgia applied this standard in another *qui tam* case, stating:

> A complaint will not be dismissed so long as it contains factual allegations sufficient "to raise a right to relief above the speculative level." Yet, "a plaintiff's obligation to provide grounds of entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." In *Iqbal*, the Supreme Court further explained the required level of specificity:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard *is not akin to a probability requirement*, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*United Stated ex rel. Schaengold v. Mem'l Health, Inc.*, 4:11-CV-58, 2014 WL 7272598, at \*8 (S.D. Ga. Dec. 18, 2014) (citing and quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007); *Iqbal*, 556 U.S. at 678 (claim must have "facial plausibility"); *Edwards*

*v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010)) (internal quotation marks and citations omitted). The plausibility standard "simply calls for enough facts to raise the reasonable expectation that discovery will reveal evidence of the necessary elements of a plaintiff's claim for relief." *Id*. at * 9 (citing *McCray v. Potter*, 263 F. App'x 771, 773 (11th Cir. 2008) and quoting *Twombly*, 550 U.S. at 556)).

### B.   Applicable Pleading Standard

There is inherent tension within the Federal Rules of Civil Procedure regarding the requisite degree of particularity that relators must allege to prosecute cases under the False Claims Act:

> Generally, federal civil complaints need only state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). And each averment should be "simple, concise, and direct," with no technical form of pleading required. Fed. R. Civ. P. 8(e). However, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

*United Stated ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (alteration omitted). The pleading standard of Rule 8 "is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla*-Diaz v. Kaplan Univ., 780 F.3d 1039, 1051 (11th Cir. 2015). The Eleventh Circuit has stated that the application of Rule 9(b) "'must not abrogate the concept of notice pleading.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). That balancing act, when coupled with the express opportunity Rule 11(b)(3) provides to plead that allegations "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," undermines any theory that a relator must prove his case in the complaint. Fed. R. Civ. P. 11(b)(3).

Moreover, "A False Claims Act complaint satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in

them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (quoting both *Clausen* and *United Stated ex rel. Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 567--68 (11th Cir. 1994)) (internal quotation marks omitted); *see also Mastej*, 591 F. App'x at 703. Eleventh Circuit caselaw applying *Clausen* has stated that the district court should evaluate the complaint as a whole and adopt a "flexible, case-by-case approach to *Clausen*'s principles where the relator's complaint provides 'indicia of reliability' that support the relator's allegations." *United Stated ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1317, 1334 (N.D. Ga. 2013).

Under Rule 9(b), "intent, knowledge, and other conditions of a person's mind may be alleged generally" and, moreover, "no proof of specific intent to defraud" is required under the False Claims Act. 31 U.S.C. § 3729(b)(1)(B). A defendant's conduct must be "knowing" under the False Claims Act, but that mental state can be alleged generally, under Rule 9(b), and then proven at trial by evidence that defendants "act[ed] in deliberate ignorance of the truth or falsity of the information," or "act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(ii) & (iii).

The particularity requirement of Rule 9(b) serves only to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Mastej*, 591 F. App'x at 703 (quoting *United Stated ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006)). Therefore, courts evaluate "whether the allegations of a complaint contain ***sufficient indicia of reliability*** to satisfy Rule 9(b) on a case-by-case basis." *Id*. at 704. (emphasis added).

Though "Rule 9(b) generally prefers . . . the who, what, when and how of an alleged fraud, alternative means" will "satisfy the rule so long as those means put the defendants on notice of the precise misconduct alleged and provide the court with some indicia of reliability… to support the allegation of an actual false claim." *Schaengold*, 2014 WL 7272598 at *9 (citing *Clausen*, 290 F.3d at 1310-11, n.18; *Durham v. Bus. Mgmt. Assocs.* 847 F.2d 1505, 1511 (11th Cir. 1988)).

### C.   Relators, as Former Employees, Have Insider Status That Provides Sufficient Reliability To Satisfy Rule 9(b).

The Eleventh Circuit has held that the insider status of an employee or former employee provides indicia of reliability that satisfy Rule 9(b). The Eleventh Circuit has recognized that a "relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims" M*astej*, 591 F. App'x at 704 (distinguishing between a relator with first-hand knowledge and a stranger to the alleged transactions) (citing *Walker, Inc.,* 433 F.3d at 1360).

The *Mastej* relator based his complaint on personal knowledge during his time as an employee with the defendant company. *Id*. at 707. The court considered the complaint as a whole to determine whether the Rule 9(b) reliability standard was met. *See Id*. at 708 ("taking all of these and other above allegations in the complaint together"). The Eleventh Circuit emphasized the relator was not a stranger to the alleged false claims who based his knowledge of submission on speculation, but was a defendant's employee whose direct knowledge came as a result of attending meetings and other job duties within the defendant company. *Id*.

In the MTD, Infilaw Defendants cite *Mastej* for the proposition that  Relators do not have the requisite personal knowledge to maintain an FCA claim. However, like the relator in *Mastej*, Relators' direct knowledge of the allegations in the TAC came from their observations of fraud during their employment with ASLS, one of the Infilaw Defendants. Additionally, Relators specifically allege in the TAC that they have direct knowledge of these allegations because they observed the fraudulent actions during their employment with ASLS. (Doc. 36 at §§ 214, 226, 235, 243). The *Mastej* court specifically stated that detailed information about a "claim is not the only way a relator can establish 'some indicia of reliability… to support the allegation of *an actual false claim* for payment being made to the Government.'" *Id.* at 707, (quoting *Clausen*, 290 F.3d at 1311). A relator who alleges "personal knowledge of the defendants' billing practices that give rise to a well-founded

belief that the defendant submitted actual false or fraudulent claims" satisfies the indicia of reliability test of Rule 9(b). *Id.* (quoting *Hopper*, 588 F.3d at 1326).

The *Mastej* court cited specific examples from the relator's complaint demonstrating the relator's knowledge of the false claims though his employment with the defendant. *Id.* Some of these examples included "attending case management meetings" and being "intimately familiar" with defendants' billing process. *Id.* The court held that the relator's complaint contained "sufficient indicia of reliability for his personal knowledge" that the defendants submitted false claims to the government. *Id.* at 708. Similarly, the Here, Relators allege in the TAC that Potter attended meetings with ASLS and Infilaw officials "regarding academic success programs including without limitation ASLS' bar exam preparation programs, and ASLS' use of those programs to secure and maintain federal funds." (Doc. 36, ¶ 28). Lorona also alleges that she was involved in weekly meetings with Infilaw Defendants, in which the entire purpose of the meetings "was how to create the appearance that Defendants were complying with the 90/10 Rule" so the government would not become suspicious. (*Id.*, ¶ 44). Additionally, Lorona worked in the financial aid office at ASLS where fraudulent Program Participation Agreements ("PPAs") were prepared by employees in the financial aid office and executed by ASLS President Scott Thompson ("Thompson") in order to receive Title VI/HEA funds from the government. (*Id.*, ¶¶ 32-33).

In *Hill v. Morehouse Med. Associates, Inc.*, the Eleventh Circuit again refused to dismiss the complaint of an employee-relator and concluded that the employee-relator's allegations will have a greater indicia of reliability, ***even when the relator no longer works for the defendant*** and the relator pleaded no specific claims information. No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) (relator was entitled to a relaxed pleading standard because the billing information was in the exclusive control of the defendant) (emphasis added).

As stated herein, both Lorona and Potter worked for Defendant ASLS and have

direct, first-hand knowledge of the Infilaw Defendants' submission of false claims. (Doc. 36, ¶¶ 22-29). Thus, the indicia of reliability standard is appropriate.

**D.**  **The Public Disclosure Bar does Not Apply in this Case Because Relators Are Original Sources Under 31 U.S.C § 3730(e)(4)(B)**

The FCA's public disclosure bar does not apply in this case because Relators are original sources. Pursuant to 31 U.S.C. § 3730(e)(4)(A),

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(*emphasis added*). An original source is:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B). Both Relators, Lorona and Potter, are original sources as defined under the FCA. Relators have knowledge of the allegations in the TAC that is both independent and materially adds to publicly disclosed information. Furthermore, Relators voluntarily provided information of the allegations in the TAC prior to its filing.

Infilaw Defendants misstate the standard for an original source under the first prong of the public disclosure bar, explained under 31 U.S.C. § 3730(e)(4)(B), by claiming that all of the articles "were published well *before* Relators filed this case." (Doc. 56 at 15). The

standard is whether a relator "prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" 31. U.S.C. § 3730(e)(4)(B). Potter first provided information regarding the allegations in the TAC on or about July 31, 2012, to the Department of Justice through its whistleblower hotline. (Doc. 36, ¶ 15). Lorona first disclosed information in the TAC to the Inspector General's Hotline on June 3, 2015 and subsequently met with an Assistant United States Attorney to discuss the allegations. (Doc. 36, ¶¶ 17-19). Potters' disclosure to the government predates all but one of the articles Infilaw Defendants provided as exhibits to their MTD. (*See* Doc. 56, Exs. 2-12). The sole article, a blog post, that was published prior to Potter's disclosure to the government includes vague allegations against ASLS, then Phoenix Law School. (Doc. 56, Ex. 10).

In *U.S. ex. rel. Osheroff v. Humana Inc.*, a case cited heavily by Infilaw Defendants, the Eleventh Circuit held that the relator was not an original source because the information provided in his complaint did not materially add to prior public disclosures. 776 F.3d 805, 815 (11th Cir. 2015). *Osheroff* is distinguishable from this case for numerous reasons. In *Osheroff*, unlike this case, the relator was never an employee of the defendant. *Id.* at 807. Instead of having direct and independent knowledge of his allegations, he received the information by conducting interviews of employees and patients. *Id.* Additionally, the relator's complaint provided no new material information to the prior publicly disclosed information, it simply added background information. *Id.* at 815. Furthermore, the *Osheroff* court held that the relator could not be an original source because "the essential elements of the fraudulent transaction" had already been disclosed to the public "so as to raise a reasonable inference of fraud." *Id.* (citing *United States ex rel. Kraxberger v. Kan. City Power & Light Co.,* 756 F.3d 1075, 1079 (8th Cir. 2014), quoting *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1514 (8th Cir.1994)).

In this case, the TAC materially adds to the publicly disclosed allegations. For example, the aforementioned blog post from AbovetheLaw.com asks "is it possible that

Phoenix told these law students to take some kind of Phoenix Law bar prep course as opposed to taking an established prep course?" (*Id*.). The TAC explains in detail how Infilaw Defendants fraudulently attempted to satisfy the 90/10 Rule by creating and implementing their own bar exam preparation courses. (Doc. 36, ¶¶ 61-75). The TAC does not make a generic allegation regarding the bar preparation information, it provides names, dates, and other relevant information, for example:

> 65. In other attempts to derive non-Title IV/HEA funding to satisfy the 90/10 Rule, Penny Willrich suggested that ASLS force its students to take its bar preparation program, provide no bar preparation materials to the students unless they sign up for ASLS bar preparation program, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds.
>
> 66. As ASLS formalized its new program, it named the program "myBAR" which stood for Multi-Year Bar Advanced Review.
>
> 67. ASLS began paying students who participated in myBAR thousands of dollars as "bonuses" for completing mini-courses called modules, thus effectively refunding the students' myBAR fees. This cleverly-packaged arrangement allowed ASLS to claim tuition received from myBAR fees as non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds.

(*Id.*, ¶¶ 65-67). These allegations are discussed even further in the TAC in the section titled "The Check Exchange with Barbri and Defendant Schools" (*Id.*, ¶¶ 76-126).

Infilaw Defendants cite *United States ex rel. Bernier v. InfiLaw Corporation*, 311 F. Supp. 3d 1288, 1290 (M.D. Fla. 2018). The court in *Bernier* held that the public disclosure bar applied because the relator in that case was not an original source. *Id.* at 1290. It held the relator was not an original source because her allegations did not materially add to the publicly disclosed information. *Id.* In this case, Potter voluntarily disclosed the allegations in the TAC prior to all but one of the articles provided by Infilaw Defendants as evidence of public disclosure. (*See* Doc. 56, Exs. 2-12). The single blog post that came before Potter's disclosure only made a vague allegation that ASLS told its students to take a bar preparation course created by ASLS. (*Id.*, Ex. 10). It does not

mention, or even imply, that ASLS did this in order to circumvent the 90/10 Rule in an attempt to defraud the government. (*See id.*).

Even if, for argument's sake, Relators were not original sources, the articles provided by Infilaw Defendants in their MTD do not make material allegations or disclose transactions that are substantially the same as the TAC. (*See* Doc. 56, Exs. 2-12). Not a single one of the articles lists the essential elements of Infilaw Defendants' fraud to the United States Government, which is the basis for the TAC. (*Id.*) This means they provide no inference that Infilaw Defendants violated the FCA. *See Osheroff*, 776 F.3d at 815. Instead all of the articles discuss Infilaw Defendants' practice of admitting students who were not academically qualified for law school and unlikely to pass the bar exam. (*Id.*). This is alleged in the TAC as well, but the TAC goes into specific detail explaining *why* Infilaw Defendants did this, *how* this constituted fraud to the government, *what* specific actions constituted violations of the FCA, *when* Infilaw Defendants began these practices, and *who* was involved in the various schemes.

The first article Infilaw Defendants present, attached as Exhibit 2, speaks scathingly about Infilaw Defendants' process of admitting students that will likely never pass the bar exam and discusses the problem with the student loan system as a whole: "this story is about not only for-profit law schools, or law schools, or even for-profit higher education. It is about the problematic financial structure of higher education in America today." (Doc. 56, Ex. 2). The next article was posted on an internet blog called "The Faculty Lounge." (*Id.*, Ex. 3) This blog post was a reaction to the previous article, in which the author argues that he believes Infilaw Defendants provide "a solid legal education," but expresses concern that profits appear to be driving their admission standards. (*Id.*). Like the first article, this blog post does not make any claims that Infilaw Defendants were defrauding the United States Government.

The next exhibit presented by Infilaw Defendants is a blog post from a website called "Outside the Law School Scam." (*Id.*, Ex. 4). This post was written by a former law

professor at CSL and expressed concern with Infilaw Defendants' dropped admission standards. (*Id.*). The next two blogs posts come from The Faculty Lounge, in which the author discusses FCSL's dropping bar passage rate and Infilaw Defendants' continually dropping admission standards. (*Id.*, Exs. 5-6). The only article that makes allegations even slightly similar to the TAC was discussed above, but did not allege ASLS was implementing its own bar preparation courses in order to defraud the government of money. (*Id.* Ex. 10). The remaining articles discuss Infilaw Defendants' practice of admitting unqualified students in order to turn a hefty profit. (*Id. See* Exs. 7, 8, 9, 11, 12).

Relators are original sources because Potter provided the information on which the allegations in the TAC were based to the government prior to all but one of the aforementioned articles. Relators have knowledge that is independent from the articles and the TAC materially adds to the allegations included in them. Relators also voluntarily provided the information alleged in the TAC prior to filing this action. Based on the foregoing, Lorona and Potter are original sources and thus, the public disclosure bar does not apply in this case.

**E.    Relators Properly Pled Claims for Violation of FCA §§ 3729(a)(1)(A) and (a)(1)(B) in Counts I, II, and IV**

*1.    Relators properly allege that Infilaw Defendants had requisite scienter*

The "knowledge" or "scienter" element is satisfied when a relator shows that the actor "'(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'" *United Stated ex rel. Clausen v. Laboratory Corp. of Am., Inc.,* 290 F.3d 1301, 1307 n. 12 (11th Cir.2002) (quoting 31 U.S.C. § 3729(b)). Moreover, "[a] corporation can be held liable under the FCA even if the verifying employee was unaware of the wrongful conduct of

other employees." *United States v. Kaman Precision Products, Inc.*, 6:09-CV-1911-ORL-31, 2011 WL 3841569, at *5 (M.D. Fla. Aug. 30, 2011) (citing *Grand Union Co. v. United States,* 696 F.2d 888 (11th Cir.1983)).

Incorrectly, Infilaw Defendants cite to a Seventh Circuit case, *U.S. v. Sanford-Brown, Ltd.*, claiming that in order for relators to plead the requisite scienter under the FCA, the relators must "prove that the defendants knowingly entered into the PPA to defraud the government." 788 F.3d 696, 709 (7th Cir. 2015); (Doc. 56 at 24) (emphasis removed). However, this case was **abrogated** by the United States Supreme Court in *Universal Health Services, Inc. v. U.S.*, 136 S.Ct. 1989, 195 L.Ed. 2d 348 (2016). Additionally, the FCA itself states that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b). According to the Supreme Court, "the Act's scienter requirement '*requires no proof of specific intent to defraud.*'" *Id.* at 1999 n. 2 (quoting 31 U.S.C. § 3729(b)(1)(B)) (emphasis added).

In the TAC, Relators allege the requisite scienter of Infilaw Defendants under the FCA several times. Some of the many demonstrative examples include:

> 33.   The ASLS' PPAs certified compliance with all regulations and requirements, despite full knowledge of ASLS and Infilaw leadership and staff that the regulations and requirements were regularly being violated as alleged herein. The submission of those PPAs caused the federal government to distribute Title IV/HEA funds to ASLS, in violation of the False Claims Act.
>
> 34.   Upon information and belief, the other Defendant Schools prepared, executed, and submitted similar PPAs, in conjunction with Infilaw, to certify compliance with all Title IV/HEA regulations and requirements, despite full knowledge of Defendant Schools and Infilaw leadership and staff that the regulations and requirements were regularly being violated. The submission of those PPAs caused the federal government

to distribute Title IV/HEA funds to Defendant Schools and Infilaw, in violation of the False Claims Act.

44.     From 2010 through and including 2013, Lorona participated in weekly meetings with other Defendant Schools and Infilaw employees, including Alicia Togno, Debbie Richards, Shirley Mays, Penny Willrich, Scott Thompson, Jim Lemire, Denise Barlow, CSL representatives (via phone), FCSL representatives (via phone), and Infilaw employees and representatives (via phone). The central topic of discussion at each of those weekly meetings was how to create the appearance that Defendants were complying with the 90/10 Rule. Infilaw leadership and representatives consistently represented at those meetings that it would be beneficial for the statistics to appear as though the revenue was split 80/20 so that the government would not become suspicious and begin an investigation into actual compliance.

53.     Defendants knew, and ignored, the fact that most of the students receiving ILs could not and would not repay the loans. In fact, because Defendants had so much Title IV money, they were able to purposefully shun collection efforts in order to avoid calling attention to the fact that the loans were not in fact collectible and because they had discovered they could, in effect, use the uncollectible ILs as a way to create fake income and trump up their "10" money to avoid the appearance of violating the guidelines and the 90/10 Rule and continue to receive the large amount of "90" money they were receiving.

91.     As part of this plan, Barbri, Infilaw and the Defendant Schools came up with an elaborate scheme to falsely count the full amount of the internal bar review course cost as non-Title IV revenue, the Defendant Schools required students that had already made payments to Barbri for the summer 2012 course, or as deposits for future courses, to engage in a "check exchange" program with the law schools. Barbri agreed to refund each student's past payments by sending the checks *directly* to the Defendant Schools. The Defendant Schools would then distribute the checks to the students in exchange for the student writing a personal check payable to the school for the same amount.

115.     The purpose of the internal bar exchange programs and check exchange process was to knowingly misstate the Defendant Schools' 90/10 revenue calculation. For example, on September 15, 2011, the Dean of ASLS (then called the Phoenix School of Law) informed the Director of Academic Services at ASLS that Defendant Infilaw had "tasked" ASLS with "operating our own bar prep course as a real solution for 90/10." The Dean further described "this important initiative for our 90/10" as a "top, top priority for both the school and the consortium." The Dean also insisted that this "90/10 program" begin in December 2011 for those taking the February 2012 bar exam. After the ASLS' Director of Academic Services

raised ethical objections to forcing students to use an internal bar preparation course, ASLS terminated the Director's employment.

208.   ASLS, CSL, and FCSL knowingly presented or caused to be presented, and continues to present or cause to be presented, false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees, or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

209.   For example, and without limitation, ASLS, CSL, and FCSL presented to DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. Absent such false certification, DOE would not have distributed Title IV/HEA funds to the Defendant Schools.

220.   ASLS, CSL, and FCSL knowingly made, used, or caused to be made or used, false records and statements material to the false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A).

221.   For example, and without limitation, ASLS, CSL, and FCSL presented to the DOE executed PPAs, which falsely certified compliance with all mandatory regulations under Title IV. These PPAs contained false records and statements. Among the false statements and records submitted, but without limitation, were statements to the ABA material to accreditation; statements regarding revenue received, in relation to the 90/10 Rule; statements as to bar passage and career success rates; and statements as to financial obligations of students. Absent such false certification, the DOE would not have distributed Title IV/HEA funds to the ASLS, CSL, and FCSL.

(Doc. 36, ¶¶ 33-34, 44, 53, 91, 115, 208, 208-09, 220-21). All of the foregoing examples demonstrate Infilaw Defendants' knowledge; thus, Relators properly allege Infilaw Defendants' scienter in the TAC.

### 2. *Relators properly allege plausible, material violations of Title IV*

As discussed previously, Fed. R. Civ. P. 12(b)(6) does not require Relators to prove their case in the TAC. The plausibility standard "simply calls for enough facts to raise the reasonable expectation that discovery will reveal evidence of the necessary elements of a plaintiff's claim for relief." *United Stated ex rel. Schaengold v. Mem'l Health, Inc.*, 4:11-CV-58, 2014 WL 7272598 at * 9 (citing *McCray v. Potter*, 263 F. App'x 771, 773 (11th Cir. 2008) and quoting *Twombly*, 550 U.S. at 556)). Further, the particularity requirement

of Fed. R. Civ. P. 9(b) serves only to make sure defendants are aware of the conduct alleged against them and to protect defendants from false allegations of fraudulent conduct. *See Mastej*, 591 F. App'x at 703. The Court must evaluate whether Relators' allegations meet the sufficient indicia of reliability test. *Id.* at 704. As stated previously, both Lorona and Potter worked for Defendant ASLS and have direct, first-hand knowledge of the Infilaw Defendants' submission of false claims, passing the indicia of reliability test.

Relators properly allege material violations of Title IV of the Higher Education Act ("HEA"), in violation of the FCA. The definition of "material" contained within the statute considers whether the misrepresentation had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), a definition "descend[ed] requirement descends from "common-law" *Universal Health Services, Inc. v. United States,* 136 S. Ct. 1989, 2002 (2016) (quoting *Kungys v. United States*, 485 U.S. 759, 769, 108 S.Ct. 1537 (1988)). *Universal Health Services* instructs courts to consider whether noncompliance is "minor or insubstantial" and amounts to "garden-variety breaches of contract or regulatory violations," or, conversely, whether the Government would have attached importance to the violation in determining whether to pay the claim. *Id*. at 2002–03. In the MTD, Infilaw Defendants claim that Relators failed to properly allege violations of Title IV, despite Relators' detailed and specific allegations. In the TAC, Relators properly allege violations of the 90/10 Rule, Infilaw Defendants' numerous and substantial misrepresentations, and Infilaw Defendants' circumvention of ABA accreditation requirements.

In order to be eligible for Title IV funding, institutions must comply with the HEA and Department of Education ("DOE") requirements by submitting a PPA. 34 C.F.R. § 668.14(a)(1); (Doc. 36, ¶ 30). When institutions, such as Infilaw Defendants, submit a PPA, they certify that they will comply with all statutory and regulatory authority applicable to Title IV. 34 C.F.R. § 668.14(b)(1); (Doc. 36, ¶ 31). At ASLS, PPAs were completed and executed in the financial aid department and the President's Office, where Lorona worked.

17

(Doc. 36, ¶ 32). Lorona had access to the PPA documents and the process in which they were certified. (*Id.*, ¶ 32). ASLS certified in the PPAs that they complied with all regulations, even though ASLS and Infilaw leadership and staff knew the requirements were violated. (*Id.*, ¶ 33). The submission of the PPAs caused the government to distribute Title IV funds to ASLS, violating the False Claims Act. (*Id.*). Relators have information as well as belief that CSL and FCSL similarly submitted PPAs. (*Id.* ¶ 34).

### i.      Violations and False Reporting of the 90/10 Rule

Relators allege numerous violations and false revenue reporting by Defendants of the 90/10 Rule in the TAC. The 90/10 Rule is a regulation under Title IV, which requires a for-profit institution to "derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds." 34 C.F.R. § 668.14(b)(16); (Doc. 36, ¶ 37). The DOE requires that for-profit institutions, like Infilaw Defendants, report annually the amount and percentage of its income derived from Title IV, HEA funds and the amount and percentage derived from other sources. (Doc. 36, ¶ 38). Potter was told directly by a CSL employee in or about July 2012 that ASLS had a "90/10 Problem." (*Id.*, ¶ 43).

Infilaw Defendants violated the 90/10 Rule by creating and implementing their own bar exam preparation programs in or around late 2011. (*Id.*, ¶ 61). Infilaw Defendants' myBAR program was inadequate as a bar preparation course and did not meet the requirements of 34 C.F.R. ¶ 668.28 because it did not prepare students to take the bar. (*Id.*, ¶ 69). Infilaw Defendants' income from bar preparation programs were not income from school activities necessary and required for students, nor did the programs prepare students for the bar exam, thus the funds received from Infilaw Defendants' bar preparation programs could not be considered non-Title IV/HEA revenue applied towards the 90/10 Rule. At paragraphs 76-126 of the TAC, Relators properly allege that Infilaw Defendants and Barbri entered into an agreement in which Barbri would return money directly to Infilaw Defendants' students and the Infilaw Defendants' students would then write a new check to the Infilaw Defendants. The purpose of the Check Exchange was to transform

money that should have been considered "90" money into "10" money. Specifically, Relators state in the TAC that

> Scott Thompson told Potter in or about July 2012 that ASLS needed to create '10' revenue with the check exchange program and that *a paper trail needed to be created for it in order to mask the fact* that the majority of students were using their Title IV distributions to pay for bar preparation.

(Doc. 36, ¶ 85)(emphasis added). This further shows that the Check Exchange program was created to defraud the federal Government by hiding the fact that Infilaw Defendants were in violation of the 90/10 Rule.

The TAC, in detail, describes that Barbri and Infilaw Defendants entered into a three-year agreement, dated July 2, 2012, in which Barbri would provide all the materials for the Infilaw Defendants' internal bar review programs. (Doc. 36, ¶ 84). This agreement between Barbri and the Defendant Schools was worth a staggering twelve million dollars ($12,000,000). (*Id.*, ¶ 84). In an agreement between Barbri and the Infilaw Defendants, Barbri refunded money that the majority of which was likely Title IV money that Defendant Schools' students had previously used to purchase Barbri's bar prep course directly from Barbri. Barbri then cut checks directly to the students and gave them to Defendant Schools to hold, rather than sending them directly back to the students. (*Id.*, ¶¶ 91-92, 108, 112). Infilaw Defendants then told students to write a check directly to the Infilaw Defendants in an amount less than the refund check – to entice students to participate in this laundering scheme. (*Id.* ¶ 108). Infilaw Defendants then deposited that money and accounted for it as "10" money under the 90/10 rule. (*Id.* ¶ 112).

As part of the Check Exchange Program, Barbri employees were then required to tell Infilaw Defendants' students that due to an agreement with Infilaw the students *must* register in the Infilaw Defendants' internal bar preparation courses, rather than Barbri's program. (*Id.*, ¶ 88). These acts are overt and were actually implemented with the full knowledge of Barbri, its employees, and Infilaw Defendants and their employees. Despite

Infilaw Defendants' outrageous claim that the TAC reveals "a natural focus by regulated entities on ensuring compliance with an aspect of Title IV," the scheme with Barbri and the ILs alleged in the TAC show that Infilaw Defendants knowingly and falsely circumvented the 90/10 Rule in violation of Title IV. (Doc. 56 at 27).

Another violation of the 90/10 Rule alleged by Relators in the TAC comes from Infilaw Defendants' implementation of Institutional Loans ("ILs"). During one of the weekly Friday meetings in 2011 that Lorona personally attended and Infilaw Defendants participated in, Scott Thompson introduced the concept of offering ILs to students as a way to skirt the 90/10 Rule. (*Id.*, ¶¶ 44-45). Infilaw Defendants saw ILs as a potential solution to the 90/10 Rule because revenue from institutional aid may be counted as non-Title IV revenue under 34 C.F.R. § 668.28(a)(5) when institutions meet certain requirements, including regular loan repayment and collection. (*Id.*, ¶ 46). Infilaw Defendants marketed the ILs the same way they marketed Title IV or GradPlus loans, despite not having the same benefits. (*Id.*, ¶ 47). Infilaw Defendants began disbursing ILs in 2012 and eventually offered them to students who were not eligible for private loans elsewhere. (*Id.*, ¶¶ 48-50). Infilaw Defendants knew a number of the students would never be able to repay the ILs, but continued to use them to create the illusion that Infilaw Defendants derived a higher percentage of their income from non-Title IV sources. (*Id.*, ¶ 54). Under the cash basis of accounting, revenue may only be recorded when cash is received, thus by counting future repayment of ILs as revenue, Infilaw Defendants violated Title IV and created the false impression that Infilaw Defendants were in compliance with the 90/10 Rule. (*Id.*, ¶ 55). Lorona was provided documents that demonstrated violations of the 90/10 Rule and was instructed to convert some Title IV/HEA loans into ILs for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule. (*Id.*, ¶ 58).

### ii.  90/10 RULE AND PUBLIC POLICY

The FCA was enacted in 1863 to deal with fraud against the U.S. Defense

Department committed by defense contractors during the U.S. Civil. The Government – at that time – knew it was subject to many fraudulent claims for payment of ill-gotten sums. Accordingly, the FCA was enacted and implemented to protect whistleblowers who had direct knowledge of these fraudulent claims. While the FCA went relatively unused for nearly a hundred years, it went through multiple revisions – most important of which occurred in the mid 1980s. Congress adopted and enacted new changes to the FCA because they  saw it as a way to stop the "conspiracy of silence among employees of corporations engaging in fraud by enlisting the cooperation of those individuals who are either close observers or otherwise involved in *fraudulent activity.*" *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co*., 944 F.2d 1149, 1151 (3d Cir. 1991) (emphasis added).

Nowhere in the FCA does the law provide a threshold of the amount of fraud required to be committed to qualify as a violation of the FCA. The original Congressional intent, followed by Congressional intent found in the multiple revisions instruct that the FCA's purpose is to prevent *any* amount of fraudulent activity. In fact, cases have found that even a single fraudulent submission taints the entire group of submissions. *United States ex rel. Brooks v. Stevens-Henager College,* 305 F. Supp. 3d 1279 (2018) (holding that an initial falsehood 'can taint subsequent claims for payment, even if those claims are for legitimate goods or services') (internal citations omitted). In an educational setting under Title IV, it should logically follow that *any* fraudulent submission should taint the entire request for Title IV funding.

The 90/10 argument and case law from outside this District relied upon by Defendants should be rejected by this Court. For example, the *Brooks* case arose out of Utah and is used for the contention that the only way a 90/10 violation could be a violation of the FCA is if the complaint plead that the actions taken by the Defendants actually moved the 90/10 "needle" to the 90% side of funds received by the school coming from Title IV programs over two consecutive years. The *Urquilla-Diaz v. Kaplan University,*

780 F.3d 1039 (2015) case is similar. The Court in that case found that:

> In sum, Diaz failed to allege facts that, if true, would establish that Kaplan's certification of compliance with the 90/10 rule was false. At most, his allegations were merely consistent with Kaplan having violated this rule, but that is not enough to state a claim under the False Claims Act. Thus, we conclude that the district court did not err in dismissing his claim insofar as it was based on Kaplan's alleged violation of the 90/10 rule.

*Id.* at 1056.

However, in neither of these cases was there any indication that there was anything inherently wrong with the conduct (scholarship program, *Brooks;* alleged textbook "scheme," *Urquillq-Diaz*) alleged to have masked 90/10 Rule violations. In the present case there is no known legitimate purpose for the elaborate check exchange program. Its sole purpose was to distort Defendants' reported percentages of revenue derived from Title IV and from other sources in order to ensure a continuing flow of funds from the federal government.

Moreover, the cases cited by Defendants address only allegations that the 90/10 Rule was actually violated. None of those cases address the DOE requirement that for-profit institutions, such as Infilaw Defendants, must report annually the amount and percentage of its income derived from Title IV. (Doc. 36, ¶ 38); 34 C.F.R. § 668.1 *et seq.* Infilaw Defendants submitted to the DOE executed PPAs, which falsely certified compliance with the mandatory regulations under Title IV, including accurate accounting of its annual income derived from Title IV funds. (*Id.*, ¶ 209). If Infilaw Defendants had not falsified this information, the DOE would not have distributed Title IV funds to Infilaw Defendants. By falsifying the percentage of income derived from Title IV funds, Infilaw Defendants submitted false claims to the United States, in violation of the FCA. Relators' TAC alleges in detail the Infilaw Defendants' reported percentages of Title IV and non-Title IV revenues (Doc. 36, ¶¶ 40-42), that the Infilaw Defendants knew they had a "90/10 problem" (Doc. 36, ¶ 43), and that Lorona in her role at ASLS in the General Counsel's office and the office of financial aid, had seen internal revenue calculations that differed

from calculations reported to the federal government and actually showed Defendants were in violation of the 90/10 Rule (Doc. 36, ¶ 58).

In addition, these two rulings relied upon by Defendants contradict the idea that the Federal Government should never be defrauded – not even one time, and if it is, all submissions therefrom become tainted. *United States ex rel. Stinson v. Prudential Insurance*, 944 F.2d 1149 (3d Cir. 1991).The 90/10 rule exists for one reason – to ensure that schools don't rely solely on the Federal Government. There is no provision in the 90/10 rule that allows a school to commit fraud to maintain the 90/10 ratio. If a school is committing some fraud, then it follows that the school is willing to do anything to keep the Title IV faucet running. The 90/10 rule provides the Government a statutory check and balance on institutions that are properly complying with the law and not submitting fraudulent claims. It does not exist to create a shield for fraud. These are two competing analyses relying on the plain language of the statute, but also the purpose of the FCA.

Combining these two ideas, this Court should allow these claims to move forward. With the rise of for-profit institutions preying upon their students such as ITT Tech, Corinthian, et al., Defendants in this case jumped on that bandwagon in the post-graduate law school field.

From a money-making perspective, it was clearly an enriching business decision for Defendants – for a time. Now, however, the gravy train has come screeching to a halt and Defendants are hoping they can tuck their tails and ride off into the sunset with their bags of hundreds of millions of dollars – dollars that would not have been there for the taking, but for Defendants' consistent abuse of the Federal Title IV programs. The *Brooks* and *Urquilla-Diaz* cases seem to allow for fraud committed under the 90/10 rule as long as it is not substantial enough to push the needle over the edge.

There is no such thing as a little bit of fraud. There should also never be anything accepted by any Court or the US Government that amounts to just a little bit of fraud. Fraud, quite simply, is fraud. One false claim submitted with Defendants' knowledge is

fraud. One false claim with Defendants' knowledge means that Defendants understood the system and understood how to cheat the same system. Even if Defendants only submitted one false claim knowingly, then it was done to extract money from the US Government that it was not entitled to. The implementation of things such as the Check Exchange (*see* Doc. 36, ¶¶ 76-126) show that Defendants were not only aware of a 90/10 problem, but that they were acutely aware of it and were actively submitting false claims, knowingly, to keep under the radar and out of the crosshairs of the US Government. Substantial sums of money were enjoyed by Defendants. Hundreds of millions of dollars were siphoned from the US Government through the Defendants' improper participation in Title IV programs and creative accounting practices implemented by the conspirators.

This Court must not allow a little bit of fraud to be the rule of law. This type of holding violates the very purpose of the False Claims Act. It violates the purposes of our judicial system. It violates the tenets of our Constitution. And, it incentivizes cheaters to get more creative to hide their fraud from the Government – if a Court will not even consider a case where some fraud was committed, but just not enough. It does not even become a particularity argument – it becomes a farce and a perversion of the very purpose of the FCA and the protections expected by the public. Companies and Individuals should be liable for any fraud committed knowingly. If not, then the American public will continue to be run roughshod by large Investment Groups gaming whatever system they can find – while forcing millions to go into financial debt and ruin. A message needs to be sent that this type of activity is not to be tolerated and it stops now by allowing these claims to move forward. If Defendants can prove that their claims were not fraudulent, then they can do so through discovery and summary judgment motions.

### iii.   Infilaw Defendants' Numerous and Substantial Misrepresentations

Under Title IV, institutions are not allowed to engage in "substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668.71(b). This prohibition extends to misrepresentations "in all forms, including those made in advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution." *Id.* Violation of the prohibition of making substantial misrepresentations may lead to the loss of an institution's eligibility and access to Title IV funds. (Doc. 36, ¶ 127). Relators specifically allege in the TAC that Infilaw Defendants "repeatedly violated this regulation by publishing materially false and misleading representations about bar passage, academic, and career prospects, and pushing unsuspecting students into loans that could never be repaid." (*Id.*) Relators offer specific examples of Infilaw Defendants' substantial misrepresentations in violation of Title IV, including: the use of the AAMPLE program to fudge admissions statistics (*Id.,* ¶¶ 128-69); failing to disclose that Infilaw Defendants' students' likelihood to pass the bar exam was declining rapidly (*Id.,* ¶¶ 170-93); and misleading prospective students about the cost of attendants (*Id.,* ¶¶ 194-197).

### iv.   Infilaw Defendants' Circumvention of ABA Accreditation Requirements

Title IV requires that institutions meet the requirements established by accrediting agencies or association. 34 C.F.R. § 668.14(b)(23). Under 34 C.F.R § 602.1 *et seq.*, the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar is the accrediting agency for law schools in the United States. (Doc. 36, ¶ 198). Failure to meet ABA requirements violates Title IV, and may subject an institution to loss of eligibility to receive Title IV funding. *Id.* The ABA does not allow law schools to admit applicants who do not appear capable of completing law school and being admitted to the bar. (*Id.,* ¶ 199). Despite the ABA's requirements, Infilaw Defendants

admitted numerous applicants who do not appear capable of being admitted to the bar, shown by median LSAT and GPA of matriculating students, the number of AAMPLE students, and poor bar passage rates (*Id.*, ¶ 200). At ASLS, Lorona was assistant to General Counsel and witnessed the ABA accreditation process and was given access to the preparation and submission of accreditation documents. (*Id.*, ¶ 204). Due to this access, Lorona possesses the indicia of reliability that such documents, with errors and misrepresentations, were submitted to the ABA, in violation of Title IV. (*Id.*).

### 3. *Relators properly allege  false claims presented by Infilaw Defendants under the False Claims Act*

As mentioned previously, though "Rule 9(b) generally prefers . . . the who, what, when and how of an alleged fraud, alternative means" will "satisfy the rule so long as those means put the defendants on notice of the precise misconduct alleged and provide the court with some indicia of reliability… to support the allegation of an actual false claim." *Schaengold*, 2014 WL 7272598 at *9 (citing *Clausen*, 290 F.3d at 1310-11, n.18; *Durham v. Bus. Mgmt. Assocs*. 847 F.2d 1505, 1511 (11th Cir. 1988)). Moreover, "there are no bright-line rules for establishing sufficient indicia of reliability under Rule 9(b) in FCA actions." *Id.* at *14.   Relators' insider status as former employees and their allegations of first-hand knowledge pass the indicia of reliability test required by Fed. R. Civ. P. 9(b). Additionally, the False Claims Act imposes liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim
> ....

31 U.S.C. § 3729(a)(1)(A), (B). A claim under § 3729(a)(1)(A) (Count I) has three elements: (1) the defendant submits a claim for payment to the Government; (2) the claim is false; and (3) the defendant knows the claim is false. Similarly, a claim under § 3729(a)(1)(B) (Count II) has three elements: (1) the defendant makes a false statement; (2)

the defendant acts knowing that the statement is false; and (3) the false statement is material to a false claim for payment. "Claim," as it is used in the False Claims Act, means, among other things, "any request or demand ... for money or property ... that ... is presented to ... the United States." § 3729(b)(2). Relators properly allege in Count I of the TAC that ASLS, CSL, and FCSL violated 31 U.S.C. § 3729(a)(1)(A) of the FCA by knowingly presenting false or fraudulent claims for payment or approval to the United States.

Relators allege that ASLS, CSL, and FCSL presented executed PPAs to the DOE that falsely certified compliance with Title IV, and that if they had not falsely certified the PPAs, DOE would not have disbursed Title IV/HEA funds. (Doc. 36 ¶ 209). The TAC explains how the PPAs were falsely certified: "ASLS, CSL, and FCSL sought funding for students who would not normally be admitted to any law school under ABA accreditation policies; ASLS, CSL, and FCSL failed to comply with ABA accreditation policies; Defendant Schools failed to comply with and fraudulently circumvented the 90/10 Rule." (*Id.*, ¶ 210). Relators further allege ASLS, CSL, and FCSL also made false statements and misrepresentations to the ABA in order to maintain their accreditation.

Combined with Relators' insider status and first-hand knowledge of the allegations in the TAC, Relators properly allege false claims presented by Infilaw Defendants. Relators Allege Sufficient Facts to Support Both Conspiracy and Reverse FCA Claims

### 1.   *Relators properly allege a claim for conspiracy*

Defendants are liable for conspiracy when relators can prove two elements: (1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid. *United States ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.*, 597 F. Supp. 2d 1280, 1289 (M.D. Fla. 2009) (internal citations omitted). "Conspire" in this context requires a meeting of the

minds "to defraud the government." *Id.* (citing *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

A person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to FCA liability. 31 U.S.C. § 3729(a)(1)(C). Although the FCA does not define the elements of conspiracy, courts recognize that "general civil conspiracy principles apply." *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir.1999) (citing *U.S. v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991)); *see also Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). A plaintiff bringing a cause of action for FCA conspiracy must allege (1) that "an agreement existed to have false or fraudulent claims allowed or paid" to the government, (2) that each alleged member of the conspiracy "joined that agreement," and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy." *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010) (citations omitted); *Rutledge v. Aveda*, No. 2:14–CV–00145–AKK, 2015 WL 2238786, at *12 (N.D.Ala. May 12, 2015) (citing *Corsello*, 428 F.3d at 1014).

At paragraphs 76-126 of the TAC, Plaintiffs allege that Infilaw Defendants and Barbri entered into an agreement in which Barbri would return money directly to Infilaw Defendants' students and Infilaw Defendants' students would then write a new check to Infilaw Defendnats. The sole purpose of the Check Exchange was to "wash" money that should have been considered "90" money into "10" money. The TAC, in detail, describes that Barbri and Infilaw Defendants entered into a three-year agreement, dated July 2, 2012, in which Barbri would provide all the materials for Infilaw Defendants' internal bar review programs (the "Bar Prep Agreement").[1] (Doc. 36, ¶ 84). This agreement between Barbri and the Infilaw Defendants was worth twelve million dollars ($12,000,000). (*Id.*, ¶ 84).

---

[1] Stephen Fredette, Barbri's Chairman and CEO, and Chidi Ogene, Infilaw's general counsel, signed the July 2, 2012 agreement. (Doc. 36, ¶ 84).

Barbri and Infilaw Defendants saw the Bar Prep Agreement as a way to "clean" "90" money and turn it into "10" money – and provide Barbri with a guaranteed payment of $12,000,000. (*Id.*, ¶ 85). In an agreement between Barbri and the Infilaw Defendants, Barbri refunded money that the majority of which was likely Title IV money that Infilaw Defendants' students had previously used to purchase Barbri's bar prep course directly from Barbri. Barbri then cut checks directly to the students and gave them to Infilaw Defendants to hold, rather than sending them directly back to the students. (*Id.*, ¶¶ 91-92, 108, 112). Infilaw Defendants then requested the students to write a check directly to the Infilaw Defendants in an amount less than the refund check – to entice students to participate in this laundering scheme. (*Id.* ¶ 108). Infilaw Defendants then deposited that money and accounted for it as "10" money under the 90/10 rule. (*Id.* ¶ 112). As part of the Check Exchange Program, Barbri employees were then required to tell Infilaw Defendants' students that due to an agreement with Infilaw Defendants the students *must* register in Infilaw Defendants' internal bar preparation courses, rather than Barbri's program. (*Id.*, ¶ 88). These acts are overt; conspiratorial in nature; and were actually implemented with the full knowledge of Barbri, its employees, and Infilaw Defendants and its employees.

As part of the Check Exchange, Infilaw Defendants and Barbri conspired and concocted a plan to force the students who had *already* paid their deposits or full tuition to Barbri to cancel with Barbri and switch their enrollment to Infilaw Defendants' bar preparation programs for the July 2012 through July 2013 bar exams. (*Id.* ¶¶ 90-91). This resulted in Barbri and Infilaw Defendants implementing their elaborate scheme to falsely count the full amount of the internal bar review course cost as non-Title IV revenue. (*Id.*). Again, the majority of the money paid to Barbri previously by these students was likely from Title IV loans the students had already taken. In effect, the conspirators were able to first allow the students to take money from the Title IV programs, pay for their bar prep through Barbri using those Title IV monies, and then "wash" the money back to the student in the form of the Check Exchange so that the student could then give "clean" money to

Infilaw Defendants to count towards the "10" money of the 90/10 equation.

Additionally, Infilaw Defendants' arrangements with Barbri contained unwritten agreements that prohibited Barbri from hosting informational sessions or setting up recruitment "tables" on campus, sending emails to students regarding Barbri's bar preparation programs, offering tuition assistance and discounts to students or otherwise competing with Infilaw Defendants in pricing or advertising to Infilaw Defendants' students for bar preparation courses. (*Id*. ¶ 118). ASLS prevented any other bar review programs from marketing to students on campus. (*Id*.).

### 2.   *Relators properly allege a reverse FCA claim*

Under 31 U.S.C. § 3729(a)(1)(G) of the FCA, a reverse false claim happens when the payee of a federally-sponsored program discovers receipt of a payment to which it was not entitled and does not return the overpayment. To properly allege a reverse FCA claim under 31 U.S.C. § 3729(a)(1)(G), a relator must show that the defendant "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government." *Graves v. Plaza Med. Centers, Corp.*, 281 F. Supp. 3d 1260, 1274 (S.D. Fla. 2017). In reverse FCA claims, "knowingly" means "actual knowledge of the existence of the overpayment." *Id.* "Obligation" is "an established duty… arising from … the retention of any overpayment." *Id.*

Relators allege in the TAC that Infilaw Defendants knowingly concealed and/or knowingly and improperly avoided an obligation to transmit money to the federal government. (Doc. 36, ¶ 247). Because Infilaw Defendants were not entitled to the Title IV/HEA funds they received from the Government, they had an obligation to repay those funds within sixty (60) days and failed to do so. (*Id.*, ¶ 248). These are not redundant claims as Infilaw Defendants argue, they are claims that flow naturally from Infilaw Defendants' fraudulent submission of PPAs to the Government to receive Title IV/HEA funds that they were not qualified to receive. Because Relators allege in the TAC that Infilaw Defendants

knowingly concealed and knowingly failed to repay funds to which they were not entitled to the Government, Relators properly alleged a reverse FCA claim in the TAC.

### F. The TAC is Not a Shotgun Pleading

Infilaw Defendants argue that Relators' TAC amounts to shotgun pleading. (Doc. 56 at 42). There are four basic types of shotgun pleadings: (1) those in which "each count adopts the allegations of all preceding counts"; (2) those that do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) those that do not separate each cause of action or claim for relief into a different count; and (4) those that assert multiple claims against multiple defendants without specifying which applies to which. *Yeyille v. Miami Dade Cty. Pub. Sch.*, 643 F. App'x 882, 884 (11th Cir. 2016). All types of shotgun pleadings are similar in "that they fail to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* Further, a "shotgun" pleading is a pleading in which "the plaintiff has failed to identify his claims with sufficient clarity to enable the defendant to frame a responsive pleading," *United Stated ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1317, 1336-37 (N.D. Ga. 2013) (internal quotation marks omitted), such that "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Id.* (quoting *Anderson v. District Bd. of Trustees*, 77 F.3d 364, 366 (11th Cir.1996)).

The factual allegations and legal claims against each of the Infilaw Defendants are well-organized in the TAC, and specifically allege the misconduct that each of the Infilaw Defendants engaged in. Relators remedied the prior instances of shotgun pleading after the Court's *sua sponte* Order. (Doc. 35). The claims in Relators' TAC provide the requisite clarity to allow Infilaw Defendants to frame a responsive pleading, thus the TAC does not amount to impermissible shotgun pleading.

### G.   Lorona's Prior Settlement Does Not Bar Her From Acting as Relator

#### 1.   *The Government did not consent to a dismissal of Lorona's FCA claims*

Lorona's prior release of her personal claims against ASLS and Infilaw is unenforceable in regard to Relators' FCA action. Pursuant to 31 U.S.C. § 3730(b)(1),

> A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

Numerous federal courts across the United States "have held that general releases that are entered into after the filing of a *qui tam* action are unenforceable." *United States ex rel. Keeler v. Eisai, Inc.*, 09-22302-CIV, 2011 WL 13099033, at *3 (S.D. Fla. June 21, 2011) (citing *U.S. v. Purdue Pharma. L.P.*, 600 F.3d 319, 326 (4th Cir. 2010)(holding that the FCA clearly provides that once a *qui tam* action is filed, the relator and the defendant may not settle or at least may not voluntarily dismiss the action); *U.S. v. Health Possibilities, P.S.C.*, 207 F.3d 335, 339 (6th Cir. 2000) ("The government's status as the real-party-in-interest renders a relator's unilateral attempt to settle akin to impermissibly bargaining away the rights of a third party."); *Searcy v. Philips Elec. N. Am. Corp., et al.*, 117 F.3d 154, 159 (5th Cir. 1997) ("[W]e find nothing in § 3730 to negate the plain import of this language.")).

In *Keeler*, the parties entered into a release from a separate lawsuit after the plaintiff had already filed a *qui tam* action. *Id.* The court held that because the *qui tam* action had been filed prior to the release, the release was unenforceable in the *qui tam* action because the Government did not consent to the release of those claims. *Id.* Similarly, in this action, Lorona filed her FCA action on August 5, 2015, prior to signing the release in the Arizona action. Lorona signed the release in question nearly two (2) years later on May 24, 2017. (*See* Doc. 56, Ex. 1). The Government did not decline to intervene in the FCA action until April 24, 2018, nearly a year after the Release was signed. (Doc. 30). Further, the

Government played no part in the settlement of Lorona's Arizona claims. In fact, the Government specifically declined to review or comment on the potential settlement of Lorona's Arizona claims. The Government certainly never *consented* to a settlement – especially in light of Lorona's FCA claims. The plain language of 31 U.S.C. § 3730(b)(1) requires that the Attorney General give written consent before *qui tam* claims may be voluntarily dismissed. No such written consent was ever given, thus the Release is unenforceable in regard to the FCA action.

### 2.   *The Government did not fully investigate prior to the Release*

Despite Infilaw Defendants' argument that "the Government had full knowledge of Lorona's FCA allegations, and had ample time to investigate those assertions," this is untrue. (Doc. 56 at 46). At the time the Release was signed, the Government had not fully investigated the FCA claims brought forth by Relators. This is evident in the extended amount of time it took for the Government to file a decision on intervention—nearly three (3) years. (*See* Doc. 30). It is further bolstered by the revelation that a "criminal investigation" has been ongoing concurrently with the civil investigation. *United States ex rel. Bernier v. Infilaw Corp.*, 616CV970ORL37TBS, 2018 WL 5839270, at *2 (M.D. Fla. Nov. 8, 2018).

### 3.   *The Release is not a general release and is not applicable to Lorona's FCA action*

The Release in question is not applicable to Relator Lorona's claims in this False Claims Action. Courts "must determine whether the language in the releases is broad enough to encompass *qui tam* claims." *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009). The language of the Release here is not broad enough to encompass Lorona's FCA claims.

The Release specifically limits the released claims to those brought *in the Arizona lawsuit* or arising out of her employment. While generally, a false claims count necessarily requires a relator to see events during their employment, these claims do not arise out of

Lorona's employment. Lorona is not filing discrimination claims, harassment claims, worker's compensation claims, retaliation claims, or anti-whistleblower claims in her FCA counts. Instead, she is reporting on very specific events she witnessed during her tenure as not just an employee but also a student. These are not claims related to her Arizona lawsuit and they are not claims that arise out of her employment – instead they were gained by being an astute observer of illegal actions.

While some of the claims in the Arizona action are similar to the claims in this False Claims Action, they are not the same. In the Arizona action, Lorona plead counts of fraud; consumer fraud; and various discrimination and retaliation claims. At their most basic, her Arizona claims were that she was personally defrauded and discriminated against by ASLS and suffered *personal* damages as a result.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Infilaw Defendants' Motion to Dismiss should be denied.


RESPECTFULLY SUBMITTED this 17th day of December 2018.

> */s/ Robert T. Mills*
> Sean A. Woods*
> Arizona Bar No. 028930
> docket@millsandwoods.com
> Robert T. Mills*
> Arizona Bar No. 018853
> docket@millsandwoods.com
> **MILLS + WOODS LAW, PLLC**
> 5055 North 12th Street, Suite 101
> Phoenix, Arizona 85014
> Telephone (480) 999-4556
> Facsimile (480) 999-4750
> *Admitted Pro Hac Vice / Attorneys for
> Relators Paula C. Lorona and Reid Potter*
>
>   -and-
>
> Jesse L. Hoyer

34

FL Bar No.: 076934
jlhoyer@jameshoyer.com
James Hoyer, P.A.
2801 W. Busch Blvd., Suite 200
Tampa, FL 33618
Telephone (813) 375-3700
Facsimile (813) 375-3710

*Attorneys for Relator Paula C. Lorona only.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Jeremy R. Bloor
US ATTORNEY'S OFFICE
400 W. Washington Street
Suite 3100
Orlando, Florida 32801
Email: Jeremy.Bloor@usdoj.gov

*Attorney for United States of America*

-and-

Vincent A. Citro, Esq.
Florida Bar. No. 0468657
**LAW OFFICES OF HORWITZ &
CITRO, P.A.**
17 East Pine Street
Orlando, Florida 32801
(407) 843-7733 phone
(407) 849-1321 facsimile
Email: vince@horwitzcitrolaw.com

David E. Mills, Esq.
**COOLEY LLP**

1299 Pennsylvania Avenue
Washington, D.C. 20004
(202) 842-7800 phone
(202) 842-7899 facsimile
Email: dmills@cooley.com
*Trial Counsel*

Mazda K. Antia, Esq.
**COOLEY LLP**
4401 Eastgate Mall
San Diego, CA 92121
(858) 550-6000
(858) 550-6420
Email: mantia@cooley.com

*Attorneys for Defendants InfiLaw Corporation,*
*Arizona Summit Law School, LLC, Florida*
*Coast School of Law, and Charlotte School*
*Of Law, LLC.*

-and-

David M. Wells
Florida Bar Number 0309291
Lauren V. Purdy
Florida Bar number 93943
**GUNSTER, YOAKLEY & STEWART, P.A.**
225 Water Street, Suite 1750
Jacksonville, FL 32202
(904) 354-1980 phone
(904) 354-2170 facsimile
Primary email: dwells@gunster.com
Primary email: lpurdy@gunster.com
Secondary email: dculmer@gunster.com
Secondary email: aarmstrong@gunster.com
*Attorneys for Defendant BarBri, Inc.*

/s/ *Sean A. Woods*

## **REQUEST FOR ORAL ARGUMENT**

Relators respectfully request oral argument on their Response to Infilaw Defendants' Motion to Dismiss, pursuant to Local Rule 3.01(j). Relators estimate one hour will be required for such argument.