**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA ex rel.
PAULA C. LORONA and REID POTTER,

       Plaintiffs-Relators,

                             Case No. 3:15-cv-959-J-34PDB

vs.

INFILAW CORPORATION, et al.,

       Defendants.

_____/

# O R D E R

**THIS CAUSE** is before the Court on two motions. On September 21, 2018, Defendant Barbri, Inc. filed a motion to dismiss Count III of the Third Amended Complaint (Doc. 36) pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)). <u>See</u> Defendant Barbri, Inc.'s Dispositive Motion to Dismiss and Memorandum in Support (Doc. 44; Barbri Motion). In addition, on October 22, 2018, Defendants Infilaw Corporation, Arizona Summit Law School, LLC (ASLS), Florida Coastal School of Law (FCSL), and Charlotte School of Law (CSL) (collectively, Infilaw Defendants) filed a motion to dismiss this action in its entirety pursuant to Rules 12(b)(1) and 12(b)(6). <u>See</u> Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion to Dismiss Third Amended Complaint and Supporting Memorandum of Law (Doc. 56; Infilaw Motion). Plaintiffs/Relators Paula C. Lorona and Reid Potter (Relators) filed a response to the Barbri Motion on October 12, 2018, and to the Infilaw Motion on December 17, 2018. <u>See</u> Plaintiffs' Response to Defendant Barbri, Inc.'s Dispositive Motion to Dismiss (Doc. 54; Response to Barbri);

Relators' Response to Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion to Dismiss (Doc. 65; Response to Infilaw). In addition, with leave of Court, the Infilaw Defendants filed a reply in support of their Motion on January 17, 2019. See Reply in Support of Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Motion to Dismiss the Third Amended Complaint (Doc. 71; Reply). Accordingly, this matter is ripe for review.

## I. Procedural History

Plaintiff/Relator Paula C. Lorona initiated this action on August 5, 2015, by filing, under seal, a four-count complaint pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq. See Complaint of Qui Tam Plaintiff Paula C. Lorona Filed Under Seal Pursuant to 31 U.S.C. §§ 3729 et seq. (Doc. 1; Original Complaint). On August 6, 2015, the Court entered an Order (Doc. 5) striking the Original Complaint as an impermissible shotgun pleading, observing that "each subsequent count of the four counts in the Complaint incorporates by reference all of the allegations of the preceding counts." See August 6, 2015 Order at 1-2. In accordance with the Court's Order, Lorona filed an amended complaint on August 31, 2015. See First Amended Complaint of Qui Tam Plaintiff Paula C. Lorona (Doc. 8; Amended Complaint). Thereafter, on March 10, 2016, with leave of Court, Lorona filed a second amended complaint, joining the additional Plaintiff/Relator Reid Potter, and adding a fifth count. See Second Amended Complaint of Qui Tam Plaintiffs Paula C. Lorona and Reid Potter (Doc. 14; Second Amended Complaint); see also Order (Doc. 13) (granting leave to amend).

Following multiple extensions of time, on February 16, 2018, the United States filed a notice of its decision not to intervene in this action. <u>See</u> United States' Notice of Election to Decline Intervention (Doc. 30). Accordingly, on April 24, 2018, the Magistrate Judge entered an In Camera Order directing the Clerk of the Court to unseal the pleadings in this matter. <u>See</u> In Camera Order (Doc 33.). Upon review of the Second Amended Complaint, the Court found that Relators had once again employed a shotgun manner of pleading. <u>See</u> Order (Doc. 35) at 1-2, filed April 26, 2018 ("Given the lack of any specification, Plaintiffs appear to be invoking all factual allegations as well as all allegations of each of the proceeding counts and leaving it to the Court to sift out irrelevancies and decide for itself which facts are relevant to the particular causes of action asserted."). As such, the Court struck the Second Amended Complaint and directed Relators to file a third amended complaint. <u>See</u> <u>id.</u> at 3. The Court cautioned Relators to "carefully review the Eleventh Circuit authority on this issue and ensure that the third amended complaint is fully compliant with the letter and spirit of the shotgun pleading rule." <u>See</u> <u>id.</u> at 3 n.1. On May 18, 2018, Relators filed the Third Amended Complaint of Qui Tam Plaintiffs Paula C. Lorona and Reid Potter (Doc. 36; Third Amended Complaint),[1] the operative pleading in this action.

## II. Factual Background[2]

### A. Overview of Claims

Defendants ASLS, CSL, and FCSL (the Law Schools) are private, for-profit law schools, controlled by their parent company, Defendant Infilaw. <u>See</u> TAC ¶¶ 4-10.

---

[1] For brevity, in citations the Court will refer to the Third Amended Complaint as "TAC."

[2] In considering the Motions to Dismiss, the Court must accept all factual allegations in the Third Amended Complaint as true, consider the allegations in the light most favorable to Relators, and accept all reasonable inferences that can be drawn from such allegations. <u>Hill v. White</u>, 321 F.3d 1334, 1335 (11th Cir. 2003); <u>Jackson v. Okaloosa Cnty., Fla.</u>, 21 F.3d 1531, 1534 (11th Cir. 1994). As such, the facts recited here are drawn from the Third Amended Complaint and may well differ from those that ultimately can be proved.

Relators allege that the Infilaw Defendants violated the False Claims Act (FCA) in connection with their receipt of federal funds from the student financial assistance programs authorized by Title IV of the Higher Education Act of 1965 (HEA). To be eligible to receive Title IV funds, institutions such as ASLS, CSL, and FCSL must enter a program participation agreement (PPA) with the Secretary of the Department of Education (DOE) which conditions "the initial and continued participation" of the institution on its compliance with certain requirements. See 34 C.F.R. § 668.14(a)(1). By entering a PPA, an institution agrees in pertinent part that:

> It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program.

34 C.F.R. § 668.14(b)(1). Relators allege that the Law Schools executed PPAs and submitted them to the federal government "despite full knowledge" that the regulations and requirements were "regularly being violated . . . ." TAC ¶¶ 32-34. Specifically, Relators allege that the Law Schools were violating the following three DOE regulations: (1) the "90/10 Rule" set forth in § 668.14(b)(16),[3] (2) the prohibition on "substantial misrepresentations" set forth in § 668.71(b),[4] and (3) the accreditation requirement set forth

---

[3] "By entering into a program participation agreement, an institution agrees that— . . . (16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds . . . ." See 34 C.F.R. § 668.14(b)(16).

[4] Pursuant to § 668.71, the Secretary is authorized to initiate a suspension or termination proceeding against an institution where the institution or its representatives make "a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." See 34 C.F.R. § 668.71(a)-(b). The regulation prohibits misrepresentations "in all forms, including those made in

in § 668.14(b)(23).[5]  In light of these violations, Relators maintain that the submission of the falsely certified PPAs "caused the federal government to distribute Title IV/HEA funds" to the Law Schools, "in violation of the False Claims Act."  Id. ¶¶ 33-34.  Relators also allege that the Law Schools made false statements to the American Bar Association (ABA) essential to the Law Schools' accreditation, which caused the government to pay Title IV funds to the Law Schools for which the Law Schools were ineligible.  See id. ¶¶ 203-05, 212-13, 222, 224.

In the Third Amended Complaint, Relators set forth five separate claims under the False Claims Act.  In Counts I, II and IV, Relators assert that the Law Schools knowingly presented false claims for payment to the federal government in violation of § 3729(a)(1)(A), and knowingly made or used false records or statements material to the false claims in violation of § 3729(a)(1)(B).  See TAC ¶¶ 206-28, 239-45.  In Count III, Relators allege that the Law Schools and Infilaw, conspired with Defendant Barbri, a corporation which provides "preparation courses and materials for individuals taking state bar exams," to violate the FCA.  See TAC ¶¶ 12, 229-38.  Last, in Count V, Relators allege that the Law Schools and Infilaw knowingly avoided their obligation to transmit money to the federal government, in violation of 31 U.S.C. § 3729(a)(1)(G), by failing to return to the federal government the "millions of dollars in payments for claims they were not entitled to."  See TAC ¶¶ 247-49.

---

any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution."  Id. § 668.71(b).

[5] "By entering into a program participation agreement, an institution agrees that— . . . (23) It will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies."  See 34 C.F.R. § 668.14(b)(23).

## B. The Relators

Lorona enrolled at ASLS as an evening student in August 2009.  Id. ¶ 136.  Lorona also "decided to work at ASLS because it would help her attend law school."  Id. ¶ 25.  ASLS hired Lorona in November of 2009 as "an administrative assistant to the General Counsel of ASLS."  See TAC ¶ 22.  In 2010, she was promoted to "financial aid representative," and in 2011, she received promotions to "assistant director of financial aid," and "student accounts/accounting manager."  Id.  As an employee, "Lorona was given a full tuition waiver and a pro rata early tuition waiver to attend ASLS."  Id. ¶ 25.  "Lorona's responsibilities as an employee of ASLS included submission of requests for federal funds, through the Common Origination and Disbursement System (COD), used by the DOE to create, deliver, and report Federal Pell Grants, TEACH Grants, and Federal Direct Loans."  Id. ¶ 23.  Following Lorona's submission of a COD request, the DOE would disburse the Title IV funds to ASLS, and Lorona would facilitate the distribution of the funds to the students.  Id. ¶ 24.  According to Relators, Lorona also "observed and participated in ASLS'[s] application for accreditation from the American Bar Association and the financial inner-workings of ASLS and Infilaw, including student loan disbursement, the application for and receipt of Title IV funds, and the certification of compliance with all DOE and Title IV regulations and requirements."  Id. ¶ 23.  Lorona alleges that ASLS President Scott Thompson executed the PPAs, "but they were prepared by other employees within the President's Office and financial aid department," such that she had "unparalleled access to the documents and the process under which they were certified."  Id. ¶ 32.[6]  However,

---

[6] While Relator Lorona alleges that she has personal knowledge of the PPAs executed and submitted by ASLS, her contention that CSL and FCSL "prepared, executed and submitted similar PPAs, in conjunction with Infilaw," is based only on "information and belief."  See TAC ¶ 34.

Lorona does not describe this process or describe her role, if any, in the preparation of the PPAs.

Potter attended law school at ASLS as well.  Id. ¶ 26.  Following his graduation, ASLS hired Potter in 2011, where he worked in the Academic Services department until September of 2014.  Id.  Potter's job at ASLS involved "guiding students through their bar exam preparation," as well as collecting bar exam preparation fees.  Id. ¶¶ 27, 29.  Potter also attended "meetings with ASLS and Infilaw officials regarding academic success programs," including ASLS's bar exam preparation programs, and the "use of those programs to secure and maintain federal funds . . . ."  Id. ¶ 28.  Potter was also involved in "discussions with representatives of Infilaw, ASLS and Barbri" regarding the check exchange program described below, and its alleged purpose as a means "to disguise funds ASLS received from federal student loan programs so that ASLS could continue to receive such funds."  Id. ¶ 29.

### C.  The 90/10 Rule

An institution's participation in most Title IV student financial assistance programs[7] is conditioned on its entry into a PPA with the Secretary of the DOE.  By entering a PPA, an institution agrees to comply with numerous statutory and regulatory rules and requirements.  See 34 C.F.R. § 668.14(b).  One such regulation is known as the "90/10 Rule" which demands as follows: "For a proprietary institution,[8] the institution will derive

---

[7] For a list of Title IV, HEA programs, see 34 C.F.R. 668.1(c)(1)-(12).  Participation in the Leveraging Educational Assistance Partnership (LEAP) program and National Early Intervention Scholarship and Partnership (NEISP) programs is not conditioned on the PPA requirement.  See 34 C.F.R. § 668.14(a)(1).

[8] The term proprietary institution is defined at 34 C.F.R. § 600.5.  Generally, the term refers to for-profit institutions of higher education which meet certain requirements.  See § 600.5(a)(1).  The parties do not dispute that the Law Schools are proprietary institutions subject to the 90/10 Rule.

at least 10 percent of its revenue for each fiscal year from sources other than Title IV, HEA program funds, as provided in § 668.28(a) and (b), or be subject to sanctions described in § 668.28(c)." See 34 C.F.R. § 668.14(b)(16). Pursuant to § 668.28(c), "[i]f an institution does not derive at least 10 percent of its revenue from sources other than Title IV, HEA program funds—(1) For two consecutive fiscal years, it loses its eligibility to participate in the Title IV, HEA programs for at least two fiscal years."

According to Relators, "[i]n or about early 2010, Defendants became concerned that they would not satisfy the 90/10 Rule because a large proportion of the students attending ASLS, FCSL, and CSL were receiving substantial Title IV/HEA funding through loans." See TAC ¶ 39. Relators allege that in 2009-2010, both ASLS and FCSL reported that over 82% of their revenue came from Title IV/HEA funding. Id. ¶ 40. Public data shows that in the 2012-2013 funding year, all three Law Schools reported over 86% of their revenue from Title IV/HEA sources. Id. ¶ 41. And, for the 2013-2014 funding year, both ASLS and CSL reported revenue from Title IV/HEA sources in excess of 87%, while FCSL's reported Title IV/HEA revenue had declined to just under 85%. Id. ¶ 42. Relators allege that, to address this "90/10 Problem," the Law Schools manipulated their revenue streams in the following three ways: 1) offering institutional loans, 2) creating internal bar preparation programs, and 3) engaging in a "check exchange" with Barbri.

### 1. Institutional Loans

Lorona asserts that she participated in weekly meetings from 2010 through 2013, where representatives and employees of the Law Schools and Infilaw discussed "how to create the appearance that Defendants were complying with the 90/10 Rule." See TAC ¶ 44. In 2011, Scott Thompson, the ASLS President and former Chief Financial Officer of

Infilaw, proposed "the concept of offering Institutional Loans ('ILs') to students as a solution to the 90/10 Rule." Id. ¶ 45. According to Lorona, "Thompson stated that from Infilaw's perspective the sole reason to offer ILs was to give the appearance that the Defendant [Law] Schools were in compliance with the 90/10 Rule." Id.

Relators allege that Infilaw and the Law Schools began offering institutional loans for the fall 2011-spring 2012 financial aid year. Id. ¶ 48. Although the Law Schools, under Infilaw's direction, initially solicited only students with top credit scores to sign up for institutional loans, once those efforts were exhausted, the Law Schools began offering institutional loans "to almost any student without regard to creditworthiness or ability to repay, including students with bankruptcies and foreclosures." Id. ¶¶ 48-50. By virtue of her position at ASLS, Lorona asserts that she has knowledge of the mechanics of the institutional loan program as she was "instructed to complete the financial transactions necessary to fund" institutional loans. Id. ¶ 57. As set forth in the Third Amended Complaint,

> Once a student was convinced to sign up for an [institutional loan], the Defendant [Law] Schools would 'refund' the Title IV/HEA funds previously received from DOE and replace those loan funds with [institutional loan] funds from the institution, most of which was previously received Title IV/HEA funds from other students' financial aid submissions. This allowed the Defendant [Law] Schools to transfer funds from the 90% side to the 10% side in a dollar-for-dollar manner, making it appear they were complying with the 90/10 Rule.

Id. ¶ 57. Nonetheless, Relators do not allege any particular examples of students who received such loans, the repayment terms of the loans, or the number of such loans each Law School issued.

Significantly, DOE regulations permit institutions to count revenue generated from institutional aid as non-Title IV revenue subject to certain requirements:

(i)     For loans made to students and credited in full to the students' accounts at the institution on or after July 1, 2008 and prior to July 1, 2012, include as revenue the net present value of the loans made to students during the fiscal year, as calculated under paragraph (b) of this section, if the loans—

(A)    Are bona fide as evidenced by standalone repayment agreements between the students and the institution that are enforceable promissory notes;

(B)    Are issued at intervals related to the institution's enrollment periods;

(C)    Are subject to regular loan repayments and collections by the institution; and

(D)    Are separate from the enrollment contracts signed by the students.

(ii)    For loans made to students before July 1, 2008, include as revenue only the amounts of payments made on those loans that the institution received during the fiscal year.

(iii)   For loans made to students on or after July 1, 2012, include as revenue only the amount of payments made on those loans that the institution received during the fiscal year.

34 C.F.R. § 668.28(a)(5).  Nonetheless, Relators contend that the Law Schools could not properly count the receivables from these institutional loans as non-Title IV income because the loans were not "subject to regular loan repayments and collections by" the Law Schools as required to constitute non-Title IV revenue under the regulation.  See TAC ¶¶ 46, 51-55; see also 34 C.F.R. § 668.28(a)(5)(i)(C).  According to Relators, the Law Schools and Infilaw knew that the institutional loans extended to low-credit students were uncollectible and never "made any serious attempts to collect" on those loans.  See TAC ¶¶ 52-54.  Indeed, Relators assert that "Defendants" knew that "most of the students receiving [institutional loans] could not and would not repay the loans," and that "Defendants" purposefully did not attempt to collect these loans "in order to avoid calling attention to the fact that the loans were not in fact collectible . . . ."  Id. ¶ 53.  Based on

"information and belief," Relators allege that "certain students" never made any payments

on their institutional loans. Id. ¶ 54. Lorona maintains that Thompson "forced" her to allow

these students to continue attending school so the receivables would count as non-Title IV

money. Id. Based on "information and belief," Relators allege that the institutional loan

default rate in the 2013 fiscal reporting year (presumably, at ASLS, although it is unclear)

exceeded 40%. Id.[9]

According to Relators, "[a]fter a year of funding" institutional loans to low-credit

students, the Law Schools reported the "amount of the corresponding receivables" to the

DOE as non-Title IV income. Id. ¶ 51. Relators do not allege the amount of the institutional

loan receivables reported to the DOE or more precisely, the amount of such receivables

derived from loans to low-credit students that were not actually subject to repayment and

collections. Indeed, Relators do not allege any information about the Title IV and non-Title

IV revenues reported to the DOE for the 2011-2012 fiscal year. Id. ¶¶ 40-42. Instead,

---

[9] Relators also appear to suggest that the Law Schools' practice of counting the net value from these loans, as opposed to cash received, violates the cash basis of accounting. See id. ¶ 55; Response to Infilaw at 20. However, the applicable regulation specifically provides that institutions must use the cash basis of accounting in calculating the revenue percentage, "[e]xcept for institutional loans made to students under paragraph (a)(5)(i) of this section . . . ." See 34 C.F.R. § 668.28(a)(2) (emphasis added). As noted above, the applicable paragraph provides that for loans made after July 1, 2008, and before July 1, 2012, institutions may include as revenue the "net present value of the loans made to students during the fiscal year," according to a specific calculation, so long as the loans are, inter alia, "subject to regular loan repayments and collections by the institutions . . . ." See 34 C.F.R. § 668.28(a)(5)(i)(C). Relators do not specifically allege when the challenged institutional loans were issued, but the loans appear to pertain to the "Fall 2011-Spring 2012 financial aid year," TAC ¶ 48, and thus, fall within the statutory period permitting a net present value calculation. Thus, Relators' only discernible theory for why the Law Schools could not properly count the institutional loans as revenue is that the loans were not actually subject to repayment and collection.

Relators also include allegations suggesting that these institutional loans were not in the best interests of the students. For example, according to Relators, the institutional loans, unlike federally funded loans, "are not deferrable by students after graduation, nor may students apply for financial hardships or forbearances" of the institutional loans. Id. ¶ 47. Relators also allege that the Law Schools "nefariously" withdrew future institutional loan support from low-credit students who the Law Schools assessed as having a low chance of passing the bar exam, "thereby destroying their ability to continue to attend school" despite having already "accrued tremendous amounts of debt . . . ." Id. ¶ 52. Relators emphasize that the Law Schools' only reason for offering the institutional loans to students was to appear to be in compliance with the 90/10 Rule. TAC ¶¶ 45, 59. However, Relators fail to explain how the Law Schools' motives, while troubling, are relevant to whether they were in compliance with DOE regulations.

Relators allege that Lorona viewed non-public, "internal calculations of revenue" related to the 90/10 Rule, "most of which" showed that ASLS was "consistently in violation of the 90/10 Rule." Id. ¶ 58. The dates and details of these internal calculations are not alleged, and Relators offer only their "information and belief" that these same documents exist at CSL and FCSL. Id. In addition, an unidentified person at an unidentified time is alleged to have provided Lorona with unidentified documents "demonstrating a violation of the 90/10 Rule," of unspecified date and magnitude, and instructed her to "convert some Title IV/HEA loans into [institutional loans] for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule." Id. ¶ 58. Whether or how Lorona accomplished this conversion is not alleged. It is unclear from the allegations whether the Law Schools' practice of providing institutional loans to low-credit students continued after the first year. Id. ¶ 60. Notably, for loans issued after July 1, 2012, only the payments actually received by the institution may be counted as revenue. See 34 C.F.R. § 668.28(a)(5)(iii). Relators do not allege any specific facts showing a violation of this provision.

### 2. The myBAR Program

On approximately September 15, 2011, the Dean of ASLS, Shirley Mays, sent an email stating that after "an insightful 90/10 meeting," the development of an internal bar exam preparation course "'has bubbled to the top as a real solution for 90/10.'" TAC ¶ 61. According to Relators, Infilaw tasked the Law Schools, beginning with ASLS, "with creating and implementing their own bar exam preparation programs to compete with established programs from Barbri and other providers." Id. ASLS then instructed the Director of the Critical Legal Skills Program (DCLSP) to implement a bar preparation program. Id. ¶ 62.

The DCLSP was not receptive to the idea of creating and implementing a new program in less than three months, sufficient to prepare December 2011 graduates for a February 2012 bar exam. Id. ¶ 62. Nonetheless, Dean Mays insisted that ASLS pursue implementation of its own bar preparation course, and at some point ASLS "formalized its new program" named "myBAR," for "Multi-Year Bar Advanced Review." Id. ¶¶ 63, 66. Relators allege on "information and belief" that the Law Schools "counted myBAR program fees as non-Title IV/HEA revenue toward satisfying the 90/10 Rule." Id. ¶ 68.

In late 2011, Dean Mays informed the DCLSP that the $50,000 fund previously offered to students in need of financial assistance to enroll in established bar preparation courses was no longer available. Id. ¶ 64. An Infilaw employee, Penny Willrich, suggested that ASLS "force its students to take its bar preparation program, provide no bar preparation materials to the students unless they sign up for ASLS bar preparation program, and even charge students parking fees during the bar preparation program to count toward non-Title IV/HEA funds." Id. ¶ 65. Relators do not allege when those suggestions were made, to whom they were made, whether they were ever implemented, or how much, if any, revenue they generated. However, Relators go on to allege that at an unspecified time, in unspecified amounts, ASLS began "paying students who participated in myBAR thousands of dollars as 'bonuses' for completing mini-courses called modules, thus effectively refunding the students' myBAR fees." Id. ¶ 67. According to Relators, this arrangement "allowed ASLS to claim tuition received from myBAR fees as

non-Title IV/HEA revenue, while hiding the fact that the revenue was refunded Title IV/HEA funds." Id.[10]

Pursuant to 34 C.F.R. § 668.28(a)(3), institutions may only consider funds generated from certain sources as non-Title IV revenue.[11]   As relevant here, § 668.28(a)(3)(iii) permits an institution to count funds "paid by a student, or on behalf of a student by a party other than the institution" for an "education or training program" that "prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party . . . ."  Relators contend that the Law

---

[10] Relators do not allege that this arrangement actually violated any specific DOE regulation, and do not rely on this allegation in their Response to Infilaw to support their claim that the myBAR program violated the 90/10 Rule.  See Response to Infilaw at 18.

[11] In full, 34 C.F.R. § 668.28(3) provides as follows:

(3) Revenue generated from programs and activities. The institution must consider as revenue only those funds it generates from—
(i)      Tuition, fees, and other institutional charges for students enrolled in eligible programs as defined in § 668.8;

(ii)     Activities conducted by the institution that are necessary for the education and training of its students provided those activities are—
(A) Conducted on campus or at a facility under the institution's control;
(B) Performed under the supervision of a member of the institution's faculty; and
(C) Required to be performed by all students in a specific educational program at the institution; and

(iii)    Funds paid by a student, or on behalf of a student by a party other than the institution, for an education or training program that is not eligible under § 668.8 if the program—
(A) Is approved or licensed by the appropriate State agency;
(B) Is accredited by an accrediting agency recognized by the Secretary under 34 CFR part 602;
(C) Provides an industry-recognized credential or certification, or prepares students to take an examination for an industry-recognized credential or certification issued by an independent third party;
(D) Provides training needed for students to maintain State licensing requirements; or
(E) Provides training needed for students to meet additional licensing requirements for specialized training for practitioners that already meet the general licensing requirements in that field.

14

Schools could not properly count the income from the myBAR program as non-Title IV revenue because it is not income "from school activities necessary and required for students enrolled in their programs, nor do the programs actually prepare their students properly to take an examination for an industry-recognized credential or certification issued by an independent third party." TAC ¶ 70. Indeed, according to Relators, the myBAR program was "woefully inadequate as a bar preparation course . . . ." Id. ¶ 69. In support, Relators assert that in an email dated December 23, 2014, "ASLS admitted . . . that the anticipated bar passage rate for an ASLS student on the February 2015 bar exam was 47% compared to a state average of 70%." Id. ¶ 69. Relators further allege that for the July 2015 Arizona bar exam the "actual pass rate for ASLS graduates" was 26.4%. Id. ¶ 75. Notably, in a separate section of the Third Amended Complaint, Relators state that 63.8% of ASLS graduates taking the bar exam in February 2012 (including repeat and first-time takers) passed the exam. Id. ¶ 159. In July of 2012, 73.1% of ASLS graduates passed the bar exam, and 72.9% of its graduates passed in February 2013. Id. While ASLS's bar passage rates do drastically decline in subsequent years, Relators provide no allegations linking this decline to the myBAR program. Indeed, there are no allegations regarding what percentage of ASLS students who enrolled in the myBAR program passed the bar exam as compared to students who utilized other programs. Moreover, Relators offer no information allowing one to assess the caliber of the internal bar exam preparation programs at CSL or FCSL.

### 3. The Check Exchange

Barbri "provides preparation courses and materials for individuals taking state bar exams, most of whom are recent law school graduates." Id. ¶ 12. These courses "include

a series of live or recorded lectures, study materials, and practice exams," and much of the cost is "attributable to Barbri's copyrighted bar preparation books, outlines, and practice exams, which are tailored to each state's bar exam." Id. ¶ 77. On July 2, 2012, Infilaw and Barbri entered into an agreement whereby Infilaw paid $12 million to have Barbri provide all the materials for the Law Schools' internal bar review programs over a three-year term, from July 2, 2012, until July 31, 2015. Id. ¶ 84. Pursuant to the agreement, Barbri stopped offering its own courses at the Law Schools, and was prohibited from soliciting students, setting up recruiting tables, or offering discounts to students at the Law Schools. Id. ¶¶ 81-82. This agreement "fixed the price of the 'live' bar preparation courses offered to . . . students, eliminated any competition by Barbri, and resulted in large payments from Infilaw to Barbri to ensure that the Defendant [Law] Schools' in-house bar review courses were the only option available to the Infilaw students." Id. ¶ 88. According to Relators, all three Law Schools implemented internal bar preparation programs utilizing the "written materials and lectures developed by Barbri for their bar exam preparation courses." Id. ¶ 79. Although touted as an attempt to increase bar passage rates, Relators allege that the reason Infilaw created these internal bar preparation programs was "to inflate the portion of revenue at the Law Schools that could be counted as non-Title IV or '10' revenue." Id. ¶ 89.

Significantly, Barbri typically begins soliciting students to sign up for its courses during their first year of law school. Id. ¶ 76. To enroll, students pay a deposit to Barbri to lock-in a lower price "as the cost increases each year a student waits to pay the deposit." Id. Thus, at the time Barbri and Infilaw entered their agreement, students taking the bar review course in the summer of 2012 had "already paid or contracted directly with Barbri

to take Barbri's bar review course and the Barbri course was already half over." Id. ¶ 86. Nevertheless, Infilaw, the Law Schools and Barbri required "students who had already paid deposits and contracted with Barbri [to] switch their enrollment to the Infilaw bar preparation programs for the July 2012 through July 2013 bar exams." Id. ¶ 90. In addition, Infilaw, the Law Schools, and Barbri devised a "check exchange" program so that Infilaw and the Law Schools could immediately recognize the full amount of these funds as non-Title IV revenue. Id. ¶¶ 90-92. Relators describe this program as follows: "Barbri agreed to refund each student's past payments by sending the checks directly to the Defendant [Law] Schools. The Defendant [Law] Schools would then distribute the checks to the students in exchange for the student writing a personal check payable to the school for the same amount." Id. ¶ 91. Students who had already made payments to Barbri for the summer 2012 course, or submitted deposits for future courses, were required to engage in this "check exchange" program. Id. Indeed, Barbri sent refund checks to ASLS for the check exchange even for students preparing for the July 2012 bar exam, who had already paid Barbri, attended Barbri classes, and had nearly completed the Barbri program. Id. ¶ 92. As such, despite having never provided any services for the money, ASLS was able to count these funds as non-Title IV revenue. Id. ¶ 92. Specifically, Relators allege that "[f]or the summer 2012 bar review course, ASLS received checks for approximately 70 graduates representing approximately $184,000. This was income that was owed and had already been paid to Barbri based on the students' agreements with Barbri." Id. ¶ 110. According to Relators, ASLS "illegally counted a large and material amount of this money as non-Title IV income in its 2012 annual audit submitted to the DOE." Id.

According to Relators, ASLS also sought to engage in a check exchange with students after the summer 2013 bar exam, when the students had already completed the preparation course and bar exam. Id. ¶ 112. "ASLS contacted these students, attempted to make them cash a 'refund' check from Barbri, and then immediately write a check in the same amount to ASLS for its myBAR program." Id. If a student refused to comply, ASLS would threaten to withhold their character and fitness certification necessary for bar admission. Id. Relators allege that Barbri sent refund checks for "approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process." Id. The Relators do not allege the amount of funds generated from these efforts but assert that the income generated was "reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE." Id.

Potter asserts that he participated in "multiple conversations with representatives of CSL and FCSL," in which he was told that the check exchange program was designed to address "ASLS's 90/10 problem." Id. ¶ 93. Potter also received an email from ASLS President Thompson explaining that the funds from the check exchange needed to be deposited by July 31st for the 90/10 calculation. Id. ¶ 94. In spring of 2013, Thompson sent several emails stating his concerns about the status of collections for the internal bar review program and emphasizing that these funds were a "'very important piece of 10 money.'" See id. ¶¶ 122-125. Potter alleges that he was present "during discussions with Barbri employees where this purpose (and its potential illegality) was discussed." Id. ¶¶ 96-97. For example, Barbri employee Mary Goza sent an email to ASLS employees on January 18, 2013 explaining the check exchange process and including instructions on how to "ensure compliance with 90/10 . . . ." Id. ¶ 108.

Indeed, in order to ensure that the funds received for the internal bar preparation program would be counted as non-Title IV revenue, ASLS would not allow students to pay their myBAR fees prior to graduation. Id. ¶¶ 99-105. ASLS either refused to accept a deposit for the myBAR program entirely, id. ¶¶ 99-104, or accepted a deposit but refunded the money upon graduation and then required the student to pay the fee in full after graduation, id. ¶ 105. It appears ASLS also waited to engage in the check exchange process until after the targeted students had graduated. Id. ¶ 107. Relators allege that the Infilaw Defendants pressured students in a variety of ways to participate in the check exchange program. Id. ¶¶ 113-14, 119-21, 125. According to Relators, the check exchange program was an "illegal price fixing and anti-competitive arrangement," which operated to the detriment of the students. Id. ¶ 126.[12]

## D. Substantial Misrepresentations

By entering into a PPA, institutions also agree to comply with the regulatory prohibition on substantial misrepresentations set forth in 34 C.F.R. § 668.71. Pursuant to this regulation, the Secretary of the DOE may initiate proceedings to fine an institution or limit, suspend or terminate the institution's participation in a Title IV, HEA program if the

---

[12] In the Third Amended Complaint, Relators also include an allegation that the revenue generated from the internal bar preparation course from 2011 through 2013 was a "sham" as ASLS simply attached its name to the Barbri materials. Id. ¶ 116. According to Relators, "the $2500 each student paid to ASLS for the myBAR program was entirely for the use of the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona." Id. Because "the entire amount of the internal bar preparation course fees paid to the [Law] Schools was really for 'books and materials' provided by Barbri," Relators contend that the Law Schools were "prohibited from counting this money as non-Title IV 90/10 revenue since this amount was not included or disclosed as tuition, fees, or other institutional charges." See id. ¶ 117 (citing 34 C.F.R. § 668.28(a)(7)(v)). The cited regulation prohibits an institution from counting as revenue "[t]he amount the student is charged for books, supplies, and equipment unless the institution includes that amount as tuition, fees, or other institutional charges." See 34 C.F.R. § 668.28(a)(7)(v). However, it is unclear whether this regulation would apply to the books, materials, and recorded lectures that make-up the voluntary bar exam preparation program. Relators do not further develop this legal argument, nor do they rely on it in their Response to Infilaw as a basis for finding a violation of the 90/10 Rule.

Secretary determines that the institution has engaged in substantial misrepresentation. See 34 C.F.R. § 668.71(a)(4). According to the regulation, "[a]n eligible institution is deemed to have engaged in a substantial misrepresentation when the institution . . . makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." Id. § 668.71(b). Such misrepresentations "are prohibited in all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses of programs of instruction offered by the institution." Id. A misrepresentation includes statements that are false, erroneous or have "the likelihood or tendency to mislead under the circumstances." Id. § 668.71(c). Such a statement is substantial if "the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment" on the statement. Id. Relators allege that the Law Schools "repeatedly violated this regulation by publishing materially false and misleading representations about bar passage, academic, and career prospects, and pushing unsuspecting students into loans that could not be repaid." See TAC ¶ 127.

### 1. AAMPLE

Relators allege that ASLS advertised statistics and data regarding the caliber of its students that were materially false and misleading. Specifically, Lorona contends that ASLS failed to include the LSAT scores and GPAs of students admitted through an alternative admissions process, known as the Alternative Admissions Model for Legal Education (AAMPLE), in its advertised statistics. See TAC ¶¶ 142 -144, 154. Because "[a]dmission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions," the failure to include the admissions data from the AAMPLE students in the admissions statistics posted on the

ASLS website, in Relators' view, rendered the reported information materially false and misleading.  Id. ¶¶ 143, 154.  Relators do not identify the specific statements that Lorona contends were misleading, nor what the statistics would have been with the AAMPLE students included.  Lorona also contends that ASLS also knew but failed to disclose that the percentage of its students likely to pass the bar exam was declining due to the admission of increasing numbers of AAMPLE students.  Id. ¶¶ 176-77.

## 2.    The Unlock Potential program

Relators allege that in May 2014, ASLS, as well as FCSL and CSL, began paying certain students to defer or forego taking the bar exam upon graduation based upon the Law Schools' determination that these students were likely to fail the exam.  Id. ¶ 182. Relators allege that this "Unlock Potential" program artificially increased bar passage percentages, thus deceiving the ABA, the DOE, and the public.  Id. ¶¶ 181-83, 190-91. According to Relators, "[a]t least 39 otherwise first-time bar exam takers were paid by ASLS to defer the July 2014 bar exam."  Id. ¶ 184.  Indeed, Lorona herself was approached on February 11, 2015, from a representative of "ASLS or Infilaw," who informed her that she was not likely to pass the February bar exam.  Id. ¶ 188.  The representative offered to pay Lorona $5,000, with an additional monthly stipend, to defer the bar exam until July 2015. Id. ¶ 189.  Relators allege that in later years the Dean of ASLS contacted students with an offer of $10,000 to defer sitting for the bar exam.  Id.  According to Lorona, the bar coach assigned to her by ASLS told her that "ASLS is concerned that it may lose accreditation and access to Title IV/HEA funding due to drastically low performance numbers."  Id. ¶ 188.  Relators conclude "upon information and belief" that ASLS counted the students who

participated in the Unlock Potential program as "full-time employees for purposes of reporting to the ABA and DOE." Id. ¶ 187.

### 3. Financial Obligations

Relators further allege that "Defendants misrepresented what incoming students should expect to pay for their education." Id. ¶ 194. Relators assert that the ASLS website represented that the tuition and fees for the "JD program during the 2010-11 academic year was $101,310.00," with an additional $2,184.00 in costs for books and supplies. Id. According to Relators, ASLS also represented that "the median cumulative program debt for graduates between July 1, 2009 and June 30, 2010 was $93,142.51 for federal student loan debt and $5,000.00 for private student loan debt." Id. Relators appear to contend that this information was misleading because ASLS's "most recent" disclosures identify the median federal student loan debt as $187,792. Id. ¶ 195.[13] Relators allege that "[d]espite notice provided by Lorona, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same." Id. ¶ 197. Relators do not identify these documents, or the particular statements or statistics that were allegedly misleading.

### E. ABA Accreditation

Last, Relators allege that the Law Schools and Infilaw violated 34 C.F.R. § 668.14(b)(23) which requires an institution to "meet the requirements established pursuant

---

[13] Relators also assert without elaboration that ASLS misleads students by "enrolling and then giving 'credit' to students ineligible for federal financial aid, "purportedly to 'giv[e] students time to fix their credit to receive loans." Id. ¶ 193. Relators contend that this is misleading because "DOE does not lend to students with credit blemishes for specified time periods." Id. This one allegation, devoid of any particular details regarding the statements made, to whom they were made, when they were made, who made them, how frequently this occurred, or how Relators are aware of it, entirely fails to satisfy the requirements of Rule 9(b). Indeed, Relators' discussion of the substantial misrepresentations in their Response makes no mention of this allegation. See Response to Infilaw at 25.

to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies." See 34 C.F.R. § 668.14(b)(23). Relators assert that the Council and the Accreditation Committee of the ABA Section of Legal Education and Admissions to the Bar (ABA Accreditation Board) is the accrediting agency for law schools in the United States. See TAC ¶ 198. Relators contend that the Law Schools are engaging in practices which violate the requirements of the ABA Accreditation Board. Id. ¶¶ 199-205. Specifically, Relators assert that contrary to ABA standards, the Law Schools "continue to admit applicants who do not appear capable of completing their legal education and being admitted to the bar." Id. ¶ 200. According to Relators, an institution may lose accreditation if it does not have a satisfactory bar passage rate, and as such, the Law Schools continue to "game these statistics" through the Unlock Potential program described above. Id. ¶ 201. In addition, Relators allege that ASLS misled prospective students in violation of ABA standards by creating "reports showing the grade point average of students admitted through alternative admissions programs versus traditional admissions." Id. ¶ 202. Lorona maintains that due to her "initial position as executive assistant to the General Counsel," she "witnessed the accreditation process" and thus can reliably report that "such accreditation documents, with errors and misrepresentations, were submitted to the ABA, in violation of federal regulations." Id. ¶ 204. Relators conclude "upon information and belief," that the other Law Schools prepared "similar accreditation documents," overseen by Infilaw, "under similarly misrepresentative schemes." Id. ¶ 205.

## III.      Standard of Review – Rules 8 and 9(b)

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009);

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).   Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth."  See Iqbal, 556 U.S. at 678, 680.  Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, claims under the False Claims Act must be "stated with particularity pursuant to Rule 9(b)." See United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006); see also Rule 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . [and] protects defendants from harm to their goodwill and reputation.'" Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in Wagner). Although "'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by specific allegations as to "'date, time or place.'" See Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting Durham, 847 F.2d at 1511). As such, a complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

Id. at 972 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001));

see also Atkins, 470 F.3d at 1357 ("Particularity means that 'a plaintiff must plead facts as

to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.'" (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1310 (11th Cir. 2002))). Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus, for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

## IV.    Public Disclosure Bar[14]

As an initial matter, the Infilaw Defendants assert that many of Relators' claims are precluded by the public disclosure bar.[15]  Pursuant to 31 U.S.C. § 3730, absent the government's opposition, a court must dismiss a qui tam action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed— . . . (iii) from the news media . . . ."  See 31 U.S.C. § 3730(e)(4)(A).  The public disclosure bar

---

[14] To the extent the Infilaw Defendants contend that Lorona's claims are barred because she signed a release pursuant to a settlement of a separate lawsuit against Infilaw and ASLS, this argument is unavailing. See Infilaw Motion at 44.  Lorona executed the release on May 24, 2017, while this action was pending.  See Stemetzki Decl., Ex. 1: Settlement Agreement and Release at 5.  "Federal courts across the country have held that general releases that are entered into after the filing of a qui tam action are unenforceable."  See United States ex rel. Keeler v. Eisai, Inc., No. 09-22302-CIV-UNGARO, 2011 WL 13099033, at *3 (S.D. Fla. June 21, 2011) (collecting cases); see also 31 U.S.C. § 3730(b)(1) ("The [qui tam] action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.").  The Court is not persuaded by the Infilaw Defendants' argument to the contrary because the case on which they primarily rely did not specifically address the impact of 31 U.S.C. § 3730(b)(1) on a post-filing release.  See United States ex rel. Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C., No. 07-80323-CIV, 2009 WL 10667702 (S.D. Fla. Mar. 24, 2009).

[15] The Infilaw Defendants do not contend that Relators' claims related to the 90/10 Rule or premised on the Unlock Potential program are subject to the public disclosure bar.  See Infilaw Motion at 12 n.7 (conceding that the "allegations concerning the bar preparation program, bar exam deferral programs, and institutional loans" are not subject to the public disclosure bar).

does not apply, however, if "the person bringing the action is an original source of the information."  Id.  An "original source" is:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction, and who has voluntarily provided the information to the Government before filing an action under this section.

See 31 U.S.C. § 3730(e)(4)(B).  To determine if the public disclosure bar applies, the Eleventh Circuit Court of Appeals applies a three-part test: (1) "'have the allegations made by the plaintiff been publicly disclosed;'" (2) if so, are the allegations in the complaint substantially the same as the allegations or transactions contained in public disclosures, and (3) "'if yes, is the plaintiff an original source of that information.'"  See United States ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 812 (11th Cir. 2015) (quoting Cooper v. Blue Cross Blue Shield of Fla., Inc., 19 F.3d 562, 565 n.4 (11th Cir. 1994) but updating the second prong of the standard based on 2010 amendments to the statute); see also United States ex rel. Bernier v. InfiLaw Corp., 311 F. Supp. 3d 1288, 1292 (M.D. Fla. 2018).  The Eleventh Circuit describes the second prong of this test as "'a quick trigger to get to the more exacting original source inquiry.'"  See Osheroff, 776 F.3d at 814 (quoting Cooper, 19 F.3d at 568 n.10).  Although previously a jurisdictional bar, Congress amended the statute in 2010, to provide that the public disclosure bar presents grounds for dismissal based on failure to state a claim, rather than lack of jurisdiction.  Id. at 810-11.

The Infilaw Defendants contend that Relators' allegations concerning the purportedly substantial misrepresentations, see supra Part II.D., and failure to comply with ABA accreditation standards, see supra Part II.E, are substantially similar to allegations

previously disclosed in the news media.[16]  In support, the Infilaw Defendants submit eleven news articles and blog posts which they contend disclose wrongdoing substantially similar to that set forth in the Third Amended Complaint.  <u>See</u> Declaration of Scott Stemetzki in Support of Defendants' Motion to Dismiss Relators' Third Amended Complaint (Doc. 56-1; Stemetzki Decl.), Exs. 2-12 (the Public Disclosures).[17]  In their Response, Relators argue that the public disclosure bar does not apply to their claims because they are original sources.  <u>See</u> Response to Infilaw at 9.  Relators also contend that even if they are not original sources, the Public Disclosures "do not make material allegations or disclose transactions that are substantially the same as the TAC."  <u>See</u> <u>id.</u> at 12-13.

### 1.  Public Disclosures[18]

In relevant part, Relators assert that the Infilaw Defendants: 1) "misrepresented their admission requirements and the caliber of students being admitted to ASLS" by failing to include AAMPLE students in their data, <u>see</u> TAC ¶¶ 155-56, 2) made statements regarding the "enrollment and success statistics" of ASLS students that were misleading for failure to include the AAMPLE students, <u>id.</u> ¶ 157, 3) made statements about ASLS's

---

[16] However, to the extent Relators allege that the Unlock Potential program misled students and the ABA Accreditation Board about the Law Schools' bar passage rates, the Infilaw Defendants do not contend that this program was publicly disclosed.  Thus, the Court's analysis in this section does not address the Unlock Potential program.

[17] Relators do not object to the Court's consideration of these documents, and the Court finds it appropriate to consider the exhibits at this stage in the proceedings "for 'the limited purpose of determining which statements the documents contain,' not for their truth."  <u>See</u> <u>Bernier</u>, 311 F. Supp. 3d at 1292 (quoting <u>Osheroff</u>, 776 F.3d at 811-12 & n.4).

[18] Relators do not assert that the cited Public Disclosures fail to fall within "the statute's enumerated categories of sources that are considered public."  <u>See</u> <u>Osheroff</u>, 776 F.3d at 812-14; <u>see</u> <u>also</u> 31 C.F.R. § 3730(e)(4)(A).  As such, the Court accepts that these articles and blog posts, which are publicly available on the internet, are "public disclosures" within the meaning of the statute.  <u>See</u> <u>Osheroff</u>, 776 F.3d at 813-14 ("District courts in the Eleventh Circuit and in other circuits have determined that the term includes publicly available websites.").  Accordingly, the Court turns to whether the allegations in the Third Amended Complaint are substantially the same as the allegations contained in the Public Disclosures.

"ultimate" bar exam passage rates that were misleading as compared to "actual" passage rates, id. ¶ 165, 4) failed to disclose that the percentage of students likely to pass the bar exam was declining due to the increasing numbers of unqualified students admitted to ASLS, id. ¶¶ 176-77, and 5) misled students about the cost of their education, id. ¶ 194.  In addition, Relators assert that the Infilaw Defendants failed to meet the ABA's accreditation requirements by continuing "to admit applicants who [did] not appear capable of completing their legal education and being admitted to the bar, as evidence[d] by [the] median LSAT and GPA of matriculating students, the growing proportion of AAMPLE students, and the poor bar passage rates of the Defendant Schools."  Id. ¶ 200.  Relators also contend that the Infilaw Defendants violated accreditation standards by misleading prospective students about the success of students in the AAMPLE program.  Id. ¶ 202.  According to Lorona, she "witnessed" the accreditation process and contends that "accreditation documents" were submitted to the ABA with "errors and misrepresentations."  Id. ¶ 204.

Similarly, the Public Disclosures discuss at length the Infilaw Defendants' alleged practice of admitting increasingly unqualified law students who were unlikely to pass the bar exam and would graduate saddled with immense student loan debt and few employment prospects.  Notably, two of the articles describe the Law Schools' use of the AAMPLE program as the means through which the Infilaw Defendants admitted students with low LSAT scores.  See Stemetzki Decl., Ex. 2 at 9; id., Ex. 7 at 4.  The Public Disclosures also address the immense debt and poor employment prospects for Infilaw graduates.  See, e.g., id., Ex. 12 (discussing the "atrocious employment statistics, sky high tuition, enormous class sizes, and graduates with massive debt loads" at the Law Schools and characterizing the schools as "a straight-up educational ripoff").  One article even notes

that the employment statistics released to the public are likely overstated because the Law Schools created temporary jobs to employ some graduates in an attempt to "produce deceptive employment rates that will entice potential future students to enroll." <u>Compare</u> Stemetzki Decl., Ex. 2 at 5 <u>with</u> TAC ¶ 135, 187.

In addition, the Public Disclosures discuss the correlation between a student's LSAT score and the probability that the student will pass the bar exam, including the observation that by admitting so many students who were unlikely to pass the bar exam, the Law Schools were jeopardizing their ABA accreditation. <u>See, e.g.</u>, <u>id.</u>, Exs 2, 5. Indeed, an August 18, 2014 blog post noted that this practice of admitting students with extremely low LSAT scores, who were therefore unlikely to pass the bar exam, was "unfair, ethically questionable, and a potential violation of ABA standards . . . ." <u>Id.</u>, Ex. 3 at 6.[19] A later blog post, dated December 18, 2014, called for an investigation of Infilaw, not only by the ABA but also by the DOE, based on the Law Schools' practice of admitting students with extremely low LSAT scores who were likely incapable of passing the bar exam. <u>Id.</u>, Ex. 6 at 3; <u>see also</u> <u>id.</u>, Ex. 5 at 5 (arguing that "it is highly ethically questionable to try to keep a law school afloat on the backs of students who have demonstrated poor aptitude for the study of law," and "even more ethically dubious when a law school is admitting large numbers of extremely high-risk students for the purpose of making a profit," and calling for the ABA to "put a stop to it"). This same author asserted that "InfiLaw is making huge profits off of totally unqualified students," and suggested that Infilaw's management likely knows that these students "have little chance of graduating (unless they also significantly lower their performance standards) and passing the bar." <u>Id.</u>, Ex. 6.

---

[19] This blog post also noted that FCSL's mandatory grading curve may be unsuitable for the caliber of students admitted and result in grade inflation. <u>Compare</u> Stemetzki Decl., Ex. 3 at 6-7 <u>with</u> TAC ¶ 145.

Based on the foregoing, the Court finds that the allegations contained in the Public Disclosures are substantially similar to the allegations and transactions giving rise to the challenged FCA claims. Indeed, Relators concede that both the Public Disclosures and the Third Amended Complaint "discuss Infilaw Defendants' practice of admitting students who were not academically qualified for law school and unlikely to pass the bar exam." See Response to Infilaw at 12. Nonetheless, Relators contend that their allegations are sufficiently distinct from the matters discussed in these articles because the Public Disclosures do not specifically accuse the Infilaw Defendants of fraud on the federal government. See id. at 12-13.[20] This argument is not well-taken. The Eleventh Circuit has previously rejected a relator's attempt to distinguish his pleadings from similar public disclosures merely "because the disclosures do not contain any allegations of wrongdoing." See Osheroff, 776 F.3d at 814. The Osheroff Court explained that the public disclosure test set forth in Cooper "does not require each source to contain an allegation of wrongdoing," and observed that the statute itself "requires only disclosures of 'allegations or transactions,' suggesting that allegations of wrongdoing are not required." Id. (quoting 31 U.S.C. § 3730(e)(4)(2012)). Thus, while the Public Disclosures do not reference specific DOE regulations, the "transaction" at the heart of Relators' claims—the intentional admission of underqualified students to the Law Schools, who are likely incapable of

---

[20] Relators also point to their allegations regarding the 90/10 Rule and the myBAR program, see Response to Infilaw at 10-11, 13, but their reliance on these allegations is misplaced. As stated above, the Infilaw Defendants do not contend that Relators' claims premised on those allegations are subject to the public disclosure bar. Significantly, "just because a relator is an original source with respect to some claim," does not convey this status to his claims in gross. Rockwell Int'l Corp. v. United States, 549 U.S. 457, 476 (2007). Indeed, "§ 3730(e)(4) does not permit such claim smuggling." Id. As such, the Court must consider application of the public disclosure bar on a claim-by-claim basis. Id.; see also John T. Boese, Civil False Claims and Qui Tam Actions § 4.02[D][1] (4th ed. & Supp. 2019) ("Because the [Rockwell] Court's finding that original source assessments are made on a claim-by-claim basis was not dependent upon the elements in the 1986 knowledge standard, this ruling holds true regardless of whether the 2010 or 1986 bar is applied.").

passing the bar exam, in violation of ABA standards and in order to capitalize on federal student loan funds—is substantially similar to the practices described in the Public Disclosures.

Moreover, contrary to Relators' arguments, the Public Disclosures are sufficient to raise the inference of fraud in connection with the federal student loan program. Several articles allege that the Infilaw Defendants' reduced their admissions standards, to the detriment of the debt-laden students graduating with law degrees they are unable to use, in order to take advantage of all available federal student loan funds and thereby increase their profits. See Stemetzki Decl., Ex. 2 ("[S]chools accredited by the [ABA] admit large numbers of severely underqualified students; these students in turn take out hundreds of millions of dollars in loans annually, much of which they will never be able to repay. Eventually, federal taxpayers will be stuck with the tab, even as the schools themselves continue to reap enormous profits."). The Public Disclosures further note that this practice likely violates ABA accreditation standards and will result (and did result) in the collapse of the Law Schools' bar passage rates. One blog post even goes so far as to call for an investigation by the ABA and DOE. See id., Ex. 6 at 3. The Public Disclosures accuse the Law Schools of "scamming" law students to capitalize on federal student loan funds and likely violating ABA standards in the process. See id., Exs., 2, 10, 12. Because "the second prong is a 'quick trigger,'" to the original source inquiry, this "significant overlap between [Relators'] allegations and the [P]ublic [D]isclosures is sufficient to show that the disclosed information . . . is substantially similar to the allegations in the [Third Amended Complaint]." See Osheroff, 776 F.3d at 814; see also Bernier, 311 F. Supp. 3d at 1293-97.

## 2. Original Source

Relators also contend that the public disclosure bar does not apply to their claims because they are original sources. <u>See</u> Response to Infilaw at 9-10. Pursuant to § 3730(e)(4)(B), Relators can qualify as original sources if they voluntarily disclosed to the government the information on which the allegations or transactions in their claims are based prior to the Public Disclosures. Relators contend that they satisfied this requirement because "Potter's disclosure to the government predates all but one of the articles Infilaw Defendants provided as exhibits to their MTD," and this article includes only "vague allegations against ASLS, then Phoenix Law School." <u>See</u> Response to Infilaw at 10 (citing Stemetzki Decl., Ex. 10). Indeed, according to the Third Amended Complaint, "Potter provided information regarding this Third Amended Complaint to the United States Department of Justice ('DOJ') on or about July 31, 2012." <u>See</u> TAC ¶ 15. Potter also provided "documentation relating to this Third Amended Complaint to the United States Department of Education" on December 12, 2012. <u>Id.</u> ¶ 16. Relators do not elaborate on what "information" or "documentation" Potter allegedly provided to the government in 2012.

Upon review of the Third Amended Complaint, it is apparent that the only allegations premised on Potter's knowledge are those related to the myBAR program and Barbri check exchange. Specifically, Part V of the Third Amended Complaint describes the basis of Potter's knowledge as his time working in the Academic Services Department at ASLS. <u>Id.</u> ¶ 26. According to the Third Amended Complaint, Potter "guid[ed] students through their bar exam preparation," and attended meetings where the use of bar exam preparation programs "to secure and maintain federal funds" was discussed. <u>Id.</u> ¶ 28. Potter was also involved in facilitating the check exchange with students and participated in discussions

with Infilaw, ASLS, and Barbri representatives about this process and its purpose.  Id. ¶ 29.  Indeed, in the Third Amended Complaint, Relators rely heavily on Potter's knowledge and experiences at ASLS in describing the check exchange process, see TAC ¶¶ 76-126, but do not otherwise reference Potter in the remainder of their pleading.  Rather, Relators' other factual allegations all stem from Lorona's knowledge and experiences at ASLS.  It is Lorona who is alleged to have "reviewed materials, statistics, and bar passage rates published by ASLS," id. ¶ 25, complained about misleading data and deceptive marketing, id. ¶ 144, and witnessed the accreditation process, id. ¶ 204.  Thus, the only reasonable interpretation of the allegation that Potter provided "information regarding this Third Amended Complaint" to the government on July 31, 2012, is that he disclosed the information in his possession related to the ASLS bar exam preparation program and check exchange with Barbri.  Because the Infilaw Defendants do not contend that the check exchange program is subject to the public disclosure bar, Relators' reliance on Potter's disclosures to the government to invoke the original source exception is misplaced.

Instead, as it is Lorona who is alleged to have knowledge of the challenged claims, the Court must determine whether Lorona qualifies as an original source as to those allegations.  According to the Third Amended Complaint, Lorona "provided documentation relating to this Third Amended Complaint" to the DOE on June 3, 2015, id. ¶ 17, and met with an Assistant United States Attorney to discuss her allegations on July 17, 2015, id. ¶ 18.  Lorona's disclosures occurred after publication of the Public Disclosures identified by the Infilaw Defendants, the latest of which was January 16, 2015.  See Stemetzki Decl. ¶¶ 5-15.  Thus, to qualify as an original source, Lorona must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transaction."

<u>See</u> 31 U.S.C. § 3730(e)(4)(B).[21]   Assuming arguendo that Lorona has independent knowledge of the matters alleged in the Third Amended Complaint, she fails to qualify as an original source because her allegations do not "materially add" to the Public Disclosures.

In their Response, Relators contend that the Third Amended Complaint "materially adds" to the publicly disclosed allegations by explaining "in detail how the Infilaw Defendants fraudulently attempted to satisfy the 90/10 Rule by creating and implementing their own bar exam preparation courses."   <u>See</u> Response to Infilaw at 10-11.   This argument misses the mark given that the Infilaw Defendants do not contend that the Relators' 90/10 claims are subject to the public disclosure bar.   Rather, the appropriate focus of the materiality analysis is whether Lorona provides any details which materially add to the publicly disclosed information regarding the Infilaw Defendants' deceptive admissions practices and violations of accreditation standards.   On this subject, Relators do not cite to a single, specific allegation that they contend represents materially new information.

Relators contend that the Law Schools were defrauding the federal government of student loan funds because they were engaged in conduct which rendered them ineligible to participate in the federal student loan programs.   However, the Public Disclosures exposed the very conduct which Relators' contend was disqualifying, namely, the Law Schools' practice of admitting unqualified students, the likely inability of those students to pass the bar exam, the high cost of the Infilaw education, and the implications of Infilaw's admissions practices with respect to the Law Schools' bar passage rates and accreditation.

---

[21] The statute also requires an original source to voluntarily provide the information to the government before filing her FCA lawsuit, <u>see</u> 31 U.S.C. § 3730(e)(4)(B), which Lorona did.  <u>See</u> Original Complaint (Doc. 1), filed on August 5, 2015.

Moreover, as in <u>Bernier</u>, the Public Disclosures link this conduct to the Infilaw Defendants' "overriding goal of squeezing as much money as possible from the federal government." <u>See</u> <u>Bernier</u>, 311 F. Supp. 3d at 1297-98.  Thus, the Court finds that the Public Disclosures "'were already sufficient to give rise to an inference'" that the Infilaw Defendants were defrauding the government of federal student loan funds.  <u>See</u> <u>id.</u> at 1297 (quoting <u>Osheroff</u>, 776 F.3d at 815).  Relators' allegations do no more than repackage what was already publicly known about the Infilaw Defendants' practices into the framework of the FCA, this is insufficient to satisfy the materiality standard.[22]

Accordingly, aside from the Unlock Potential program, to the extent Relators assert that the Infilaw Defendants violated the FCA by making substantial misrepresentations and violating accreditation standards, those claims are barred.  As such, Relators' remaining claims are those premised on: 1) the Infilaw Defendants' violations of the 90/10 Rule, and 2) the Infilaw Defendants' use of the "Unlock Potential" program to mislead the public and the ABA Accreditation Board about the Law Schools' bar passage rates.  As to these claims, the Court will next determine whether Relators have adequately alleged each violation of the FCA under Rules 8 and 9(b).

## V.     The False Claims Act

Pursuant to the FCA, a private person, called a "relator," may "bring a <u>qui</u> <u>tam</u> action in the name of the United States against anyone who files a claim proscribed by the FCA."

---

[22] Notably, as discussed below, Relators' allegations regarding the preparation and execution of the PPAs, the submission of student loan requests, and the preparation and submission of the accreditation documents to the ABA Accreditation Board are largely vague and conclusory.  Thus, the type of internal, insider information that <u>could</u> have materially added to what was publicly known about the Infilaw Defendants' practices is missing from the Third Amended Complaint.

See Atkins, 470 F.3d at 1354 n.4 (internal citation omitted) (citing Clausen, 290 F.3d at 1308). As relevant here, the False Claims Act imposes civil liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [the presentment provision];
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [the false record provision];
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) [the conspiracy provision]; or
>
> (G) . . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . [the reverse-false-claim provision].

See 31 U.S.C. § 3729(a)(1). "A 'claim' includes direct requests for government payment as well as reimbursement requests made under a federal benefits program." See United States ex rel. Chase v. HPC Healthcare, Inc., 723 F. App'x 783, 788 (11th Cir. 2018); see also 31 U.S.C. § 3729(b)(2) (defining claim in pertinent part to mean "any request or demand, whether under a contract or otherwise, for money or property . . . that—(i) is presented to an officer, employee, or agent of the United States . . ."). In addition, the FCA defines the term knowingly to mean "that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ." See 31 U.S.C. § 3729(b)(1)(A). As such, the term knowingly "require[s] no proof of specific intent to defraud." See 31 U.S.C. § 3729(b)(1)(B).

Although Relators accuse the Law Schools of numerous violations of DOE regulations, regulatory violations alone do not give rise to a cause of action under the FCA. Indeed, the FCA is not "'an all-purpose antifraud statute,' or a vehicle for punishing garden-

variety breaches of contract or regulatory violations." See Universal Health Servs., Inc. v. United States ex rel. Escobar (Escobar), 136 S. Ct. 1989, 2003 (2016) (internal citation omitted) (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)). "'Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies.'" Chase, 723 F. App'x at 788 (quoting Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005)); see also Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1045 (11th Cir. 2015); see also Hopper v. Solvay Pharms., Inc., 588 F.3d 1318, 1328 (11th Cir. 2009) ("Improper practices standing alone are insufficient to state a claim under [the presentment provision or the false record provision] absent allegations that a specific fraudulent claim was in fact submitted to the government."). "Simply put, the 'sine qua non of a False Claims Act violation' is the submission of a false claim to the government." Urquilla-Diaz, 780 F.3d at 1045 (quoting Corsello, 428 F.3d at 1012).

## VI.     Counts I, II and IV – Presentment and False Record Claims

In Count I of the Third Amended Complaint, Relators assert a presentment claim premised on § 3729(a)(1)(A). The elements of a presentment claim are as follows: 1) a false or fraudulent claim, 2) the presentment of the claim, and 3) knowledge that the claim was false. See 31 U.S.C. § 3729(a)(1)(A). In Counts II and IV of the Third Amended Complaint, Relators assert false record claims premised on § 3729(a)(1)(B). To establish a false record claim under the FCA, Relators must allege that the Law Schools: "(1) made, used, or caused to be made or used, a false record or statement; (2) that is material to a false or fraudulent claim; and (3) with the knowledge the statement was false." See Rutledge v. Aveda, No. 2:14-cv-145-AKK, 2015 WL 2238786, at *5 (N.D. Ala. May 12,

2015).  In their Response, Relators do not distinguish between their various claims in Counts I, II, and IV, and it is difficult to discern the precise legal theories on which they rely. Nonetheless, all three counts are premised on the central contention that the student loan funding requests are "false or fraudulent" claims for payment.[23]  Relators offer two reasons why these claims are false: (1) because the Law Schools made false certifications of compliance in the PPAs, and (2) because the Law Schools made material false statements to the ABA Accreditation Board.  These arguments implicate two potential legal theories: false certification and fraudulent inducement.

To adequately allege a false certification claim, Relators must set forth facts that, if true, would show: "'(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"  See Urquilla-Diaz, 780 F.3d at 1052 (quoting United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006)).[24]  Notably, false certifications can be express or implied.  Express false certification occurs where a defendant expressly and falsely certifies compliance with a law, rule or regulation in connection with a claim for payment.  See United States ex rel. Keeler v. Eisai, Inc., 568 F. App'x 783, 798-99 (11th

---

[23] At times, Relators appear to contend that the PPAs constitute false claims.  However, PPAs are not, themselves, requests for funds.  Rather, it is the student loan disbursement requests that constitute "claims."  See United States ex rel. Brooks v. Stevens-Henager College, 305 F. Supp. 3d 1279, 1296 n.6 (D. Utah Mar. 30, 2018).

[24] In Urquilla-Diaz, the Eleventh Circuit applied a prior version of the False Claims Act which imposed liability under the false record provision where a person "knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government."  See 31 U.S.C. § 3729(a)(2) (2006) (emphasis added).  Congress amended this statute via the Fraud Enforcement Recovery Act of 2009 (FERA), removing the underlined language and replacing it with "material to a false or fraudulent claim."  See 31 U.S.C. § 3729(a)(1)(B) (2009).  The Urquilla-Diaz Court declined to consider whether the amendments to the statute might alter the Hendow elements for post-amendment claims.  See Urquilla, 780 F.3d at 1045.  Nonetheless, the changes to the statute are not material to the issues addressed in this order.

Cir. 2014); see also United States ex rel. Medrano v. Diabetic Care Rx, LLC, No. 15-cv-62617-BLOOM/Valle, 2019 WL 1054125, at *4 (S.D. Fla. Mar. 6, 2019) ("'Express certification mean that the supplier has certified compliance with applicable laws and regulations as part of the claims submission process.'" (quoting United States ex rel. Phalp v. Lincare Holdings, Inc., 116 F. Supp. 3d 1326, 1345 (S.D. Fla. 2015) aff'd as modified 857 F.3d 1148 (11th Cir. 2017))); United States ex rel. Ortolano v. Amin Radiology, No. 5:10-cv-583-Oc-PRL, 2015 WL 403221, at *6 (M.D. Fla. Jan. 28, 2015) ("[A]n express certification occurs when the defendant actually signs or otherwise certifies compliance with some law or regulation that is identified on the face of the claim submitted."); John T. Boese, Civil False Claims and Qui Tam Actions § 2.03[G][1] (4th ed. & Supp. 2019) ("Express false certification theory, as its name suggests, requires a claim that expressly and falsely certifies compliance with a particular requirement . . . .").

In contrast, "[a] claim for payment is impliedly false when it impliedly certifies compliance with [an] underlying legal requirement when, in fact, the claimant is not in compliance." See United States ex rel. Brooks v. Stevens-Henager College, 305 F. Supp. 3d 1279, 1296 (D. Utah 2018). The Supreme Court recently confirmed that "the implied false certification theory can, at least in some circumstances, provide a basis for liability." See Escobar, 136 S. Ct. at 1999. Relying on the well-recognized concept of misrepresentation by omission in common-law fraud, the Escobar Court held that:

> the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

Escobar, 136 S. Ct. at 2001. Notably, the Supreme Court specifically declined to determine "whether all claims for payment implicitly represent that the billing party is legally entitled to payment." See Escobar, 136 S. Ct. at 2000 (emphasis added). Nonetheless, as to both express and implied certifications, the materiality prong is critical. Id. at 2001-04 ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."). The Supreme Court describes the materiality standard as both "rigorous" and "demanding," and instructs that particularized facts supporting materiality must be pled in the complaint. Id. at 2002-04 & n.6.

Additionally, the Eleventh Circuit recognizes a fraud in the inducement theory of liability under the FCA. See United States ex rel. Marsteller v. Tilton, 880 F.3d 1302, 1314-15 (11th Cir. 2018). Under this theory, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." See Hendow, 461 F.3d at 1173. The "subsequent claims are false 'because of an original fraud (whether a certification or otherwise).'" See Marsteller, 880 F.3d at 1314 (quoting Hendow, 461 F.3d at 1173). Significantly, for fraud in the inducement to be actionable under the False Claims Act, "'the promise must be false when made,'" and "material to the government's decision to pay out moneys to the claimant." Hendow, 461 F.3d at 1174.

Here, Relators contend that the Law Schools made express certifications of compliance with DOE regulations in the PPAs that were false, causing the government to distribute Title IV funds for which the Law Schools were ineligible. See Response to Infilaw

at 18, 27.[25]   In addition, Relators contend that the Law Schools made material misrepresentations to the ABA Accreditation Board regarding the Law Schools' bar passage rates in order to maintain their accreditation.  See id. at 27.  Relators' theory is that these material misrepresentations, essential to accreditation, caused the government to provide student loan funds to the Law Schools for which they were ineligible.  The Court considers each theory in turn.

## A. The PPAs

It is unclear whether Relators are proceeding on the theory that the PPAs represent express false certifications—the certifications of compliance in the PPAs were made in connection with the student loan claims and were false when made, or promissory fraud— the Law Schools certified that they would comply with the provisions in the PPA, without

---

[25] In their briefs, Relators do not raise the implied false certification theory of relief and they make no effort to plead the Escobar elements in the Third Amended Complaint.  Specifically, Relators do not include any allegations describing the statements or certifications made in connection with the student loan requests, and as such, have not shown that these requests "[do] not merely request payment, but also make[] specific representations about the goods or services provided . . . ."  See Escobar, 136 S. Ct. at 2001.  The Court recognizes that following Escobar, courts have split on whether such representations are necessary to state a claim for implied false certification.  Compare United States ex rel. Rose v. Stephens Institute, 909 F.3d 1012, 1017-18 (9th Cir. 2018) (concluding that the court was bound by prior panels who had construed Escobar's requirements as mandatory); United States v. Sanford-Brown, Ltd., 840 F.3d 445, 447-48 (7th Cir. 2016) (rejecting implied false certification claim where relator failed to meet either condition in Escobar) with United States v. Triple Canopy, Inc., 857 F.3d 174, 178 n.3 (4th Cir. 2017) (appearing to indicate that all claims for payment implicitly represent that the billing party is legally entitled to payment); United States v. DynCorp Int'l, LLC, 253 F. Supp. 3d 89, 99-100 (D.D.C. 2017) (explaining that in the D.C. Circuit, specific representations are not necessary to state an implied false certification claim and that this remains good law after Escobar); see also United States ex rel. Medrano v. Diabetic Care Rx, LLC, No. 15-cv-62617-BLOOM/Valle, 2019 WL 1054125, at *5 (S.D. Fla. Mar. 6, 2019) (describing the Escobar elements as mandatory and rejecting argument that "specific representations are not required").  Regardless, the Court need not decide the issue here.  In the Third Amended Complaint, Relators rely solely on allegations of expressly false statements in the PPAs and accreditation documents.  Relators, who have twice amended their claims, do not allege that the Law Schools made any implicit certifications in the requests for student loan funds, nor do Relators rely on this theory in their Response to Infilaw.  Indeed, Relators include virtually no allegations detailing the actual loan requests themselves.  As such, the implied certification theory of relief is not before the Court in this case.  See United States ex rel. Barrett v. Beauty Basics, Inc., No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *4 (N.D. Ala. June 11, 2015) (rejecting implied certification theory in part because "plaintiffs have not stated with particularity the facts surrounding any loan applications"); Brooks, 305 F. Supp. 3d at 1298 & n.9 (rejecting implied certification theory because it was not pled in the complaint and explaining that "[a]t a minimum, the Government needs to allege what [the institution] impliedly represented when it requested Title IV funds").

the intention to do so, in order to induce the government to provide student loan funding. Under either theory, Relators must allege facts from which one could plausibly infer that the certifications of compliance or promises to comply in the PPAs were both false when made and material. See Urquilla-Diaz, 780 F.3d at 1052; Hendow, 461 F.3d at 1171-72 ("[T]o succeed on a false certification theory, some falsity must be alleged. . . . [A] palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act."); Marsteller, 880 F.3d at 1314-15; see also United States v. Sanford-Brown, Ltd., 788 F.3d 696, 708-09 (7th Cir. 2015) ("[P]romises of future performance do not become false due to subsequent non-compliance.") reinstated in pertinent part by 840 F.3d 445, 447 (7th Cir. 2016); United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 500 (8th Cir. 2016) ("To demonstrate this promise was false, it is not enough to show that [defendant] did not comply with the PPA; Relators must show that [defendant], when signing the PPA, knew accurate grade and attendance records were required, and that [defendants] intended not to maintain those records."); United States ex rel. Main v. Oakland City Univ., 426 F.3d 914, 917 (7th Cir. 2005); Hendow, 461 F.3d at 1174 ("[F]or promissory fraud to be actionable under the False Claims Act, 'the promise must be false when made.'" (internal quotation omitted)). Relying instead on vague and conclusory statements, Relators fail to meet their burden.[26]

---

[26] Notably, unlike similar PPA cases, Relators do not allege that the Law Schools annually re-certified the PPAs, or that the actual claims, i.e., the loan applications, included certifications of the Law Schools' compliance with DOE regulations or eligibility for the funds. Compare Jallali v. Nova Se. Univ., Inc., 486 F. App'x 765, 766 (11th Cir. 2012) (alleging that the institution certified compliance "each time it request[ed] federal student aid payments"); Urquilla-Diaz, 780 F.3d at 1046 (addressing allegations that institution "falsely assert[ed] in a yearly letter that it was in compliance with the ban on recruitment-based incentive compensation"); United State ex rel. Bernier v. Infilaw Corp. (Bernier II), 347 F. Supp. 3d 1075, 1080 (M.D. Fla. 2018) (summarizing allegations that an institution's "entry into the PPA and annual recertification of compliance amounts to presenting a false claim and submitting a false record"). Here, as alleged in the Third Amended Complaint, Relators rely solely on PPAs of unspecified date and number to establish falsity.

As to the PPAs executed at FCSL and CSL, Relators do not allege when they were signed, who prepared them, what they said, or who signed them. Relators also provide no allegations to suggest that they have or had any first-hand knowledge about the PPA certification process at either of those schools. Indeed, Relators rely merely on "information and belief" to contend that FCSL and CSL executed PPAs that were similar to those of ASLS. See TAC ¶ 34. Perhaps even more troublesome is the fact that despite Lorona's "unparalleled access" to the PPAs at ASLS, the allegations in the Third Amended Complaint regarding those documents are similarly vague. While Relators do identify ASLS President Scott Thompson as the signer of the PPAs, they still fail to allege who prepared them, what the documents said, or when they were signed. See TAC ¶ 32. Relators broadly maintain that "ASLS and Infilaw leadership and staff" had "full knowledge" that the regulations and requirements of the PPA were "regularly being violated" but fail to identify the persons to whom they are referring, or explain when or how these unidentified individuals acquired this knowledge. Id. ¶ 33.

Critically, because the Court has no information about when the PPAs were signed, the Court cannot determine whether the alleged regulatory violations began before or after the Law Schools entered those agreements. Thus, there are no facts to support the inference that at the time ASLS executed any PPA it was not complying, or intended not to comply, with DOE regulations. The Third Amended Complaint is devoid of any particularized allegations from which to plausibly infer that at the time the PPAs were signed, whenever that was, the persons who prepared and signed the PPAs, whoever they were, made certifications of compliance (or promises to comply) that were false at the time they were made. See United States ex rel. Brooks v. Stevens-Henager College, 305 F.

Supp. 3d 1279, 1312 (D. Utah 2018) ("But Relators do not identify the dates on which any of these schools executed their PPAs.  Without more, the court has no basis to determine whether any of the promises these schools made in their PPAs were 'false when made.'"); United States ex rel. Barrett v. Beauty Basics, Inc., No. 2:13-CV-1989-SLB, 2015 WL 3650960, at *3 (N.D. Ala. June 11, 2015); see also Jallali v. Nova Se. Univ., Inc., 486 F. App'x 765, 767 (11th Cir. 2012); United States ex rel. Pilecki-Simko v. Chubb Inst., 443 F. App'x 754, 760-61 (3d Cir. 2011).  Because Relators have not pled with any particularity the purported false certifications of compliance, their allegations of mere regulatory violations are not sufficient to state a claim under the FCA.  See Urquilla-Diaz, 780 F.3d at 1052 ("'[M]ere regulatory violations do not give rise to a viable FCA action'; instead '[i]t is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.'" (emphasis and second alteration in original) (quoting Hendow, 461 F.3d at 1171)).

Nevertheless, Relators contend that they need not satisfy the particularity standard because they have "insider status" that provides sufficient "indicia of reliability" to satisfy Rule 9(b).  See Response to Infilaw at 7-9.  Indeed, the Eleventh Circuit recognizes that "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims."  United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014); Chase, 723 F. App'x at 788.  In contrast, relators "without first-hand knowledge of the defendants' billing practices" and corporate outsiders are unlikely to have a sufficient basis for their allegations.  Id.  Regardless, "[a]t a minimum, a plaintiff-relator must explain the basis for

her assertion that fraudulent claims were actually submitted." Mastej, 591 F. App'x at 704; Chase, 723 F. App'x at 789 (explaining that "the basis of [the relator's] direct knowledge must be pled with particularity"). "It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge." Mastej, 591 F. App'x at 704-05 (internal citations omitted); United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1302-03 n.4 (11th Cir. 2010) (finding insufficient indicia of reliability where office manager alleged that she "'found [unspecified] documentation' and 'discovered' or 'learned' that the defendants had submitted false claims").

Lorona maintains that she has personal knowledge to support her allegations that false PPAs were submitted to the government based on her positions as an administrative assistant to the general counsel in 2009, financial aid representative in 2010, assistant director of financial aid in 2011, and accounting manager in 2011. See TAC ¶ 22. However, Lorona fails to allege the basis of her knowledge with particularity. Lorona's knowledge of the PPAs is premised solely on the following allegation: "PPAs were completed and executed in the financial aid department and the President's Office, giving Relator Lorona unparalleled access to the documents and the process under which they were certified." Id. ¶ 32. However, allegations regarding what this process was, whether Lorona had any direct involvement in it, or whether she spoke to anyone who did are noticeably absent. Significantly, these are details which, given her "unparalleled access," should have been known to Lorona and as such, their absence from the Third Amended Complaint is particularly concerning. See Keeler, 568 F. App'x at 802 ("Most concerning, however, is that many of the details that were required to have been pleaded and should

have been known to Relator are absent from the Complaint."). Indeed, because Relators do not allege when the PPAs were prepared and signed, it is not even apparent whether Lorona was working for ASLS during the relevant time period. Here, Lorona has done no more than state baldly that she was aware of ASLS's PPA certification process. This is not enough. See Mastej, 591 F. App'x at 704-05; Sanchez, 596 F.3d at 1303 n.4. "Consequently, in light of the paucity of details, the Court has no basis to find that Relator's claims are more likely to be reliable rather than purely speculative or as the court in Clausen warned, spurious." Keeler, 568 F. App'x at 802 (citing Clausen, 290 F.3d at 1313 n.24). Accordingly, Relators' claims premised on the PPAs are due to be dismissed for failure to adequately allege the requisite falsity under the standards of Rule 9(b).

In addition, for the reasons that follow, even if Relators' general allegations about the PPAs were sufficient, Relators also fail to allege the underlying violations with the requisite particularity. See id. at 793 ("'Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the circumstances constituting fraud or mistake that must be pled with particularity pursuant to Rule 9(b).'" (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004))). Specifically, Relators fail to allege factual allegations supporting an inference that the Law Schools actually violated the 90/10 Rule, made substantial misrepresentations in violation of 34 C.F.R. § 668.71, or made misleading statements to the ABA Accreditation Board. Absent allegations showing a violation of any of these regulations, the Court cannot infer that the certifications of compliance in the PPAs were false

### 1. The 90/10 Rule

To show that the Law Schools' certifications of compliance with the 90/10 Rule were false, Relators must "allege with particularity that [the Law Schools] received more than 90 percent of [their] revenue from Title IV funds or that [they] received less than 10 percent of [their] revenue from non-Title IV funds." See Urquilla-Diaz, 780 F.3d at 1056. Relators fail to do so. In the Third Amended Complaint, Relators describe three ways in which the Law Schools attempted to manipulate their Title IV and non-Title IV revenues—institutional loans, the myBAR program, and the check exchange. Relators' allegations describing these purported schemes lack adequate detail or other indicia of reliability. Nevertheless, even accepting the allegations as true, "absent allegations about [each Law Schools'] total revenue," the fact that the Law Schools attempted to manipulate their revenues alone "does not make it plausible (as opposed to merely possible) that the school[s] violated the 90/10 rule." See id. at 1056; see also Brooks, 305 F. Supp. 3d at 1312-13.

As to the institutional loan scheme, Relators allege that the Law Schools offered loans to low-credit students. According to Relators, the Law Schools made no serious attempts to collect those loans, and as such, it was improper for the Law Schools to count the net value of those loans as non-Title IV revenue. However, Relators' general allegations as to the existence of this institutional loan scheme are unsupported by any particularized facts about the students with low-credit who received such loans and were not subject to collections, the dates such loans were issued, the amounts of any of these loans, or the number of such loans each Law School issued. Critically, Relators also fail to allege the total amount of allegedly improper non-Title IV revenue derived from these loans or the proportional relationship of this revenue to the total amount of the Law Schools'

revenues overall. Indeed, Relators include data on the Law Schools' reported 90/10 percentages for the 2009-2010, 2012-2013, and 2013-2014 funding years, but omit this information as to 2011-2012, the year the Law Schools allegedly used the institutional loan scheme to manipulate their revenue. See TAC ¶¶ 40-42, 48, 51. Relators allege that the Law Schools reported the receivables from these institutional loans to the DOE as non-Title IV income and that this "created the illusion that the [Law Schools] derived a much higher percentage of their income from non-Title IV sources so that the [Law Schools] appeared to be well in compliance with the 90/10 Rule." Id. ¶ 51. But Relators do not provide any particularized allegations as to what the reported percentages were, or critically, what those percentages would or should have been without the institutional loan scheme. See Brooks, 305 F. Supp. 3d at 1312 n.23.

Instead, Relators allege in a broad and conclusory manner that "Lorona was aware of and viewed internal calculations of revenue under the 90/10 Rule (as opposed to the publicly reported data), most of which demonstrated that ASLS was consistently in violation of the 90/10 Rule." See TAC ¶ 58. This allegation is entirely too vague and conclusory to satisfy ordinary pleading requirements much less the specificity required by Rule 9(b). What were these documents? When did she see them and to what time periods did they pertain? How did she obtain them? Were these finalized numbers or merely projections? If "most" showed violations but not all, what was the difference? Lorona further alleges that she was "provided documents demonstrating a violation of the 90/10 Rule and instructed to convert some Title IV/HEA loans into [institutional loans] for the sole purpose of converting revenue to create the appearance of compliance with the 90/10 Rule," but does not describe the details of the purported violation, when this incident happened, who

it was that gave her this directive, or whether she complied with it.  Id. ¶ 58.  And, most egregiously, Relators allege only "upon information and belief" that "the same documents existed at the other [Law] Schools."  Id.  The mere allegation that Lorona saw unspecified documents "most of which" she contends demonstrated a violation of the 90/10 Rule as to ASLS, which she believes exist at FCSL and CSL, does not provide sufficient indicia of reliability to satisfy the standards of Rule 9(b) with respect to any of the Law Schools.  See Sanchez, 596 F.3d at 1303 n.4.  Accordingly, the Court finds that Relators have not alleged with particularity that the institutional loan scheme actually resulted in violations of the 90/10 Rule.  See Urquilla-Diaz, 780 F.3d at 1056; Brooks, 305 F. Supp. 3d at 1312.

Relators' allegations as to the myBAR program are similarly insufficient.  Relators assert that ASLS created the myBAR program just prior to the February 2012 bar exam as a potential solution to the 90/10 problem.  According to Relators, ASLS could not properly count the myBAR fees as non-Title IV revenue because the program was inadequate to prepare students for the bar exam.  See TAC ¶¶ 69-70.  However, Relators offer only "information and belief" that any of the Law Schools actually counted the myBAR fees as non-Title IV revenue.  Id. ¶ 68.  Moreover, Relators provide no specific allegations as to the amount of revenue the Law Schools earned as a result of this program, the relevant time periods during which each Law School reported this income, or the amount or percentage of total revenues derived from myBAR program fees.  Thus, as with the institutional loans, Relators fail to allege particularized facts supporting even an inference that the Law Schools actually violated the 90/10 Rule.[27]

---

[27] Moreover, Relators' allegations that the myBAR program was so inadequate as to render it outside the scope of 34 C.F.R. § 668.28(a)(3)(iii) are exceedingly thin.  Notably, Relators' allegations focus on the hurried way ASLS implemented the program less than three months prior to the February 2012 bar exam.  See TAC ¶¶ 62-64.  Yet, 63.8% of ASLS graduates passed this exam, and 73.1% passed in July 2012.

Relators' allegations regarding the Barbri check exchange program are slightly more detailed, but again fall short of alleging an actual violation of the 90/10 Rule. Specifically, Relators allege that ASLS "received checks for approximately 70 graduates representing approximately $184,000," and that "ASLS illegally counted a large and material amount of this money as non-Title IV income in its 2012 annual audit submitted to the DOE." See TAC ¶ 110. Significantly, however, Relators do not allege ASLS's total revenues in 2012, the specific data reported in the 2012 annual audit, or the proportion of ASLS's overall revenues encompassed by the check exchange. Thus, while it is possible that ASLS would have been in violation of the 90/10 Rule absent the inclusion of funds from the check exchange and other programs, one cannot plausibly infer such a violation from the non-conclusory factual allegations contained in the Third Amended Complaint. See Urquilla-Diaz, 780 F.3d at 1056. Likewise, ASLS alleges that in 2013, "Barbri sent refund checks for approximately 63 former students to ASLS and ASLS was successful in convincing many of these students to participate in the check exchange process. These checks from these students were falsely reported by Infilaw as non-Title IV revenue on its 2013 annual audit submitted to the DOE." Id. ¶ 112. Relators do not allege the amount of funds garnered from these approximately 63 students, but presumably, it is some amount less than the $184,000 generated in 2012. In the Third Amended Complaint Relators do provide some information regarding ASLS's revenues during the 2012-2013 funding year, specifically that "ASLS reported an 87.70%/12.30% split with Title IV/HEA revenue of

Relators do not allege the overall state averages for those years, nor do they allege what percentage of myBAR students passed the bar exam as compared to students enrolled in other bar preparation courses. Instead, Relators' sole factual support for their contention that the myBAR program was inadequate are internal statistics about ASLS's predicted bar passage rate for the July 2015 bar exam. Id. ¶ 69. Relators' reliance on data from 2015 is puzzling given that by that point ASLS was using "the same Barbri materials and lectures that were used for Barbri courses offered at the other law schools in Arizona." Id. ¶¶ 84, 116.

$60,030,378.00." Id. ¶ 41. Thus, the revenue collected and reported from the check exchange program in 2013 was less than .27% of ASLS's total revenues, and as such, less than the amount necessary to demonstrate a violation of the 90/10 Rule based on the numbers alleged in the Third Amended Complaint.[28] Moreover, Relators include no allegations regarding the check exchange process, if any, at CSL and FCSL, nor the amount of any revenues generated from this program at those schools.

Accordingly, Relators have failed to allege sufficient particularized facts to make a plausible showing that absent the purportedly improper accounting schemes, the Law Schools would have violated the 90/10 Rule. Thus, Relators allegations are insufficient to raise the inference that the Law Schools' certifications of compliance with that Rule were false. Accordingly, to the extent Relators' claims are premised on false certifications of compliance, or promises to comply, with the 90/10 Rule in the PPAs, those claims fail. See Brooks, 305 F. Supp. 3d at 1312-13.[29]

---

[28] If $60,030,378.00 represents 87.70% of ASLS's total revenue, then ASLS's total revenue was $68,449,689.90, and the Court calculates that $184,000 represents 0.268% of that amount.

[29] To the extent Relators premise their claim on allegedly false statements in the 2012 and 2013 annual audits submitted to the DOE, this theory is also unavailing. See Response to Infilaw at 22; see also TAC ¶¶ 110, 112. In their Response, Relators attempt to distinguish their claims from Urquilla-Diaz and Brooks by arguing that the annual audits constitute "false claims to the United States, in violation of the FCA." See Response to Infilaw at 22. Of course, the audits are not themselves requests for funds, and therefore, like the PPAs, are not "claims" within the meaning of the FCA. To the extent Relators' theory is that these audits constitute false records material to false claims, their allegations are still insufficient. Relators do not identify who performed the audits, the specific false statements contained in them, or the basis for Relators' knowledge of their contents. And regardless, Relators fail to allege facts demonstrating that the purportedly false statements were "material" to the government's decision to issue the student loan funds. See 31 U.S.C. § 3729(a)(1)(B). Indeed, as stated above, Relators have not shown that absent the purportedly improper activity, the audits would have shown a violation of the 90/10 Rule rendering the Law Schools ineligible for federal financial aid. Stated another way, Relators do not explain how the false statements in the audits render the subsequent student loan requests "false," and false statements alone, absent the existence of a false claim, do not violate the FCA. See Brooks, 305 F. Supp. 3d at 1314 (rejecting theory that would "impose liability for any claims for payment submitted after the Colleges made any false statement, whether in a contract or otherwise"); see also Urquilla-Diaz, 780 F.3d at 1056 (explaining that while lying is reprehensible, "it violates the False Claims Act only if the 'false statements ultimately led the government to pay amounts it did not owe'" (internal quotation omitted)); Bernier, 347 F. Supp. 3d at 1087 (finding that the second amended

## 2. The Unlock Potential program

Relators also allege that the Law Schools violated the DOE regulation which prohibits institutions from making substantial misrepresentations. <u>See</u> 34 C.F.R. § 668.71. Specifically, Relators allege that the Law Schools substantially misrepresented their bar passage rates by paying students to defer taking the bar exam through the Unlock Potential program. Based on these allegations, Relators maintain that the Law Schools falsely certified compliance with this DOE regulation in the PPAs.

Relators maintain that the Unlock Potential program "is an outright attempt to deceive the ABA accrediting board, DOE, incoming students, existing students, and graduating students by attempting to fallaciously increase bar passage percentages." TAC ¶ 181. However, Relators fail to allege with any particularity what false statements were made, when they were made, or who made them. Relators imply that ASLS paid students to defer taking the July 2014 and February 2015 bar exams, as well as "subsequent bar exams" in order to manipulate its bar passage rates. <u>See id.</u> ¶¶ 184-86, 189. Relators appear to contend that as a result of this program, the Law Schools' statements about their bar passage rates were misleading, but Relators fail to identify any particular statement that they contend was misleading. Based on Relators' own allegations, it does not appear that the Law Schools were concealing the existence of this Unlock Potential program from the public. <u>See id.</u> ¶ 189 (alleging that ASLS Dean Mays told media outlets that she was not asking students not to take the bar exam, but "merely advising them that they could enroll in the [Unlock Potential] program"). And, even if the Unlock Potential program did constitute an improper attempt to manipulate bar passage statistics, Relators point to no

---

complaint "as a whole fails to plead with particularity facts to provide a plausible connection between these three alleged PPA violations and DOE's decision to award [the institution] federal funding-again").

allegations suggesting that the existence of this program actually had a material impact on bar passage rates. Whether the Law Schools published substantially misleading information regarding its bar passage rates depends entirely on what was said, when it was said, in what context, what was or was not disclosed about the Unlock Potential program, and the impact the program did or did not have on the bar passage statistics. None of this information is alleged in the Third Amended Complaint. Therefore, Relators' conclusory allegations are insufficient to show that the Law Schools made any substantial misrepresentations regarding their bar passage rates, and therefore Relators have not shown that the certifications of compliance in the PPAs with this regulation were false.[30] Accordingly, Relators' claims premised on violations of 34 C.F.R. § 668.71 are due to be dismissed.

## B. Accreditation

Relators also contend that as a result of the Unlock Potential program, the Law Schools misrepresented their bar passage rates to the ABA Accreditation Board. As the Eleventh Circuit recognized in Urquilla-Diaz, "[m]aking false statements to an accreditation agency could lead to a False Claims Act violation because whether a school is accredited is material to the government's decision to disburse Title IV funds to the school (or its students)." See Urquilla-Diaz, 780 F.3d at 1056. However, "[m]aking false statements to

---

[30] Significantly, Relators have also failed to meet their burden of alleging that the Law Schools' purported false certifications of compliance with 34 C.F.R. § 668.71 were material to the government's decision to continue providing financial aid. See Escobar, 136 S. Ct. at 2002 ("[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."); Rutledge v. Aveda, No. 2:14-cv-00145-AKK, 2015 WL 2238786, at *9 (N.D. Ala. May 12, 2015) ("Here, [Relator] alleges the [institute] certified its compliance with the program, but she never specifically alleges how and why noncompliance with the regulations allegedly violated would prevent payment by the government."). Indeed, the Supreme Court specifically recognized that plaintiffs in FCA cases must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by . . . pleading facts to support allegations of materiality." Escobar, 136 S. Ct. at 2004 n.6. This, the Relators have not done as to this claim.

an accreditation agency does not expose a school to liability under [the false records provision] unless the statements were essential to the school having received (or maintained) its accreditation."  Id.

Here, Relators fail to allege with Rule 9(b) particularity any material false statements to the ABA Accreditation Board.  Instead, Relators vaguely allege that:

> ABA accreditation documents were prepared by the General Counsel of ASLS.  Due to her initial position as executive assistant to the General Counsel, Lorona witnessed the accreditation process, giving her unparalleled access to the preparation and submission of such documents. In that manner, she possesses inherent indicia of reliability that such accreditation documents, with errors and misrepresentations, were submitted to the ABA, in violation of federal regulations.

See TAC ¶ 204.  Despite this "unparalleled access," Lorona fails to include any specific factual information about the contents of these documents, the specific errors and misrepresentations purportedly contained within them, or when the documents were prepared and submitted to the ABA.  Id.  Notably, Lorona alleges that she "witnessed the accreditation process" due to her "initial position as executive assistant to the General Counsel."  Id.  However, Lorona only served in that role from November 2009 to some point in 2010.  Id. ¶ 22.  According to the Third Amended Complaint, the Law Schools' efforts to "game" the bar exam statistics through the Unlock Potential program did not begin until May 2014.  Id. ¶ 182.  Thus, Relators provide no "indicia of reliability" to support their contention that the accreditation documents contained misrepresentations about the Unlock Potential program.  Indeed, as there are no allegations as to when the accreditation process during which the Law Schools allegedly made false representations took place, it is entirely unclear whether Lorona worked in the General Counsel's office during the relevant time period.

Moreover, while Relators allege in a conclusory manner that the Law Schools "[g]amed" the bar passage statistics, they do not allege what statistics were reported to the ABA, when they were reported (whether before or after implementation of the Unlock Potential program), what the "actual" statistics would have shown, and whether the ABA would have denied accreditation had it known the true facts. Thus, Relators have failed to plead "particular facts that provide a plausible connection between [ASLS's] allegedly false statements to the [ABA Accreditation Board] and the agency's decision to accredit" the Law Schools. See Urquilla-Diaz, 780 F.3d at 1056. As such, Relators have not alleged sufficient information to show that Relators' false statements were material to the accreditation decision and "'ultimately led the government to pay amounts it did not owe.'" See id. (quoting Hopper, 588 F.3d at 1329). Accordingly, Relators' claims premised on purported misrepresentations to the ABA Accreditation Board are also due to be dismissed.

As to Counts I, II, and IV, the Court finds that Relators have failed to allege the requisite "'facts as to time, place, and substance of the defendant's alleged fraud, [and] the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" See Corsello, 428 F.3d at 1012 (alteration in original) (quoting Clausen, 290 F.3d at 1310). As explained above, Relators fail to allege these details both as to the specific false statements or certifications at issue, and as to the underlying regulatory violations.[31] Moreover, the Relators have failed to plead with particularity sufficient indicia

---

[31] The Court further notes that, as to the presentment claim, Relators fail to include any particularized facts as to the actual presentment of the purported false claims—the student loan requests—to the government, as is required to state a presentment claim in the Eleventh Circuit. See Jallali, 486 F. App'x at 767 ("[Relator's] complaint does not allege facts identifying the time, place, or substance of the allegedly fraudulent claims for payment."); Rutledge, 2015 WL 2238786, at *10-12; Beauty Basics, 2015 WL 3650960, at *2, *4 ("[P]laintiffs have not stated with particularity the facts surrounding any loan applications."); compare Urquilla-Diaz, 780 F.3d at 1055 n.13 (referencing "specific allegations about three students who applied for and received Title IV funds to attend classes" at the institution). Nonetheless, because Relators' claims fail for the reasons set forth above, the Court has assumed, without deciding, that Relators' allegations regarding

of reliability to support their claims.  Accordingly, the Court will dismiss Counts I, II, and IV of the Third Amended Complaint for failure to comply with Rule 9(b).

## VII.    Count III (Conspiracy) and Count V (Reverse False Claim)

Because Relators fail to adequately allege the submission and payment of false claims in Counts I, II and IV, their reverse-false claim cause of action fails as well "because it is based on false claims having been paid that Defendants failed to repay."  See Mastej, 591 F. App'x at 706 n.20.  In like fashion, because the Relators fail to adequately allege a viable FCA claim under the presentment or false record provisions, their claim that the Infilaw Defendants conspired with Barbri to violate the FCA necessarily fails.  See United States ex rel. Chase v. LifePath Hospice, Inc., Case No. 8:10-cv-1061-T-30TGW, 2016 WL 5239863, at *9 (M.D. Fla. Sept. 22, 2016); United States ex rel. Potra v. Jacobson Cos., Inc., No. 1:12-cv-01600-WSD, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) (citing Vigil v. Nelnet, Inc., 639 F.3d 791, 801 (8th Cir. 2011) ("Because the Complaint fails to state claims under [the presentment and false record provisions], it likewise fails to state an actionable conspiracy claim . . . .")); see also John T. Boese, Civil False Claims and Qui Tam Actions § 2.01[E][4] (4th ed. & Supp. 2019) ("Where an underlying FCA allegation has been found to be without merit or otherwise not viable, a Section 3729(a)(3) conspiracy claim based on that underlying conduct must also be dismissed.").  Thus, Relators' conspiracy claim is also due to be dismissed.  Accordingly, the Court concludes that the Barbri and Infilaw Motions are due to be granted in their entirety.  In light of the foregoing, it is

---

Lorona's involvement in the submission of COD requests, see TAC ¶¶ 23-24, as well as the allegations describing the Law Schools' reported Title IV revenue, see TAC ¶¶ 40-42, provide sufficient indicia of reliability that the Law Schools' submitted, or caused to be submitted, requests for federal student loan funds under Title IV/HEA programs during the relevant time period.

**ORDERED**:

1. Defendant Barbri, Inc.'s Dispositive Motion to Dismiss and Memorandum in Support (Doc. 44) is **GRANTED**.

2. Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, and Charlotte School of Law, LLC's Omnibus Motion to Dismiss Third Amended Complaint and Supporting Memorandum of Law (Doc. 56) is **GRANTED**.

3. The Clerk of the Court is **directed** to enter judgment in favor of Defendants Infilaw Corporation, Arizona Summit Law School, LLC, Florida Coastal School of Law, Charlotte School of Law, and Barbri Inc. and against Plaintiffs Paula C. Lorona and Reid Potter.

4. The Clerk of the Court is further **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 12th day of August, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:
Counsel of Record